ZIGGITY SYSTEMS, INC.

v.

**VAL WATERING SYSTEMS; Vallorbs Jewel Co, Inc.; Jeanette Steudler, in her capacity as executrix and representative of the estate of Frederick W. Steudler, Sr.; and Frederick W. Steudler, Jr.**

Civ. A. No. 89–625.

United States District Court, E.D. Pennsylvania.

Sept. 27, 1990.

On Motion For Reconsideration Nov. 14, 1990.

---

**8.** § 8364 was repealed effective December 19, 1990. See P.L. 834, No. 198, § 306.

John F. McNulty and Alex R. Sluzas, E. Arthur Thompson, Paul & Paul, Philadelphia, Pa., for defendants.

Wayne A. Graver, Lavin, Coleman, Finarelli & Gray, Philadelphia, Pa., David R. Melton, Ryan M. Fountain, Barnes & Thornburg, South Bend, Ind., for plaintiff.

FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF
LAW, AND ORDER

HUYETT, District Judge.

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ................................................ 762

**FINDINGS OF FACT** .................................................. 763
 I. Parties ......................................................... 763
 II. Patents-in-Suit ................................................ 763
 III. Eldon Hostetler, The Inventor ................................. 764
 IV. Development of the Ziggity Poultry Watering System ............ 765
 V. Patent Infringement ........................................... 771
 VI. Willful Infringement .......................................... 775
 VII. Liability of the Defendants ................................... 775
 VIII. Patent Validity .............................................. 776
 A. 35 U.S.C. § 103 (Obviousness) ............................... 776
 B. 35 U.S.C. § 102 (On Sale Bar) ............................... 779
 C. Inequitable Conduct ......................................... 780
 D. 35 U.S.C. § 112 ............................................. 780
 E. 35 U.S.C. § 132 (New Matter) ............................... 781
 IX. Damages ....................................................... 781
 X. Breach of Contract Counterclaims .............................. 782
 A. The Settlement Agreement .................................... 782
 B. The Oral Agreement .......................................... 783

**DISCUSSION** ........................................................ 783
 I. Patent Infringement Analysis .................................. 783
 A. Scope of the Claims at Issue ................................ 783
 1. Scope of Claim 19 of the '345 patent ..................... 784
 2. Scope of the remaining claims at issue ................... 785
 B. Literal Infringement ........................................ 786
 1. Literal infringement of Claim 19 ......................... 786
 2. Literal infringement of the remaining claims ............. 789
 C. Infringement Under the Doctrine of Equivalents .............. 790
 D. Willful Infringement ........................................ 792
 E. Liability of the Defendants ................................. 794
 1. Val ...................................................... 794
 2. Vallorbs ................................................. 794
 3. Individual defendants .................................... 795
 II. Patent Validity Analysis ...................................... 796
 A. Invalidity Under 35 U.S.C. § 103 (Obviousness) .............. 797
 1. Scope and content of the prior art ....................... 798
 2. Level of ordinary skill in the art ....................... 799
 3. Differences between the prior art and the claims at issue ........ 800
 4. Secondary considerations ................................. 802
 5. Conclusion with respect to the defense of obviousness ........... 807
 B. Invalidity Under 35 U.S.C. § 102 (On Sale Bar) .............. 808
 C. Invalidity Because of Inequitable Conduct ................... 812
 1. Ziggity drinker 2 ........................................ 812
 2. Ziggity drinker 3 ........................................ 813
 3. Ziggity's sale of "trigger action" drinkers to Cap-It-All in December 1978 ........................................... 813
 4. Ziggity's interrogatory answers and answer to request for production of documents ................................. 814
 5. Dutch Search Report and the Boegli Patent ................ 814
 6. British Search Report and the Wilmot Patent .............. 815
 D. Invalidity Under 35 U.S.C. § 112 ............................ 816
 E. Invalidity Under 35 U.S.C. § 132 (New Matter) .............. 818
 III. Damages Analysis ............................................. 819

 A. Lost Profits ...................................................... 820
 1. Lost profits as a result of lost sales ............................ 820
 2. Lost profits as a result of price erosion ......................... 824
 B. Reasonable Royalty .............................................. 824
 C. Sales Base....................................................... 829
 D. Prejudgment Interest............................................. 830
 E. Increased Damages .............................................. 831
 F. Attorney Fees ................................................... 832
 G. Summary of Damages ............................................ 832
 IV. Analysis of Breach of Contract Counterclaims......................... 833
 A. The Settlement Agreement ........................................ 833
 B. The Oral Agreement .............................................. 835

CONCLUSIONS OF LAW ................................................. 837

APPENDIX ............................................................. 839

---

## FINDINGS OF FACT

### I. PARTIES

1. Plaintiff Ziggity Systems, Inc. ("Ziggity") is a corporation organized and existing under the laws of the State of Indiana and has its principal place of business located at 12456 Industrial Parkway East, Middlebury, Indiana 46540. (Stipulated).

2. Defendant Val Products, Inc. ("Val") is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and has its principal place of business located at 2599 Old Philadelphia Pike, Bird-in-Hand, Pennsylvania 17505. (Stipulated).

3. Defendant Vallorbs Jewell Company is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and has its principal place of business located at 2599 Old Philadelphia Pike, Bird-in-Hand, Pennsylvania 17505. (Stipulated).

4. Defendant Frederick W. Steudler, Sr. (deceased) was an individual residing at 138 Musser Avenue, Lancaster, Pennsylvania 17603, and was an officer and director of both Val and Vallorbs. (Stipulated).

5. Defendant Jeanette Steudler, named in her capacity as Executrix for the Estate of Frederick W. Steudler, Sr., is an individual residing at 138 Musser Avenue, Lancaster, Pennsylvania 17603, and is an officer and director of both Val and Vallorbs. (Stipulated).

6. Defendant Frederick W. Steudler, Jr. is an individual residing at 311 Poplar Avenue, New Providence, Pennsylvania 17660, and is an officer and director of both Val and Vallorbs. (Stipulated).

### II. PATENTS–IN–SUIT

7. The patents-in-suit are United States Letters Patent No. 4,637,345 ("the '345 patent") and United States Letters Patent No. 4,491,088 ("the '088 patent"). (Stipulated).

8. The '088 patent issued January 1, 1985 on Application Serial No. 520,099, filed April 10, 1981. The sole named inventor was Eldon Hostetler, Vice President of Ziggity. Application Serial No. 520,099 was a continuation of United States Patent Application Serial No. 113,607, filed January 21, 1980. United States Letters Patent No. 4,284,036 ("the '036 patent") issued on Application Serial No. 113,059 on August 18, 1981. That portion of the 17 year term of the '088 patent subsequent to August 18, 1998, the expiration date of the '036 patent, was disclaimed during the prosecution of Application Serial No. 520,099 in order to overcome the Examiner's rejection over the already-then issued '036 patent based on "double patenting." On April 16, 1985, reexamination of the '088 patent was requested. As a result of the reexamination proceeding in the United States Patent and Trademark Office, claims 1 and 2 of the '088 patent were cancelled, and new

claims 3, 4, and 5 were added and issued on March 31, 1987 as Reexamination Certificate No. B1 4,491,088. (Stipulated).

9. The '345 patent issued January 20, 1987 on Application Serial No. 644,612, filed August 27, 1984. Application Serial No. 644,612 was a continuation of application Serial No. 520,099. (Stipulated).

10. Ziggity has alleged infringement of claims 1–13 and 19–24 of the '345 patent and claims 3–5 of the '088 patent. (Stipulated).

11. Claims 14–18 of the '345 patent are not at issue in this action. (Trial Transcript 2/16/90 at page 193, lines 5–8).

12. The '036 patent is not at issue in this litigation. (Trial Transcript 2/20/90 at page 94, lines 21–25).

13. All ownership interest in the '088 patent and the '345 patent have been assigned to Ziggity by Eldon Hostetler. (Defendants' Exhibit 281).

## III. ELDON HOSTETLER, THE INVENTOR

14. Eldon Hostetler is the sole inventor of the patents-in-suit. (Trial Transcript 2/13/90 at page 101, line 15 thru page 102, line 1).

15. Eldon Hostetler was born in an Old Order Amish home on a 280–acre farm near Shipshewana, Indiana in 1923. (*Id.* at page 25, lines 16–23).

16. Eldon Hostetler's formal education concluded with the eighth grade. (*Id.* at page 25, lines 21–22).

17. He worked on the family farm until he was 21 years old. (*Id.* at page 25, lines 24–25).

18. In 1944 at 21 years of age, he went to work for Creighton Brothers of Warsaw, Indiana. At that time, Creighton Brothers was the largest poultry farm in the world. (*Id.* at page 25, lines 24–25; page 26, lines 13–15 & 21–22).

19. While employed at Creighton Brothers, Eldon Hostetler took a short course in poultry at Purdue University. (*Id.* at page 27, lines 5–6).

20. At Creighton Brothers, Eldon Hostetler was responsible for selection and blood testing of poultry. (*Id.* at page 27, lines 3–9).

21. After Eldon Hostetler left Creighton Brothers, he went into a partnership with Dr. Pringle, a large broiler grower who wanted to get into the hatchery business. (*Id.* at page 28, lines 5–10).

22. Eldon Hostetler developed a new strain of poultry which later became known as the White Meatier. (*Id.* at page 29, lines 1–6).

23. In 1984, Eldon Hostetler started research on an automatic feeder. (*Id.* at page 29, line 10).

24. Eldon Hostetler has been involved in research and development of poultry feeding and watering equipment since 1948. (*Id.* at page 29, lines 10–13).

25. Eldon Hostetler is the sole or co-inventor on close to 50 patents relating to poultry feeding and watering equipment. (*Id.* at page 29, lines 1–19).

26. From 1956 to 1976, Eldon Hostetler was employed by Chore Time, which is the largest poultry feeding and watering equipment manufacturer in the world. (*Id.* at page 30, lines 1–19).

27. Eldon Hostetler's responsibilities at Chore Time were to research and develop poultry feeding and watering products. (*Id.* at page 31, lines 6–8).

28. Eldon Hostetler considers the centerless auger system developed for Chore Time and the nipple watering system developed for Ziggity to be his most significant developments. (*Id.* at page 29, lines 18–25).

29. In 1976, Eldon Hostetler's wife was stricken with cancer, and he terminated his employment with Chore Time to take care of his wife's health needs. (*Id.* at page 30, line 24 thru page 31, line 2).

30. During that time period, Eldon Hostetler commenced development of a new product and took steps to start a company to manufacture and distribute it. The product was a watering system for poultry. (*Id.* at page 31, lines 3–10.)

31. Ziggity was formed in 1977. (*Id.* at page 30, lines 19–23).

32. Eldon Hostetler has been the vice-president of Ziggity ever since the company's formation. (Plaintiff's Exhibit 23–78.)

## IV. DEVELOPMENT OF THE ZIGGITY POULTRY WATERING SYSTEM

33. Eldon Hostetler's first efforts to develop a poultry watering system centered around the development of a cup system. (Trial Transcript 2/13/90 at page 31, lines 11–15).

34. In 1977, cup, bell, and trough systems were the water systems of choice by poultry integrators and growers. (Trial Transcript 2/15/90 at page 11, lines 12–17).

35. Cup, bell, and trough systems are referred to as open systems. (Trial Transcript 2/15/90 at page 12, lines 8–11).

36. In an open system, water is supplied to a container such as a cup, bell, or trough drinker. Chickens drink from these open containers. (Plaintiff's Exhibit 51–B at page 10, lines 3–8).

37. Poultry cannot swallow. Poultry must trap water in their mouths and then raise their heads so that the water will run down their throats. (Trial Transcript 2/14/90 at page 70, lines 1–5).

38. Drinking in an upright position is more natural for a chicken and other fowl. (Trial Transcript 2/14/90 at page 70, lines 1–11).

39. In 1977, there were only a few nipple systems sold in the United States. The nipple systems sold at that time were manufactured in Europe. The Monoflo vertical action nipple with threaded attachment to the supply pipe is an example of the type of nipple drinker offered to the American poultry market in 1977. (Trial Transcript 2/13/90 at page 32, lines 4–12).

40. Nipple drinking systems are generally known as closed systems. (Trial Transcript 2/15/90 at page 12, lines 12–14).

41. In a closed watering system, water is supplied to the system through a regulator which controls the pressure of the water within the system. Nipple drinkers are attached directly to the water supply lines and the system is placed in a position with respect to the cage or floor so that chickens and other fowl get the water from the system by activating a triggering device on the nipple. (Trial Transcript 2/13/90 at page 33, line 22 thru page 34, line 24; page 38, lines 4–21).

42. The nipple systems offered in the United States market in 1977 did not perform well. They leaked and did not assure a constant and metered flow of water to birds when the nipple was triggered. (Trial Transcript 2/14/90 at pages 79–80; page 81, lines 16–23).

43. The poor performance of the nipple drinkers available in 1977 created negative good will for nipple systems in general. (Trial Transcript 2/15/90 at page 11, lines 17–22; page 16, lines 2–6).

44. Because of the resistance to nipple systems, Eldon Hostetler's initial development of a poultry watering system concentrated on the use of a cup waterer. (Trial Transcript 2/13/90 at page 32, lines 13–25; page 33, lines 1–4).

45. Eldon Hostetler had a 12,000 square foot chicken house at his home which he used for research and testing. (Trial Transcript 2/13/90 at page 32, lines 17–19).

46. He purchased tooling to make a sufficient quantity of his cup watering system devices to test them in his own chicken house. (Trial Transcript 2/13/90 at page 32, lines 13–16).

47. The cup watering system developed by Eldon Hostetler in 1976 and 1977 is described in United States Patent No. 4,185,590. (Defendants' Exhibit 5).

48. Eldon Hostetler's cup watering system was not successful because it was too costly to manufacture and, therefore, too expensive to succeed on the market. (Trial Transcript 2/13/90 at page 32, line 13 thru page 33, line 4).

49. One feature of Eldon Hostetler's cup watering system did, however, contribute to the success of the Ziggity nipple watering systems developed later. That feature was an arrangement allowing for the drinker to be snapped onto a saddle

affixed to the water supply pipe. (Trial Transcript 2/13/90 at page 33, lines 7–16; page 42, lines 8–22).

50. The snap-on feature allowed for easy removal and cleaning of drinkers and reattachment of the drinker to the supply line. (Plaintiff's Exhibit 36).

51. In 1977, John Fredericks, general manager of Creighton Brothers and a long-time friend and associate of Eldon Hostetler, suggested to Eldon Hostetler that he develop a nipple watering system which utilized the snap-on feature. (Trial Transcript 2/13/90 at page 33, lines 7–10).

52. Creighton Brothers had experimented with European style nipple drinkers. The European style nipple drinkers often became clogged, resulting in leaks or inadequate water supply to the chickens. (Trial Transcript 2/13/90 at page 33, lines 7–8).

53. Eldon Hostetler's cup watering system was of the active type. The chicken was required to peck at a trigger pin to release water into the cup. (Trial Transcript 2/13/90 at page 31, line 11 thru page 32, line 3).

54. The designer of a nipple watering system for poultry must keep several factors in mind. Principal among these factors are: Leaks must be avoided, a proper amount of water must be dispensed when the nipple is triggered, and the system must be "user friendly," i.e. it must be a system that the chickens, including day-old chicks or "peeps," can and will use. (Trial Transcript 2/13/90 at page 43, line 4 thru page 45, line 13).

55. In a nipple watering system, the birds must water themselves by activating the triggering device on the nipple drinker. (Trial Transcript 2/13/90 at page 45, lines 2–9).

56. There are two broad categories of chicken house systems using nipple drinkers. One is a cage system, and the other is a floor system. (Trial Transcript 2/13/90 at page 37, lines 4–23; Trial Transcript 2/14/90 at page 73, lines 1–9).

57. Cage systems are primarily used for laying hens, including pullets, which are laying hen chicks. In a floor system, the birds using the drinkers are broiler chickens. (Trial Transcript 2/15/90 at page 26, lines 22–23; page 27, line 24 thru page 28, line 3).

58. Broiler chicks are brought to a chicken house in flocks of 20,000 or more to be fed and watered for a period of approximately six and eight weeks, at which time the chickens are processed for human consumption. (Trial Transcript 2/15/90 at page 23, lines 13–19; page 29, lines 11–20).

59. Water leaks or an over-supply of water from a nipple drinker when triggered can cause a condition in chicken houses known as "wet pits." Wet pits cause disease, mortality, and condemnation of the chickens when processed. Additionally, wet pits increase the labor required to maintain a proper environment for the growth of broilers and the production of eggs in cage operations. (Trial Transcript 2/15/90 at page 16, lines 4–6; page 24, lines 12–24).

60. The designer of a nipple watering system for chickens must also be mindful of the labor and maintenance cost of the use of the system. Some broiler houses accommodate up to 100,000 chickens at a time. (Trial Transcript 2/13/90 at page 43, lines 10–14; Trial Transcript 2/14/90 at page 76, lines 10–16).

61. Eldon Hostetler's first nipple drinker consisted of the triggering device in his cup watering system with the cup having been removed and the nipple attached to the saddle on the water supply line. (Plaintiff's Exhibit 3, Drawing No. 1).

62. This first nipple drinker was made from an injection molded plastic body and had a machined stainless steel insert which defined the outlet and the seats for the head of the trigger pin and two ball valve elements. (Trial Transcript 2/13/90 at page 47, line 22 thru page 48, line 9).

63. Eldon Hostetler tested this first drinker in his own chicken house. The drinker was unsuccessful because dirt and other debris in the supply line got caught in the seats preventing an effective seal of the ball valves and the head of the trigger

pin, resulting in leaks. (Trial Transcript 2/13/90 at page 48, lines 10–21).

64. After recognizing the difficulties and failures of his first nipple drinker, Eldon Hostetler modified the drinker. His second prototype drinker was made with a solid injection molded plastic body. The second prototype drinker used a cup headed trigger pin, wherein the head of the pin was radiused on the bottom and flat on the top. The second prototype nipple drinker used only one ball valve. The cup headed trigger pin and the ball valve cooperated with seats integrally molded into the plastic body. (Plaintiff's Exhibit 3, Drawing No. 2; Trial Transcript 2/13/90 at page 48, line 22 thru page 50, line 24).

65. Nipple drinkers are used with very low water pressures. If the water pressure becomes too high, baby chicks cannot trigger the drinker against the force of the water pressure. Typically, water pressures in the nipple drinker system are less than one-half pound per square inch. (Trial Transcript 2/13/90 at page 34, line 25 thru page 35, line 18).

66. The water pressure is reduced through the action of the regulator attached to the system. (Trial Transcript 2/13/90 at page 39, lines 10–20).

67. Low water pressures are a factor that the designer of a successful nipple drinker must take into account. (Trial Transcript 2/13/90 at page 34, line 25 thru page 35, line 18).

68. Eldon Hostetler's third prototype nipple drinker used the same ball and trigger pin as used in his second prototype. However, the housing or body of the drinker was changed to provide for a cylindrical bottom to the valve chamber upon which rested a molded thermal plastic seat which was somewhat resilient. (Plaintiff's Exhibit 3, Drawing No. 3; Trial Transcript 2/13/90 at page 50, line 25 thru page 51, line 15).

69. The third prototype nipple drinker was considerably more successful than the previous two. However, sealing problems continued and Eldon Hostetler sought to correct those problems by redesigning the insert molded thermal plastic seat. (Trial Transcript 2/13/90 at page 136, lines 14–20).

70. In the fourth nipple drinker in the evolution of the Ziggity nipple drinker watering system, Eldon Hostetler modified the seat to provide for an upstanding circular leaf at the bottom of the seat. The modified seats provided a seal at the lower leaf where the cup head of the trigger pin rested and a seal at the upper leaf on the seat which cooperated with the ball valve element. (Plaintiff's Exhibit 3, Drawing No. 4; Trial Transcript 2/13/90 at page 51, lines 16–24).

71. The fourth drinker developed by Eldon Hostetler was successful and was the product sold commercially in large quantities in 1977 and 1978. It was referred to as the model No. 50 nipple drinker. (Plaintiff's Exhibit 23, at pages 3, 4, 7, and 31).

72. The No. 50 nipple drinker worked reasonably well in cage operations with adult laying hens. It was not as successful for baby chicks and start-grow pullets. (Plaintiff's Exhibit 23, at page 196).

73. Eldon Hostetler found that the shrinkage of the plastic in the molding process for the drinker body, or housing, resulted in the so-called "straight" outlet having a somewhat reverse taper. The restriction at the lower most point of the outlet could become clogged with material such as a grain of sand, which would hold the trigger pin in an up position resulting in a flow of water into the pits. Additionally, the restricted outlet made the trigger pin harder to activate. Eldon Hostetler made several changes to the molding process in an attempt to solve this problem. First, the molds were changed to allow for a two degree open taper of the outlet. This fifth change to the nipple drinker was helpful but not sufficient. (Trial Transcript 2/13/90 at page 53, line 18 thru page 54, line 16).

74. Next, the molds were further changed to allow for notches in the drinker body right below where the thermal plastic seat is inserted. This sixth change appeared to solve the problem created by shrinkage of the part in molding. (Plain-

tiff's Exhibit 3, Drawing No. 6; Trial Transcript 2/13/90 at page 55, lines 5–21).

75. When Eldon Hostetler started developing of his nipple drinker at the suggestion of his friend, John Fredericks, General Manager of Creighton Brothers, he had his attorney prepare a letter to Mr. Fredericks confirming that in April of 1977, Mr. Hostetler had installed prototype nipple drinker systems for testing by Creighton Brothers and that, from time to time, modifications to those nipple drinkers would be placed in the Creighton Brothers nipple drinker system for further testing. (Plaintiff's Exhibit 23, at page 1).

76. Although not documented in a letter, a similar arrangement was made with Mr. Hostetler's friend of 30 years, Frank Horwood, who was general manager of Cap–It–All Chore Time Poultry, Ltd. of Australia and New Zealand. (Trial Transcript 2/13/90 at page 71, line 15 thru page 72, line 13).

77. Eldon Hostetler knew, as did other designers of nipple watering systems, that extensive testing in the field was required to develop a good nipple drinker system. (Trial Transcript 2/14/90 at page 15, lines 17–18; page 59, lines 11–15; Trial Transcript 2/21/90 at page 198, lines 13–15).

78. The tests at Creighton Brothers and Cap–It–All and the use in the field of the No. 50 drinkers established that the constant pecking by the chickens on the trigger pin resulted in the outlet of the drinker body being worn from the inside. The worn outlet allowed for a substantial increase in the flow of water. In the nipple drinker systems developed by Mr. Hostetler, the water released to the chicken upon activation of the trigger is metered. The metering is accomplished by carefully defining the clearance of the cylindrical shank of the trigger pin within the outlet opening of the drinker body. (Plaintiff's Exhibit 23, at page 195).

79. Fiberglass impregnation of the drinker body material strengthened the material but did not prevent the water on the drinker body which resulted in excessive flow of the water to chickens. Excessive flow of water to the chickens also results in wet pits because the water which cannot be consumed by the bird simply runs down the bird's breast to the pit. (Plaintiff's Exhibit 23, at page 78; Trial Transcript 2/13/90 at page 90, lines 10–22; Trial Transcript 2/15/90 at page 24, line 15–19).

80. In October of 1978, Eldon Hostetler attempted to solve the problem of the worn outlet by insert molding a cadmium plated steel washer at the throat of the outlet in the drinker body. (Plaintiff's Exhibit 3, Drawing No. 7; Trial Transcript 2/13/90 at page 55, line 22 thru page 56, line 14).

81. Mr. Hostetler believed that the steel washer would provide a durable surface against which the trigger pin would strike and control maintenance of the metering orifice at the throat of the drinker outlet. Several thousand drinkers of this type were constructed and delivered to Creighton Brothers for testing. They failed. Mr. Hostetler found that the flow of water across the ball valve, the trigger pin, and the washer resulted in electrolysis of the steel parts and adversely affected the concept behind the insertion of a washer in this seventh nipple drinker development. (Plaintiff's Exhibit 23, at page 196).

82. Eldon Hostetler again modified the molding to open the outlet even further to a seven degree angle in the hopes that some side to side motion of the trigger pin and the freedom of motion would result in ease of use by the baby chicks. Drinkers of this type were supplied to Cap–It–All for testing in New Zealand. Trials of these drinkers were not successful. The tapered opening and the problem of wear of the drinker body caused by activation of the trigger pin resulted in excessive water flow and wet pit problems. The results of these trials using this eighth version of the nipple drinker at Cap–It–All in New Zealand were reported to Eldon Hostetler in a letter dated February 1, 1979. (Plaintiff's Exhibit 3, Drawing No. 8; Plaintiff's Exhibit 23, at pages 123 thru 126; Trial Transcript 2/13/90 at page 56, lines 15–23; page 57, lines 6–8).

83. After the failure of the seventh version of the nipple drinker which included the washer inserted at the throat of the

nipple outlet, Mr. Hostetler changed the drinker design to include a stainless steel insert in the outlet of the drinker body which had a straight bore providing for a defined clearance around the cylindrical shank of the trigger pin. This ninth version of the nipple drinker was very successful for adult laying hens in cage operations. The first of the No. 50 trigger drinkers with straight action and stainless steel inserts were delivered to Creighton Brothers in January 1979. (Plaintiff's Exhibit 3, Drawing No. 9; Plaintiff's Exhibit 23, at page 121; Trial Transcript 2/13/90 at pages 57–59).

84. Chickens are cannibalistic. In recognition of this fact, poultry managers debeak the baby chicks to prevent them from doing harm to the other chicks. (Trial Transcript 2/13/90 at pages 95–96).

85. One method of debeaking which was popular until the mid to late 1970's consisted of removing a portion of the upper beak in front of the nostrils. This method resulted in a projecting lower beak. This method of debeaking was popular in the midwest where Eldon Hostetler was performing his developmental work. The projecting lower beak made it very easy for even young chicks to trigger a vertical action drinker where the trigger pin moves along its axis only. (Trial Transcript 2/13/90 at page 96, lines 5–20).

86. The European style nipple drinkers offered to the United States market in 1977 were of the vertical action type.

87. All of the nipple drinkers developed by Eldon Hostetler in 1977 and 1978 were vertical action drinkers. (Plaintiff's Exhibit 23, at pages 194 & 195).

88. In 1978, use of the Lyons debeaking equipment was popular in the midwest. The Lyons debeaking equipment removed both the upper and lower beaks of baby chicks in front of the nostrils. (Trial Transcript 2/13/90 at page 97, lines 2–13).

89. Baby chicks debeaked in this manner could not use vertical action drinkers. (Trial Transcript 2/13/90 at page 97, lines 12–14).

90. After the introduction in the market of the Lyons Debeaker, removal of both the upper and lower beaks on baby chicks had became more and more prevalent in the poultry industry. Mr. Hostetler recognized that his vertical action drinker was difficult, if not impossible, to use by baby chicks debeaked in this manner. (Trial Transcript 2/13/90 at page 97, lines 15–25).

91. At the same time that Mr. Hostetler was solving problems with the straight action drinkers, he commenced working on a nipple drinker which could be triggered with side-to-side movement of the trigger pin from 360 degrees. The motivation behind this development was (1) the change in the debeaking methods of baby chicks and (2) Mr. Hostetler's recognition that chickens tried to get the water drop released from the drinker off of the side of the pin rather than the bottom of the pin. (Plaintiff's Exhibit 23, at page 196).

92. In September of 1978, he laid out on paper a trigger action nipple drinker with 360 degree action on the trigger pin. The trigger pin was changed to include a drum type head with a flat bottom and the upper surface containing a large concave recess in the head of the pin. The layout also called for a new seat which included the shoulder and leaf of the previous seat used in the No. 50 straight action drinkers but provided for a flat surface upon which the flat underside of the trigger pin head could rest. (Trial Transcript 2/13/90 at pages 59–61).

93. Mr. Hostetler's hope was to provide for a leveraged actuation of the trigger pin lifting the ball valve element off of its seat so that baby chicks without upper and lower beaks could trigger the drinker. (Plaintiff's Exhibit 23, at pages 196–197).

94. Mr. Hostetler ordered pins of this type from Elco Industries, which manufactured the pins by using a cold headed process. (Plaintiff's Exhibit 23).

95. The first 2,000 sample pins manufactured by the cold headed process and of the design laid out by Mr. Hostetler in mid-September 1978 were delivered to Ziggity for tolerance check on September 29, 1978. (Plaintiff's Exhibit 23, at page 70).

96. At the same time, Eldon Hostetler was working with his mold shop, Bender Mold and Machine in Mishawaka, Indiana, with respect to development of a seat that would work in cooperation with the new recess headed pin having a flat bottom on the head. (Plaintiff's Exhibit 23, at page 44).

97. Upon receipt of prototype pins and seats, Mr. Hostetler assembled some drinkers of this design and placed them in his own chicken house for testing. (Trial Transcript 2/14/90 at page 59, lines 6–15).

98. On October 2, 1978, Elco provided Mr. Hostetler with a quote for production quantities of the recess headed trigger pins. The first 6,500 trigger pins were received by Ziggity on December 11, 1978. These were also assembled in drinkers with prototype seats for testing in Mr. Hostetler's chicken house. (Plaintiff's Exhibit 23, at pages 71 & 109).

99. In January of 1979, Mr. Hostetler was satisfied that the concept of the 360 degree trigger action nipple drinker was good and might develop into a very good nipple drinker if Elco and the seat manufacturers could deliver products within the narrow range of tolerance that Mr. Hostetler sought and specified.

100. Satisfied that the concept was good, but recognizing that manufacturing tolerance problems could prevent use of the drinker design, and mindful of the fact that other nipple drinker systems, initially thought to have good and workable designs, later developed problems in the field, Mr. Hostetler decided to show the poultry industry his new concept nipple drinker at the Southeastern Poultry Association Trade Show, the premier annual trade show held in Atlanta, Georgia. (Trial Transcript 2/13/90 at page 60, lines 1–8; Trial Transcript 2/14/90 at page 30, lines 4–9).

101. The 1979 Southeastern Poultry Association Trade Show opened on January 25, 1979. (Trial Transcript 2/13/90 at page 60, lines 4–7).

102. Samples of the 360 degree trigger action nipple drinkers were given out at that trade show. (Plaintiff's Exhibit 23, at page 104; Trial Transcript 2/14/90 at page 29, line 25 thru page 30, line 4.)

103. At the 1979 Southeastern Poultry Association Trade Show, 360 degree trigger action nipple drinkers were offered for sale by Ziggity. (Trial Transcript 2/14/90 at page 29, line 25 thru page 30, line 4).

104. The tenth version of the Ziggity nipple drinker, the drinker shown at the 1979 Southeastern Poultry Association Trade Show, was the forerunner of the Model 60 Trigger Action Drinker which became the standard nipple drinker product in mid–1979 and continued as Ziggity's standard nipple drinker until early 1989. (Plaintiff's Exhibit 23, at page 198; Trial Transcript 2/13/90 at page 60, lines 1–8).

105. The tenth version of the Ziggity nipple drinker contained a machined stainless steel insert in the drinker body with a seven degree taper in the drinker outlet to provide for the side motion of the trigger pin which extended through and out of the drinker body outlet. (Plaintiff's Exhibit 3, Drawing No. 10).

106. In February 1979, Mr. Hostetler sought quotes on a modified seat arrangement to use with a modified drinker body arrangement. Mr. Hostetler had found that in both the 360 degree trigger action nipple drinkers and the straight action nipple drinkers, it was possible for the ball valve to adhere to the thermal plastic seat and for the seat to become dislodged in the drinker body upon triggering of the trigger pin. (Plaintiff's Exhibit 23, at pages 136, 137, & 138).

107. The eleventh version of the Ziggity nipple drinker provided for a shoulder or collar on the inserted thermal plastic seat which cooperated with a change in the cap portion of the drinker body so that the cap would hold the seat in position within the drinker body and the valve chamber. (Plaintiff's Exhibit 3, Drawing No. 11; Trial Transcript 2/13/90 at page 61, lines 12–19; page 62, lines 2–14).

108. The 360 degree trigger action nipple drinkers incorporating this eleventh design change were manufactured and sold in March of 1979 and thereafter. (Plaintiff's Exhibit 23, at pages 141, 143–46; Trial

Transcript 2/14/90 at page 53, lines 14–23; page 34, line 1–10).

109. The twelfth version of the Ziggity nipple drinker, which did not become the standard drinker until 1989, became available in late 1979. In the twelfth version of the Ziggity nipple drinker, the machined stainless steel insert in the outlet of the drinker body was replaced with a stainless steel eyelet. Additionally, the drinker body was shortened and made more compact and the 0–ring which sealed the drinker body to the saddle in which the drinker body was mounted was moved from the side of the drinker body to the upper surface of the cap. This change made it easier to insert and remove the drinkers from the saddles. (Plaintiff's Exhibit 3, Drawing No. 12; Trial Transcript 2/13/90 at page 63, line 4 thru page 64, line 9).

110. The twelfth version of the Ziggity nipple drinker became very successful and as a result of the Ziggity nipple drinker's success, resistance to nipple drinker systems was broken down to the point where in the mid to late 1980's, the Ziggity nipple watering system was the preferred water system among poultry integrators and growers.

111. Throughout the development of the Ziggity nipple drinker, Mr. Hostetler has experimented with numerous seat materials in the hopes of finding a material with the right amount of resiliency, but one which was not adversely affected by the presence of chlorine or chemicals in vitamins and medications supplied to the chickens through the watering system. The search for the ideal material continues today. (Trial Transcript 2/13/90 at page 74, lines 20–24; Trial Transcript 2/15/90 at page 47, line 6 thru page 48, line 13).

112. Mr. Hostetler long ago discovered that stainless steel seats were not the answer because of the electrolysis problem. Further, stainless steel seats can become gummy and inoperative like any other seat material when certain vitamins and medications are placed into the watering system by poultry growers. (Trial Transcript 2/15/90 at page 51, lines 21–25; Trial Transcript 2/22/90 at page 73, lines 9–14).

113. In recognition of these developments after nearly a decade of use of nipple drinkers, Mr. Hostetler conceived the idea of using a plastic metering pin in the inlet of the drinker body to control and meter the quantity of water supplied to a chicken upon triggering of the nipple. This thirteenth version of the Ziggity nipple drinker is the current standard product offered for sale by Ziggity since early 1989. (Trial Transcript 2/13/90 at page 66, lines 5–22).

## V. PATENT INFRINGEMENT

114. Val became involved in the poultry watering industry in the mid–1970's. (Trial Transcript 2/21/90 at page 75, lines 2–4).

115. Val's first product was a cup watering system which it manufactured and sold until it commenced making and selling nipple drinkers in 1983. (Trial Transcript 2/21/90 at page 75, line 6; page 185, lines 17–20).

116. Val's first nipple drinkers copied many of the features of the Ziggity nipple drinkers on the market in 1983. The Val nipple drinkers used a pin substantially identical to the trigger pin used in the Ziggity 360 degree trigger action nipple drinker. Other features which were nearly identical were the body, the snap-on hook features, and the ball. (Trial Transcript 2/21/90 at page 20 thru page 21, line 14).

117. The Val nipple drinker could be mounted in the Ziggity saddles, and the Val drinker was physically interchangeable with the Ziggity drinker. (Trial Transcript 2/21/90 at page 24, lines 1–6).

118. The only significant distinction between the Val nipple drinker and the Ziggity nipple drinker in 1983, and subsequently, was the stainless steel machined seat used by Val as compared to the resilient injection molded seat used by Ziggity. (Trial Transcript 2/21/90 at page 20 thru page 21, line 14; Trial Transcript 2/22/90 at page 96, line 21 thru page 97, line 1).

119. After 1983 when Val Products commenced selling nipple drinkers, Ziggity's 360 degree trigger action nipple drinker had enjoyed substantial commercial suc-

cess. (Trial Transcript 2/16/90 at pages 67–69).

120. In 1985, Ziggity commenced an action against the same defendants that are named in this action in the United States District Court for the Eastern District of Pennsylvania, Civil Action No. 85–0378. The Honorable Edward Cahn presided over that action. (Plaintiff's Exhibit 65).

121. In that action, Ziggity alleged that defendants had infringed Ziggity's '088 patent by the manufacture, use, and sale of a 360 degree trigger action nipple drinker which included a trigger pin substantially identical to Ziggity's trigger pin. (Plaintiff's Exhibit 65).

122. On February 4, 1987, a Stipulation of Dismissal of that action was filed after the parties had reached agreement on the terms of a settlement of the issues alleged in that action. (Plaintiff's Exhibit 65).

123. Pursuant to the terms of that settlement, Val was given until April 1, 1987 to exhaust inventory of drinkers alleged to infringe the '088 patent. (Plaintiff's Exhibit 76; Trial Transcript 2/16/90 at page 127, lines 6–9).

124. In the Settlement Agreement, Ziggity agreed that a nipple drinker containing a pin with a flat upper surface on the head of the pin would not infringe the '088 patent. (Plaintiff's Exhibit 76).

125. In the Settlement Agreement, Ziggity released the defendants from claims of past infringement and covenanted not to sue the defendants for infringement of its patent with respect to any drinker made by the defendants which included a flat head trigger pin as shown in Exhibit A to the Settlement Agreement. (Plaintiff's Exhibit 65).

126. Subsequent to April 1, 1987, Ziggity moved to enforce the Settlement Agreement contending that Val had sold 360 degree trigger action nipple drinkers having a trigger pin therein which had a recess in the head of the pin after April 1, 1987. (Plaintiff's Exhibit 65).

127. At a hearing before Judge Cahn on June 10, 1987, Judge Cahn found that the charges made by Ziggity pertaining to the breach of the Settlement Agreement had been established and pursuant to an order of Judge Cahn, Val paid $12,000.00 to Ziggity and represented and warranted that 156,628 drinkers were sold by Val after April 1, 1987 containing the large recess headed trigger pins. (Plaintiff's Exhibits 65 & 76).

128. At all times, the seat and trigger pins used in the Val nipple drinker have been manufactured by Vallorbs. (Trial Transcript 2/14/90 at page 128, lines 14–17; Trial Transcript 2/21/90 at page 53, lines 14–17).

129. Prior to April 1, 1987, Vallorbs commenced manufacturing trigger pins with a smaller recess for use in Val drinkers. (Trial Transcript 2/21/90 at page 197, lines 13–22).

130. The first operation in the manufacture of the trigger pins by Vallorbs was performed on a screw machine. Production of trigger pins on a screw machine results in the formation of a burr when the part is cut off of the bar stock in the screw machine. (Trial Transcript 2/14/90 at page 133, lines 3–4).

131. For a period of time after April 1, 1987, the trigger pins were manufactured on the screw machine with the large head portion of the pin coming out first and being part of the bar stock when machined. Using this method of manufacturing the trigger pins, the machined part is cut off of the bar stock at the small end of the trigger pin. (Trial Transcript 2/16/90 at page 49, lines 11–24).

132. This method of manufacture resulted in a very small or, in some cases, non-existent burr at the center of the upper surface of the head of the trigger pin. (Trial Transcript 2/16/90 at page 49, line 25 thru page 50, line 3).

133. Sometime in 1987, Val changed its method of manufacturing the trigger pins by machining the small end of the pin while the pin remained attached to the bar stock in the screw machine and cutting the pin off at the large head. (Trial Transcript 2/16/90 at page 51, lines 13–15).

134. This procedure resulted in the formation of a screw machine burr on the upper surface of the head of the trigger pin. (Trial Transcript 2/14/90 at page 51, lines 13–15).

135. Vallorbs implemented a secondary manufacturing operation for the removal of the screw machine burr. (Trial Transcript 2/14/90 at page 132, lines 14–20).

136. The deburring operation used by Vallorbs consists of bringing a saw in contact with the burr on the head of the pin to remove a portion of the burr including the loose "slag" normally associated with a screw machine burr. (Trial Transcript 2/14/90 at page 136, line 8 thru page 137, line 1).

137. The saw contacts the flat surface of the pin with the plane of the saw being vertical to the plane of the head of the trigger pin. (Trial Transcript 2/14/90 at page 137, lines 2–13).

138. The saw operation leaves a portion of the burr projecting from the flat surface of the head of the trigger pin. (Trial Transcript 2/14/90 at page 137, lines 8–11).

139. In the next step of the deburring operation, the pin head is struck with a spherical punch. (Trial Transcript 2/14/90 at page 137, lines 17–20; page 138, lines 7–15).

140. The radius of the spherical punch is the same as the radius of the ball valve element used in the drinker—.156 inch. (Trial Transcript 2/14/90 at page 138, lines 16–18; Trial Transcript 2/16/90 at page 15, lines 17–23).

141. Some of the production drawings for the head of the trigger pin call for a tolerance of .001 inch in the overall height of the head of the pin from the lower flat surface to the upper flat surface. (Trial Transcript 2/21/90 at page 202, lines 20–23).

142. The Vallorbs secondary operation results in the formation of a recess in the center of the upper surface of the head of the trigger pin which is designed to vary between 0 and .003 inches. (Trial Transcript 2/16/90 at page 20, lines 18–20).

143. Measurements of the recess in trigger pins in Val drinkers found in the field after sale by Val were conducted by Eldon Hostetler on Ram Optical Measuring Equipment and revealed that the recess varies in depth from .002 inch to .0075 inch. The trigger pins manufactured by Vallorbs and assembled in the Val nipple drinkers are not flat, i.e. the upper surface of the Val trigger pin is *not* a continuous horizontal surface without a noteworthy depression. (Trial Transcript 2/13/90 at page 104, lines 14–25; page 105, lines 1–12; page 107, lines 2–23).

144. There is a recess in the upper surface of the head of the Val trigger pin of varying depth. (Trial Transcript 2/15/90 at page 43, lines 6–20; Trial Transcript 2/16/90 at page 20, lines 18–20).

145. As noted above, the recess is placed in the head of the pin by a spherical punch. (Trial Transcript 2/16/90 at page 15, lines 12–15).

146. The horizontal width of the recess increases with an increase in the depth of the recess. (Trial Transcript 2/21/90 at page 17, lines 9–12).

147. The recess made by the spherical punch has a circumferential edge where the recess meets the upper flat, or horizontal, surface of the Val trigger pin. (Trial Transcript 2/13/90 at page 107, lines 20–23).

148. The recess is a precise, carefully formed recess—it is not a surface irregularity. (Trial Transcript 2/14/90 at page 150, lines 10–23).

149. The small or bottom end to the Val trigger pin is smooth and has no burr or recess. (Trial Transcript 2/22/90 at page 50, lines 8–21).

150. There is a functional advantage to having the above described recess in the upper surface of the head of the Val trigger pin. (Trial Transcript 2/14/90 at page 123, lines 7–12).

151. The secondary deburring operation results in a uniform, within tolerance, clearance between the lower most portion of the ball valve element when seated in the drinker and the upper surface of the

head of the trigger pin. (Trial Transcript 2/14/90 at page 150, lines 20–23; page 151, lines 14–21; Trial Transcript 2/22/90 at page 142, lines 8–25).

152. Clearance between the trigger pin and the ball valve element is necessary to assure that the ball valve element will not be held off of the seat when the drinker is not activated by a chicken. (Trial Transcript 2/14/90 at page 151, lines 14–21; page 125, lines 22–25).

153. When triggered, the edge region of the recess provides the initial point of engagement with the ball valve element resulting in leveraged off-center activation of the ball valve element. (Trial Transcript 2/14/90 at page 86, lines 4–8; page 87, lines 2–7).

154. When the trigger pin is tilted by the chicken, the long lever arm from the point of contact on the shank of the trigger pin to the fulcrum at one edge of the lower surface of the head of the trigger pin where it contacts the seat is greater than the lever arm from that fulcrum point to the point of contact of the trigger pin and the ball. (Trial Transcript 2/21/90 at page 20 thru page 21, line 14).

155. Simple laws of mechanics and physics dictate that, the shorter the second lever arm, the greater the advantage of force, and that, the longer the second lever arm, the greater the advantage of distance. (Trial Transcript 2/21/90 at page 24, lines 1–6).

156. The presence of the recess in the upper surface of the head of the Val trigger pin makes the nipple drinker easier to trigger by baby chicks and decreases the response time between activation of the trigger pin and the delivery of water to the chicken utilizing the drinker. (Trial Transcript 2/21/90 at page 26, lines 15–17).

157. The upper surface of the trigger pin can be made flat and within the desired tolerance of finish. (Trial Transcript 2/16/90 at page 145, lines 10–11; Trial Transcript 2/22/90 at pages 24–25).

158. The term "flat" requires a continuous horizontal surface without noteworthy peaks or depressions. The term "finish" relates to the smoothness of the flat surface and is measured in micro-inches. (Trial Transcript 2/14/90 at pages 146–150).

159. The chosen method of manufacturing the trigger pin by Vallorbs results in cost savings. (Trial Transcript 2/14/90 at page 153, lines 12–15; Trial Transcript 2/16/90 at page 16, lines 14–15; page 22, lines 8–14; page 33, lines 11–12).

160. The method of manufacturing the Val trigger pin creates a recess, that recess has an edge, and that edge provides the initial actuation engagement with the ball valve at a location spaced apart from the lowermost portion of the ball valve. (Trial Transcript 2/16/90 at page 15, lines 12–15; Trial Transcript 2/13/90 at page 107, lines 20–23).

161. Defendant Frederick W. Steudler, Jr. testified that he believes that the terms "confront" and "confronting" mean "touching." (Trial Transcript 2/16/90 at page 70, lines 16–24).

162. Nothing in the dictionary definition of "confronting" requires that term to mean "touching." Claim 19 contains no special requirement that the ball valve must actually be touching the valve actuator, other than of course during actuation engagement. Therefore, the spatial orientation of the recess as "confronting" the ball valve is *not* limited to actual contact between the recess and the ball valve.

163. In the Val nipple drinker, the recessed region and the ball valve are confronting.

164. The 360 degree trigger action nipple drinkers manufactured by Vallorbs and sold by Val containing the above-described recess in the center of the upper surface of the head of the trigger pin literally infringe Claim 19 of the '345 patent.

165. The 360 degree trigger action nipple drinkers manufactured by Vallorbs and sold by Val containing the above-described recess in the center of the upper surface of the head of the trigger pin also literally infringe Claims 1–2, 6–13, and 20–24 of the '345 patent. (Defendants' Exhibits 3 & 4).

166. The 360 degree trigger action nipple drinkers manufactured by Vallorbs and sold by Val having a recess in the center of the upper surface of the head of the trigger pin, as described above, perform substantially the same function in substantially the same way to yield substantially the same result as does the claimed invention. (Trial Transcript 2/21/90 at page 24 thru page 26, line 14).

167. The 360 degree trigger action nipple drinkers manufactured by Vallorbs and sold by Val having a recess in the center of the upper surface of the head of the trigger pin, as described above, infringe Claims 1–13 and 19–24 of the '345 patent and Claims 3–5 of the reexamined '088 patent under the doctrine of equivalents. (*See, e.g.*, Defendants' Exhibits 3 & 4).

## VI. WILLFUL INFRINGEMENT

168. Vallorbs, the manufacturer of the trigger pin used in the Val nipple drinker, as well as the two individual defendants, have been and still are (with, of course, the exception of Frederick W. Steudler, Sr.) involved in the screw machine industry and have developed an expertise in manufacturing small precision parts. Ziggity, on the other hand, does not manufacture any of the component parts of its nipple drinker and has no expertise in the screw machine industry.

169. The term "flat" has a special meaning in the screw machine industry. (Defendants' Exhibits 163–172).

170. Within the screw machine industry, the heads of defendants' trigger pins are considered flat. (Trial Transcript 2/22/90 at page 109, lines 5–13; page 121, lines 5–7).

171. In June 1987, Val presented Mr. Ramik, defendants' patent counsel, with examples of what it considered to be flat-headed trigger pins. (Defendants' Exhibits 278–1 thru 278–4; Trial Transcript 2/20/90 at page 98, line 11 thru page 100, line 24). At that time, Mr. Ramik provided Val with his verbal opinion that the head of its new trigger pin was flat and, thus, that the new trigger pin did not infringe either of the patents-in-suit. (Trial Transcript 2/20/90 at page 100, line 25 thru page 101, line 18; Trial Transcript 2/21/90 at page 86, line 2 thru page 87, line 9).

172. On June 12, 1987, Ziggity raised some concern over whether defendants had breached the Settlement Agreement reached in the previous litigation between the parties (Defendants' Exhibit 9) by manufacturing and using the trigger pins with the smaller recesses. (Plaintiff's Exhibit 65). However, for nineteen months thereafter, Ziggity did not raise any more objections concerning Val's newly designed trigger pins. (Trial Transcript 2/21/90 at page 124, line 9–15; page 206, lines 1–16).

173. Defendants did not become aware that Ziggity did not consider the head of their new trigger pin to be flat until Ziggity initiated this lawsuit in January of 1989. (Trial Transcript 2/21/90 at page 206, lines 10–16).

174. Based on the totality of the circumstances, I find that defendants acted in good faith in attempting to design around the patents-in-suit and had a reasonable basis for believing that their new trigger pins were flat and, thus, not infringing the patents-in-suit. Consequently, I further find that defendants' infringement of the patents-in-suit was *not* willful.

## VII. LIABILITY OF THE DEFENDANTS

175. Val makes, uses, and sells the infringing nipple drinkers.

176. The seats and trigger pins manufactured by Vallorbs are components of the infringing drinkers sold by Val. (Trial Transcript 2/14/90 at page 128, lines 14–17).

177. The seats and trigger pins manufactured by Vallorbs and assembled into the nipple drinkers sold by Val are a material part of the invention of the '088 and '345 patents. (Plaintiff's Exhibits 49–B, 50–B, 51–B, and 68).

178. The seats and trigger pins manufactured by Vallorbs and assembled into the nipple drinkers sold by Val are specially made for use in such drinkers and are not staple articles or commodities of com-

merce suitable for substantial non-infringing use. By manufacturing the seats and trigger pins for use in the Val drinker, Vallorbs has contributorily infringed the '088 and '345 patents. (Plaintiff's Exhibits 66 & 68).

179. Vallorbs manages Val and controls Val's actions. (Plaintiff's Exhibit 68, page 24, line 9 thru page 25, line 9). The management of Vallorbs makes the decisions concerning the products which are sold by Val. Therefore, Vallorbs has induced Val to infringe the patents-in-suit.

180. Val and Vallorbs are almost totally integrated through common management, common employees, and common physical facilities. (Plaintiff's Exhibit 68, at page 24, lines 5–24; Trial Transcript 2/21/90 at page 182). In essence, Vallorbs is the manufacturing arm for Val's nipple drinkers. (Plaintiff's Exhibit 68, at page 24, line 12 thru page 25, line 9).

181. Frederick W. Steudler, Sr. and Frederick W. Steudler, Jr., along with Richard Steudler, have total and final authority and control over Vallorbs and Val. (Trial Transcript 2/14/90 at page 155, lines 13–15; Trial Transcript 2/15/90 at page 175, lines 20–15; pages 187–190; Trial Transcript 2/20/90 at page 148, lines 1–12).

182. Frederick W. Steudler, Sr. and Frederick W. Steudler, Jr. were the principal officers, directors, and managers of all activities of Val and Vallorbs on a day to day basis. (Plaintiff's Exhibit 68, at page 75, line 20 thru page 76, line 11; page 442, line 24 thru page 443, line 1). As corporate officers, they were certainly aware of what they were doing and of their activities.

183. Frederick W. Steudler, Sr. and Frederick W. Steudler, Jr. actively participated in both the manufacture and sale of the infringing products. (Trial Transcript 2/26/90 at page 119, lines 8–18; page 42, line 21 thru page 43, line 19).

184. Frederick W. Steudler, Sr. died on August 16, 1989. (Stipulated).

185. Ziggity moved to substitute Jeanette Steudler, in her capacity as executrix and representative of the estate of Frederick W. Steudler, Sr., for Frederick W. Steudler, Sr. as a party defendant. By order dated February 9, 1990, the court granted this motion and ordered that the caption of the case be amended accordingly.

186. Defendant Frederick W. Steudler, Sr., prior to his death, and defendant Frederick W. Steudler, Jr. have induced Val and Vallorbs to infringe the patents-in-suit.

## VIII. PATENT VALIDITY

### A. 35 U.S.C. § 103 (Obviousness)

187. The relevant prior art is that art which a person with ordinary skill in the art of nipple-type watering drinkers for fowl and small animals could reasonably be expected to look for solutions to problems relating to nipple drinkers, such as controlling water leakage and obtaining water flow upon slight lateral movement of the trigger pin. With respect to the problem of controlling water leakage, the general art of fluid valves is potentially relevant. With respect to the problem of obtaining water flow upon slight lateral movement of the trigger pin, the relevant art is the more specific art of designing and manufacturing nipple-type watering devices for poultry, wherein the poultry, including day old chicks, must affirmatively activate a triggering device to obtain water.

188. The content of the prior relevant art is (1) the fourth and nine versions in the development of the Ziggity nipple waterer, (2) the nipple waterer described in the 1977 EZ Sip brochure published by Ziggity, and (3) United States and foreign patents defined to be prior art within 35 U.S.C. § 102. (Defendants' Exhibits 5 & 8.)

189. Defendants contend that the most relevant of the prior art is the Clark patent, assigned to Fox Products Company, U.S. Patent No. 3,756,199, hereinafter, "the Clark patent" or "the Fox drinker." (Defendants' Exhibits 2, 3, 4, 5, & 12; Trial Transcript 2/16/90 at page 155, lines 19–23).

190. Fox Products Company manufactured and sold nipple drinkers constructed as described in the Clark patent from the early to mid–1970's. (Trial Transcript

2/21/90 at page 57, lines 22–25 thru page 58).

191. The Fox drinker met with minimal commercial success, and Fox Products Company eventually ceased production. (Trial Transcript 2/20/90 at page 125, lines 12–25; page 126, lines 1–6).

192. More recently, the inventor, Clark, has commenced manufacturing a drinker similar to that shown in Figure 1 of the Clark patent, which has been redesigned to attempt to correct problems prevalent with the earlier Fox drinker. (Trial Transcript 2/21/90 at page 177, lines 20–24; pages 178–180).

193. The Clark patent was issued September 4, 1973, and commercial embodiments of the drinker described in the Clark patent were manufactured and sold at that time and thereafter. (Defendants' Exhibit 5).

194. Ziggity has approximately 70 percent of the nipple drinker market, and defendant Val has approximately 30 percent of the nipple drinker market. All others offering nipple drinkers for sale, including the redesigned Clark nipple drinker, account for less than 5 percent of the nipple drinker market. (Trial Transcript 2/15/90 at page 55, lines 4–5; page 32, lines 2–12).

195. The Clark patent and the commercial embodiment of the Fox drinker utilize a flat disc valve triggered by a flat-headed trigger pin. (Defendants' Exhibit 5).

196. The Clark patent discloses 360 degree trigger action. (Defendants' Exhibit 5; Trial Transcript 2/16/90 at page 171, lines 11–13).

197. The EZ Sip brochure and versions 4 and 9 of the No. 50 Ziggity trigger drinker do not disclose 360 degree trigger action. The primary difference between the claimed invention and the EZ Sip brochure and the No. 4 and 9 versions of the Ziggity nipple drinker is the 360 degree off-centered leveraged actuation called for in the claims of the '088 and '345 patents. (Plaintiff's Exhibits 42 & 43; Trial Transcript 2/14/90 at page 31, lines 20–22).

198. The primary and distinct differences between the disclosure of the Clark patent and the claimed invention is the use of a ball valve means in the claimed invention, as opposed to the flat disc valve means disclosed in the Clark patent, and the resulting off-centered leveraged actuation of the ball valve means called for in the claims of the '088 and '345 patents. (Plaintiff's Exhibits 42 & 43; Defendants' Exhibit 5).

199. Defendants contend that these differences between the invention claimed in the '088 and '345 patents and the prior art (the EZ Sip brochure and the Clark patent) are such that the subject matter as a whole would have been obvious to one of ordinary skill in the art to which such subject matter pertains at the time the invention was made in 1979.

200. In support of that contention, defendants assert that U.S. Patent No. 2,851,-007 issued on September 9, 1958 to Kagan, which discloses a poultry watering valve and which was a reference of record during the prosecution of the re-examination of the '088 and '345 patents, discloses a ball valve means. (Defendants' Exhibits 2, 3, 4, & 5).

201. The poultry watering device disclosed in Kagan is a vertical action nipple drinker wherein the ball valve means is unseated allowing the flow of water upon *vertical* motion of the trigger pin—not *lateral* motion of the trigger pin. (Defendants' Exhibit 131; Trial Transcript 2/13/90 at page 157, lines 9–24).

202. Defendants also note U.S. Patent No. 3,163,394 issued on December 29, 1964 to Downin. The Downin patent was not of record during the prosecution of the '088 and '345 patents. (Defendants' Exhibit 125).

203. Downin discloses a ball valve for use in a faucet in a relatively high pressure water distribution system. The structure disclosed in Downin and according to the specification in Downin, was developed by the inventor to overcome pressure surges in the distribution system caused by the rapidity with which the ball valve opens and closes the faucet. The ball valve in Downin is unseated by rotation of a cam

member which pushes the ball valve off the seat when the higher lobe of the cam comes in contact with the ball valve. Downin is non-analogous prior art. (Defendants' Exhibit 125).

204. Defendants also note French Patent No. 2,068,037 published August 20, 1971 naming Monnier as the applicant's representative. (Defendants' Exhibits 126 & 127).

205. Monnier discloses a device for blowing compressed air of the type known in practice as "air guns" which are intended to project a jet of compressed air for cleaning mechanical and other parts. (Defendants' Exhibits 126 & 127).

206. Monnier discloses a hollow nozzle for the jet of compressed air which has a concave surface at its inlet and which in a closed position rests on the convex surface of a ball valve means. Compressed air is allowed to enter the hollow core of the nozzle when the nozzle is deflected angularly with respect to the center line of the nozzle structure thereby permitting air to enter the inlet of the hollow stem of the nozzle. (Defendants' Exhibits 126 & 127).

207. Monnier is a non-analogous prior document. Monnier is dealing with a structure of a valve suitable for opening and closing a passage to allow or prevent compressed air from entering the passage. Monnier does not teach unseating a ball from a seat by off-centered leverage actuation. Monnier teaches the use of mating convex and concave surfaces to provide a seal in an open position and opening the passage in the central core in the nozzle by angular deflection of the nozzle so as to break the seal between the end of the nozzle and the ball valve. Monnier's valve structure is not within the environment of fluid valves or poultry watering equipment and, thus, is not relevant prior art. (Defendants' Exhibits 126 & 127).

208. Defendants note French Patent No. 734,635 published in October 5, 1932 and issued to Maury. (Defendants' Exhibit 128).

209. Maury is a non-analogous prior document. Maury discloses a stopcock for use with high pressure water systems. Maury, like Monnier, disclosed a hollow discharged jet, the inlet of which is blocked by a valve member having a convex surface which cooperates with the upper surface of the discharge jet. Maury provides for allowing fluid to enter the hollow stem of the discharge jet upon angular displacement of the jet which disrupts the mating relationship between the convex surface of the blocking member. Like Monnier, Maury provides a convex surface on a blocking member to prevent entry of water into the hollow core of the discharged jet. Like Monnier, in Maury, upon angular displacement of the discharged jet, the seal between the blocking member and the inlet end of the discharged jet is broken allowing high pressure water to enter the discharge jet. (Defendants' Exhibit 128).

210. Finally, defendants note U.S. Patent No. 3,477,408 issued on November 11, 1969 to Mull. (Defendants' Exhibit 130).

211. Mull discloses an open trough type watering system which contains a float valve which is used to unseat, in a purely vertical motion, a ball valve to allow additional water to fill the trough when the float sinks sufficiently low in the trough. (Defendants' Exhibit 130).

212. The upper surface of the rod which unseats the ball valve is concave to mate with the convex surface of the ball valve; at the inlet to the trough, the connecting rod 88 is raised and lowered vertically through guide member 90. (Defendants' Exhibit 130).

213. Kagan was of record during the prosecution of the '088 patent and '345 patent. Downin, Monnier, and Maury do not disclose devices useful in the relevant art—the design and manufacturing of poultry watering equipment. (Defendants' Exhibits 2, 3, 4, 5, & 8).

214. All of the prior art relied upon by the defendants was either of record during the prosecution of the '088 and '345 patents (EZ SIP brochure, Kagan, and Mull) or is not analogous prior art (Monnier and Maury) or is merely cumulative of prior art which was of record (Mull).

215. The difference between the invention claimed in the '088 and '345 patents and the relevant prior art would not have been obvious to one of ordinary skill in the relevant prior art at the time the invention was made in 1979.

216. The claimed invention has enjoyed substantial commercial success. Prior to the availability on the market of the Ziggity 360 degree trigger action nipple drinker in the Spring of 1979, nipple drinkers had little success in the poultry watering market. (Trial Transcript 2/13/90 at page 39, line 21 thru page 40, line 1).

217. The success of the Ziggity 360 degree trigger action nipple drinker is because of the ease with which it is triggered by baby chicks, particularly chicks that have had their upper and lower beaks removed. When Ziggity commenced business in 1977, the then available European style nipple drinkers had been unsuccessful and had created resistance to the adoption of nipple drinking systems by poultry integrators and growers. Ziggity's success, at first, was minimal. (Trial Transcript 2/13/90 at page 39, line 21 thru page 40, line 1).

218. Since the introduction of the 360 degree trigger action drinker, Ziggity's sales have doubled every year until fiscal 1989, and Ziggity now has 70% of the nipple market. (Trial Transcript 2/15/90 at page 30, lines 19–23).

219. Ziggity's success has paved the way for defendants' entry into the nipple market. There is a nexus between Ziggity's commercial success and the claimed invention. (Trial Transcript 2/15/90 at page 31, lines 18–23; page 60, lines 5–9).

220. The poor performance of nipple drinkers of the European style and those such as the Fox drinker that were available in the United States in the mid–1970's created a long felt need for a successful nipple drinker system. (Trial Transcript 2/13/90 at page 39, lines 21 thru page 40, line 1; Trial Transcript 2/14/90 at page 79, line 15 thru page 80, line 5).

221. Most poultry integrators and growers recognize the advantage of a closed system in terms of reduced labor and the avoidance of a high incidence of disease and contamination of the water supply. Until the Ziggity 360 degree trigger action nipple drinker was marketed in 1979, no successful nipple drinker or other closed system had been brought to the market. (Trial Transcript 2/14/90 at page 78, lines 8–25).

222. Val copied certain of the features of the Ziggity nipple drinker, including the snap on hook arrangement, and Val designed its drinker so that its drinker could be fit within the saddles produced by Ziggity for mounting the Ziggity nipple drinker. (Trial Transcript 2/16/90 at page 121, line 8 thru page 122, line 20).

223. The initial Val drinker first sold in 1983 was virtually identical to the Ziggity nipple drinker in all respects with the exception of the use of a stainless steel seat as compared to the Ziggity resilient seat. (Trial Transcript 2/21/90 at page 20 thru page 21, line 14; Trial Transcript 2/22/90 at page 96, line 21 thru page 97, line 1).

224. The '088 and '345 patents have been acknowledged by others. When charged with infringement, Monoflo and Impex nipple drinker manufacturers agreed to commence making flat headed trigger pins to avoid infringement of the '088 and '345 patents. (Trial Transcript 2/13/90 at page 122, line 12 thru page 125, line 6).

B. 35 U.S.C. § 102 (On Sale Bar)

225. The sixth and eighth versions in the development of the Ziggity nipple drinkers were used experimentally and were *not* shown to work for their intended purpose prior to January 21, 1979. The seventh version of the Ziggity nipple drinker was used experimentally by Creighton Brothers and was *not* shown to work for its intended purpose prior to January 21, 1979. Hence, the sixth, seventh, and eighth versions in the development of the Ziggity nipple drinker are *not* prior art. (Trial Transcript 2/13/90 at page 69, lines 6–10).

226. The claimed invention was *not* in public use or on sale in the United States

prior to January 21, 1979. (Trial Transcript 2/14/90 at page 56, lines 12–15).

227. The invention claimed in the '088 and '345 patents was *not* known or used by others in this country, or patented or described in a printed publication in this or a foreign country before the invention thereof by Eldon Hostetler. (Trial Transcript 2/13/90 at page 101, lines 15–25).

228. Eldon Hostetler did *not* abandon the invention claimed in the '088 and '345 patents.

229. The invention claimed in the '088 and '345 patents was *not* first patented or caused to be patented and was *not* the subject of an inventor's certificate by Eldon Hostetler or his legal representatives or assigns in a foreign country prior to January 21, 1980 on an application for patent or inventor's certificate filed prior to January 21, 1979.

230. The claimed invention in the '088 and '345 patent was *not* described in a patent granted on an application for patent by anyone else filed in the United States before the invention thereof by Eldon Hostetler and was *not* described in a patent granted on an international application by another who had fulfilled the requirements of paragraphs (1), (2), and (4) of section 371(c) of title 35 of the United States Code before this invention by Eldon Hostetler.

231. Eldon Hostetler did himself solely invent the subject matter sought to be patented. (Trial Transcript 2/13/90 at page 101, lines 15–22).

232. Before Eldon Hostetler's invention thereof, the invention claimed in the '088 and '345 patents was *not* made in this country by another who had not abandoned, suppressed, or concealed it.

233. The invention claimed in the '088 and '345 patents is novel.

## C. Inequitable Conduct

234. As noted above, the sixth, seventh, and eighth versions in the development of the Ziggity nipple drinker are *not* prior art.

235. The Boegley reference, U.S. Patent No. 3,385,267, was cited by the Examiner in connection with the examination of the application pending in the Netherlands. Boegley, 3,385,267, was subsequently cited and relied upon by the Examiner during the original prosecution for the '088 patent. (Defendants' Exhibits 5 & 8).

236. The Examiner cited the Boegley 3,385,267 patent for its teaching of a serrated or multi-stepped seat cooperating with the radius of a cup-headed trigger pin. (Defendants' Exhibit 8).

237. Ziggity's then current patent attorney pointed out to the Examiner that the Boegley reference did not teach or suggest the combination of two valve elements namely, a ball and a pin head, cooperating with multiple spaced valve seats. (Defendants' Exhibit 2).

238. Upon filing that amendment, the Examiner issued the '088 patent. (Defendants' Exhibits 2 & 3; Plaintiff's Exhibit 42).

239. During the re-examination of the '088 patent requested by the defendants, defendants and the Patent Office primarily relied upon the teaching of Winegard, U.S. Patent No. 3,077,896, for the same or related propositions. (Defendants' Exhibit 3).

240. Winegard is more pertinent than Boegley 3,385,267.

241. No material prior art was withheld from the Patent Office by Mr. Hostetler or his attorneys.

242. To the extent that any material prior art was withheld from the Patent Office, the withholding of such prior art from the Patent Office was neither intentional, nor grossly negligent.

## D. 35 U.S.C. § 112

243. The specification of the '088 and '345 patents, including the drawings, contain a sufficient description of the invention and of the manner and process of making and using the invention in full, clear, concise, and exact terms so as to enable any person skilled in the art of designing and manufacturing poultry watering systems to make and use the invention. (Defendants' Exhibits 2, 3, & 4).

244. The specification, including the drawings, discloses the best mode contemplated by Eldon Hostetler for carrying out his invention at the time the patent application was filed on January 21, 1980. (Defendants' Exhibits 2, 3, & 4).

### E. 35 U.S.C. § 132 (New Matter)

245. All of the claimed subject matter in the '088 and '345 patents are supported by the original specification, including the drawings. No amendment during the prosecution history introduced new matter into the disclosure of the invention. (Defendants' Exhibits 2, 3, & 4).

## IX. DAMAGES

246. The products which compete in the poultry watering equipment market are open water systems, such as cups, bells, troughs, and closed systems, such as nipple drinkers. (Trial Transcript 2/15/90 at page 12, lines 8–14).

247. While some users of poultry watering equipment remain loyal to open water systems, their number is rapidly decreasing. (Trial Transcript 2/15/90 at page 30, lines 12–18).

248. There is a separate and distinct market for nipple drinkers. (Trial Transcript 2/15/90 at page 17, line 3–13).

249. Buyers of poultry watering equipment are either buyers of open watering systems or buyers of nipple watering systems. (Trial Transcript 2/15/90 at page 17, lines 6–10).

250. Those who have used nipple watering systems do not revert back to using open watering systems. (Trial Transcript 2/15/90 at page 16, lines 8–14).

251. Within the nipple market, Ziggity has approximately 70 percent of the total nipple drinker sales, and Val has approximately 30 percent of the total nipple drinker sales. (Trial Transcript 2/15/90 at page 31, line 24 thru page 32, line 7).

252. All the other manufacturers of nipple drinkers have an insignificant percentage of the total nipple drinker sales—not more than 2–5 percent. (Trial Transcript 2/15/90 at page 32, lines 8–12).

253. Ziggity and Val market their nipple drinker through distributors. The buyers of poultry watering equipment are poultry integrators and contract growers. There are less than 50 poultry integrators in the United States market. Four to five poultry integrators comprise 70 to 80 percent of the poultry market. Poultry integrators are vertically integrated operations that produce all supplies required for the breeding, hatching, processing, and feeding of chickens, with the exception of the houses in which the chickens are raised. (Trial Transcript 2/15/90 at pages 18–26; Trial Transcript 2/23/90 at page 51, lines 15–18).

254. There are two large segments of the poultry market. One is the cage operations for the production of eggs, and the other is the floor operations for growing chickens for the production of chicken meat for human consumption. (Trial Transcript 2/15/90 at page 26, lines 17–24).

255. There is no significant open market for chickens or eggs outside of the market developed by the integrators. (Trial Transcript 2/15/90 at page 22, lines 3–19).

256. Integrators contract with farmers to raise broiler chickens for meat production and to house chickens for egg production. (Trial Transcript 2/15/90 at page 18, lines 6–9).

257. Typically, the contract growers own the houses and the equipment, including the poultry watering equipment used in the houses. (Trial Transcript 2/15/90 at page 18, lines 20–23).

258. Some integrators require that contract growers use a specific brand and type of poultry watering equipment. Other integrators have approved lists of brands and types of poultry watering equipment. (Trial Transcript 2/15/90 at page 17, lines 21–23).

259. Ziggity and Val concentrate sales efforts on integrators and compete for inclusion on the approved list of manufacturers of poultry watering equipment. (Trial Transcript 2/15/90 at page 17, lines 21–25; Trial Transcript 2/21/90 at page 203, line 22 thru page 204, line 14).

260. The factors evaluated by integrators in selecting poultry watering equipment are the mortality rate of chicks, the ratio of feed consumed to weight gained in boiler operations, the total weight gained per bird, and the frequency of condemnation of disease or defective birds upon processing. (Trial Transcript 2/15/90 at pages 19–20).

261. There is a strong demand for the Ziggity and Val nipple drinker products. (Trial Transcript 2/15/90 at page 30, lines 9–11).

262. Val's drinker would not have performed as well as it did if Val had not infringed the '088 and '345 patents. (Trial Transcript 2/23/90 at page 47, line 25; page 48, lines 1–3; page 59, lines 23–25; page 60, lines 1–14).

263. Poor performance of the Val drinker would have resulted in removal as an authorized or approved supplier on the integrator supplier lists. (Trial Transcript 2/15/90 at page 36, line 18 thru page 37, line 2).

264. Ziggity would have obtained approximately 70 percent of the sales of the Val nipple drinkers and related products if Val had not infringed the '088 and '345 patents. (Trial Transcript 2/15/90 at page 38, line 14 thru page 39, line 2).

265. Ziggity did, at all relevant times, have the capacity, and presently has the capacity, to manufacture and market substantially more nipple drinkers to accommodate a greater demand for its product and, thus, would have been able to accommodate the sales to Val's customers. (Trial Transcript 2/15/90 at page 66, lines 5–20; pages 71–74; pages 104–107).

266. But for the infringement by defendants, Ziggity could have charged a higher price for its nipple drinkers. (Trial Transcript 2/15/90 at page 41, lines 5–14).

267. Ziggity's damages resulting from the infringement include lost profits in the form of price erosion. (Trial Transcript 2/15/90 at page 102, lines 21–25; page 103, lines 1–10).

268. Ninety-six to ninety-eight percent of Ziggity's drinker sales, excluding replacements, are sales of drinkers in connection with sales of the entire nipple drinker watering system, including, but not limited to, the regulators, pipes, saddles, hangers, anti-perch devices, raps, clamps, valves, and filters. (Trial Transcript 2/15/90 at page 34, lines 3–18).

269. The nipple drinker drives the sale of the entire nipple drinker watering system. Accordingly, the sale of parts of the system not covered by the '088 and '345 patents are convoyed with the sale of nipple drinkers. (Trial Transcript 2/15/90 at page 33, lines 6–15; page 109, lines 4–6; Trial Transcript 2/22/90 at page 71, lines 6–14).

270. Based on profits on 70 percent of Val's sales, a reasonable royalty of 15% on the sales that Val would have retained, price erosion, convoyed sales, and prejudgment interest, Ziggity's damages total $3,835,090.46. (Plaintiff's Exhibit 47).

## X. BREACH OF CONTRACT COUNTER-CLAIMS

### A. The Settlement Agreement

271. In the Settlement Agreement, Ziggity covenanted not to sue defendants for patent infringement if the head of their trigger pin was flat. (Plaintiff's Exhibit 76).

272. The upper surface of the trigger pin in the Val nipple drinker is *not* flat. (Trial Transcript 2/22/90 at page 68, lines 1–14 & 19–23; page 95, lines 4–11).

273. Accordingly, Ziggity did *not* breach the Settlement Agreement.

274. Defendants also raise the defenses of release and license. Both of these defenses are based upon defendants' contention that the upper surface of the trigger pin in the Val nipple drinker is flat.

275. The upper surface of the trigger pin in the Val nipple drinker is *not* flat. (Plaintiff's Exhibit 65; Trial Transcript 2/22/90 at page 68, lines 1–14 & 19–23; page 95, lines 4–11).

276. Hence, the defenses of release and license are without merit.

## B. The Oral Agreement

277. At the conclusion of the hearing to enforce the Settlement Agreement that the parties entered into in their previous patent litigation, which hearing was conducted on June 12, 1987, Judge Cahn of this court suggested that Ziggity's counsel should contact Val's counsel prior to commencing any action for infringement based on the theory that Val's small-recess-headed trigger pin infringed Ziggity's patents-in-suit. (Plaintiff's Exhibit 65, at page 89, lines 8–11).

278. Counsel for Ziggity stated at the hearing that he would do so. (Plaintiff's Exhibit 65, at page 89, lines 12–13).

279. There was no consideration for the alleged contract. (Plaintiff's Exhibit 65).

280. Ziggity commenced this action in January 1989.

281. There had been substantial contact between counsel for Ziggity and Val regarding Ziggity's belief that Val was continuing to violate the Settlement Agreement and the Court's order of June 12, 1987. (Defendants' Exhibits 176, 177, 178, & 180).

282. When the action was filed in this court, a courtesy copy was delivered to counsel for the defendants with a letter from Ziggity's counsel stating a willingness to discuss resolution of the dispute prior to the incurrence of expense in the conduct of litigation. (Plaintiff's Exhibit 48).

283. Defendants proceeded with an answer and counterclaim and discovery commenced.

284. Defendants suffered no damages as a result of Ziggity's alleged breach of its agreement to contact the defendants prior to initiating this lawsuit because defendants were never deprived of their opportunity to attempt to settle this lawsuit and avoid unnecessary litigation.

285. In light of all the surrounding circumstances, defendants were *not* justified in relying on Ziggity's lack of complaints with respect to their new trigger pins during a ten-month period as a positive endorsement of their new trigger pins. (Trial Transcript 2/21/90 at page 208, lines 6–9).

286. Ziggity made it clear at the hearing before Judge Cahn on June 12, 1987 that Val's new trigger pin did *not* have a flat head. (Plaintiff's Exhibit 65).

287. Defendants did *not* acquire the machinery for the secondary operation (burr removal) in reliance on anything Ziggity did or did not do. Rather, defendants purchased the machinery to reduce the cost of manufacturing and to increase the volume of production of trigger pins. (Trial Transcript 2/14/90 at page 153, lines 12–15; Trial Transcript 2/16/90 at page 16, lines 14–15; page 22, lines 8–14; page 33, lines 11–12; Trial Transcript 2/21/90 at pages 205–206).

## DISCUSSION

### I. PATENT INFRINGEMENT ANALYSIS

■ The burden of proof as to factual issues relating to defendants' infringement rests upon the patent owner, Ziggity. The level of persuasion necessary to meet that burden is a preponderance of the evidence. *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1361 (Fed.Cir.1983). It is not necessary for the patent owner to prove that every claim of the patent is infringed. Infringement of any single claim establishes liability.

■ The infringement analysis entails two principal inquires: (1) a determination of the scope of the claims as a matter of law and (2) the factual finding of whether the properly construed claims encompass the accused structure. *Mannesmann Demag Corp. v. Engineered Metal Prod. Co.*, 793 F.2d 1279, 1282 (Fed.Cir.1986); *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569 (Fed.Cir.1983). This analytical framework applies both where claims are asserted to be literally infringed and where infringement occurs under the doctrine of equivalents. *Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 805 F.2d 1558, 1562 (Fed.Cir.1986).

### A. Scope of the Claims at Issue

■ A claim must be construed in light of the language of the claim, the prior art,

the prosecution history, and the patent specification, and not in light of the accused device. "It is only *after* the claims have been *construed without reference to the accused device*, that the claims, as so construed, are applied to the accused device to determine infringement." *SRI Int'l v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1118 (Fed.Cir.1985) (emphasis in original).

■ The specification and drawings are useful aids in ascertaining the scope and meaning of the language employed in the claims. *United States v. Telectronics, Inc.,* 857 F.2d 778, 781–82 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1046, 109 S.Ct. 1954, 104 L.Ed.2d 423 (1989). The invention defined by the claims, however, is not restricted to the precise structure disclosed by the specification and drawings. *See SRI Int'l,* 775 F.2d at 1121–1122; *Lemelson v. United States,* 752 F.2d 1538, 1552 (Fed.Cir.1985); *Autogiro Co. of America v. United States,* 384 F.2d 391, 396–98, 181 Ct.Cl. 55 (1967).

> The specification "set[s] forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112. This one embodiment of the invention does *not* restrict the claims. Claim interpretation must *not* make use of "best mode" terms inasmuch as the patentee need *not* guard against infringement by listing every possible infringing device in the specification.

*SRI Int'l,* 775 F.2d at 1122 (quoting *Autogiro,* 384 F.2d at 398). Only the words, terms, and phrases of the claim itself "define the metes and bounds of the protection afforded by the claims." *Palumbo v. Don–Joy Co.,* 762 F.2d 969, 974 (Fed.Cir. 1985). When necessary, these words, terms, and phrases are construed in light of the specification. However, to read the specification into the claims would obviate the need for their statutorily required existence in the patent. *SRI Int'l,* 775 F.2d at 1121. Further the claims of the patent are to be construed so as to maintain the validity of the patent if that is at all possible. *ACS Hosp. Sys. v. Montefiore Hosp.,*

732 F.2d 1572, 1577 (Fed.Cir.1984); 35 U.S.C. § 282.

1. *Scope of Claim 19 of the '345 patent*

In the present litigation, Ziggity asserts infringement of Claims 1–13 and 19–24 of the '345 patent (Plaintiff's Exhibit 43) and Claims 3–5 of the '088 patent (Plaintiff's Exhibit 42). Claim 19 of the '345 patent is a representative claim to which the remaining claims have been and will be compared, although each claim stands on its own merits with respect to the infringement and validity analysis. 35 U.S.C. § 282.

At the outset, the preamble of Claim 19 defines the invention as "a watering device for fowl and small animals." Claim 19 further defines the invention as having a "housing." The specification states that elements 20 and 30 of the patent drawings exemplify such a housing. Claim 19 goes on to define, in ordinary language, a specific valve structure formed within that housing. That valve structure comprises the following: upper and lower seats, a ball valve for bearing on the upper seat to seal against fluid flow, a valve actuator with a portion projecting through and beyond the outlet and portion bearing on the lower seat, and a specifically oriented recess in the head portion of the valve actuator. The last two subparagraphs of Claim 19 describe the spatial and functional interrelationships of the components of this structure.

■ Nowhere in Claim 19 are absolute dimensions of the components specified, nor do they need to be. *See* 35 U.S.C. § 112, ¶ 6. Any structure of these components in the defined arrangement which provides the defined function within the defined environment is included within the language of that claim. Hence, any watering device for fowl with a ball valve/actuator structure of the type set forth in Claim 19 is literally within the scope of Claim 19.

Claim 19 does not specify the size of the recess in terms of absolute numbers, but instead in terms of what the recess must accomplish. In particular, the size of the recess must be such that the edge region of the recess can cooperate with the ball valve

to provide a specific form of "initial actuation engagement" in response to "lateral movement" of the valve actuator pin. Claim 19 further defines that specific form of initial actuation engagement as being that which is "provided at a location spaced apart from the lowermost portion of the ball valve." In a broad sense then, the size of the recess must only be sufficiently large and spatially oriented to permit the edge of the recess to initially engage the ball valve at a place away from the lowermost portion of the ball valve.

Claim 19 likewise specifies the extent of "lateral movement" not in terms of absolute distances, but instead in terms of its necessary function within the environment—whatever such movement is necessary to cause the ball valve to shift off its seat and permit fluid to flow and is obtainable and expected within the poultry watering environment. This language of Claim 19 is necessarily broader than the corresponding recitations in Claims 1 and 3 of the '345 patent and Claims 4 and 5 of the '088 patent, which are further limited to "slight" and "any" movement, respectively.

As required by 35 U.S.C. § 112, certain intercomponent dimensions are provided in the specification and general relative dimensions of the best mode known, as of the filing date, are shown in the patent drawings. At no point in the specification, drawings, or prosecution history did the inventor, Eldon Hostetler, state that his invention was limited to certain absolute dimensions of components. In fact Mr. Hostetler explicitly stated the opposite: "While the preferred embodiment of the invention has been illustrated and described, it will be understood that changes in the construction may be made within the scope of the appended claims without departing from the spirit of the invention." *See* Plaintiff's Exhibit 43 at column 6, lines 53–56.

The absolute limit to the dimensions of the recess and the absolute limit in lateral movement were never at issue during the prosecution history of the patents-in-suit. Therefore, in properly construing the scope

of Claim 19, it is unnecessary and improper as a matter of law to impose any absolute size limitations on the "recessed region." All that is required is that the size of the recess be sufficient to perform its required function. Likewise, there is no basis for imposing any limitation on the extent of the "lateral movement" referred to in Claim 19, other than to require that the lateral movement cause the ball valve to shift off its seat.

### 2. *Scope of the remaining claims at issue*

As stated earlier, plaintiff asserts infringement of Claims 1–13 and 19–24 of the '345 patent and Claims 3–5 of the '088 patent. Therefore, I shall construe the scope of the remaining claims at issue.

Claim 1 of the '345 patent shares many of the same limitations as Claim 19 but defines the invention as "adapted to be connected to a water supply line." *Compare* Plaintiff's Exhibit 43 at column 6, lines 67–68 *with* column 9, line 22. Additionally, Claim 1 does not recite the "upper and lower" spatial limitation of the seat locations used in Claim 19, but instead uses the more general "valve seat and second seat" designations. *See* Plaintiff's Exhibit 43 at column 6, line 61. However, as noted above, Claim 1 includes the more specific limitation of "slight actuator movement" on the extent of movement necessary to cause fluid flow. *See* Plaintiff's Exhibit 43 at column 7, line 6.

Claim 2 of the '345 patent includes all the limitations of Claim 1, but recites the ball valve limitation of Claim 19 and requires the concave actuator surface to "substantially" correspond to the curvature of the ball valve. *See* Plaintiff's Exhibit 43 at column 7, lines 11–13. While the written specification does not define "substantially" apart from its ordinary meaning, the drawings do provide a general indication of the extent of variance expected in having the curvatures "substantially" correspond. More importantly, it is useful to note that Ziggity, in defining the subject matter of its invention in the claims, was obviously aware of the significance and applicability of the term "substantially."

That term was used only in Claims 2, 10, and 23 and, thus, should not be implied into any other claim absent evidence of Ziggity's specific intent to do so.

In contrast to Claims 1 and 19, Claim 3 more specifically defines the recess/valve relationship. The recess is specified to have a "leveraging edge" at the "circumference" of the recess, and the valve is to be "at least partially received within" the recess. Claim 4 includes these same limitations and further requires the recess to be a concave surface. Claim 5 carries that limitation a step further and requires that the valve member be a ball valve having a portion receivable within the concave recess. Figure 2 of the '345 patent shows an example of such an arrangement.

Claim 6 differs from Claim 19 primarily in not defining the location of the seats in terms of the usual vertical orientation of the watering device. Instead, Claim 6 also defines the location of initial actuation engagement in terms of the location of the closest portion of the ball valve to the second seat. Claim 7 includes all the limitations of Claim 6 and, in addition, requires that lateral movement of the valve actuator cause the edge region to move toward the ball valve. Thus, by implication, the subject matter of Claim 7 assumes the edge region is not in contact with the ball valve already, or else the edge region could not move "toward" the ball valve.

Claim 8 includes all of the limitations of Claim 7 and further requires the recess to include a concave surface and the edge region to be located at the periphery of that concave surface. Claims 9–12 progressively limit the inventive subject matter to include specific additional structures to enhance drinker performance. Claim 13 provides a specific definition of the extent of necessary lateral movement by reference to intended usage with small chicks.

Claim 20 includes all of the limitations of Claim 19 and further defines the location of the lowermost portion of the ball valve with respect to the plane of the lower seat. Claim 21 applies the limitation of Claim 8 to the subject matter of Claim 20. Claim 22 further defines the invention in terms of the functional advantages which the structure provides from repeated actuation.

Claim 23 generally incorporates the subject matter of Claim 19 with the additional limitation and function of Claim 9 concerning fulcrum lifting from a flattened lower seat surface and orients the location of initial actuation engagement with respect to the housing outlet. Claim 24 further includes structure defining a second sealing function at the second seat.

Claim 4 of the reexamined '088 patent differs from Claim 19 of the '345 patent primarily in requiring three valve seats which provide three fluid seals and in requiring such proximity of the peripheral edge of the recess and the ball valve such that *any* lateral movement of the trigger pin causes fluid flow. Claim 5 of the reexamined '088 patent includes limitations similar to those in Claim 4, except that the "housing" is defined more broadly to include the drinker "saddle", which is shown in the drawing as item 6. Finally, Claim 3 of the reexamined '088 patent includes all the subject matter of Claim 5 with additional limitations directed to the structure of the interlocking hooks.

### B. Literal Infringement

The next step in the infringement analysis is the application of the properly construed claims to the accused device. Plaintiff asserts both literal infringement and infringement under the doctrine of equivalents. I shall first address literal infringement.

■ A finding of literal infringement requires that each and every element or feature of the properly construed claim be found in the accused device. *Atlas Powder Co. v. E.I. Du Pont De Nemours & Co.*, 750 F.2d 1569, 1579 (Fed.Cir.1984) (citing *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569 (Fed.Cir.1983)).

#### 1. *Literal infringement of Claim 19*

Defendants contend that the Val nipple drinker does not literally infringe the patents-in-suit. Using Claim 19 of the '345 patent as an example, defendants maintain that the Val nipple drinker cannot be read

on Claim 19 because (1) the Val pin does *not* have a recessed region; (2) the Val pin does *not* have an edge region; (3) the recessed region and the ball valve are *not* confronting; and (4) the initial actuation engagement is *not* provided at a location "spaced apart" from the lowermost portion of the ball valve. *See* Defendants' Post-Trial Brief, at 28–29. I will address each of contentions seriatim.

a. *Recessed region*—Defendants' expert witness, Mr. Ramik, concluded that the recessed region specified in claim 19 is limited to the type of recess shown in the illustration of Figures 2 and 3 of the '345 patent. According to Mr. Ramik, those drawings show a recess that extends practically to the diameter of the head of the pin. Therefore, defendants contend that the recessed region set forth in Claim 19 must be of a width and depth as shown in Figures 2 and 3.

■ This reasoning is flawed. In construing the "recess region" to have a size requirement limited to what is specifically shown in the drawings, defendants ignore well established patent law. It is true that, in construing the claim in a patent, the court must consider a number of factors, including: (1) the language of the claim; (2) other claims in the patent; (3) the disclosure in the specification and drawings, and (4) the prosecution history of the patent. However, defendants fail to recognize that the specification and drawings cannot be used to limit the scope of the claim or the claimed invention as a whole.

■ The words and phrases in the specification, together with the drawings, (1) must enable a person skilled in the pertinent art to make and use the invention, and (2) must set forth what the inventor believes to be the preferred mode of carrying out the invention, at the time the patent application was filed. Different methods of carrying out the invention disclosed in the patent are called the "embodiments" of the invention.

■ Patent laws do not require that the applicant describe in the specification every possible future embodiment of the invention. *SRI Int'l v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1121–22 (Fed. Cir.1985). Therefore, the claims of the patent are not necessarily limited to the particular embodiments of the invention described in the patent specification and drawings. *SRI Int'l*, 775 F.2d at 1122 (quoting *Autogiro Co. of America v. United States*, 384 F.2d 391, 398, 181 Ct.Cl. 55 (1967)); *Lemelson v. United States*, 752 F.2d 1538, 1552 (Fed.Cir.1985).

■ Therefore, I conclude that the pin in the Val nipple drinker has a "recessed region." Although the recessed region in the Val trigger pin is much smaller in diameter than the recessed region in the Ziggity pin, it is a recessed region nonetheless. The recess in the Val pin is clearly visible to the naked eye. Defendants cannot, nor do they attempt to, argue that there is no indentation on the Val pin. Rather they contend that the indentation on their pin is not a recessed region as that word should be construed in Claim 19, in light of the Figure 2 and Figure 3 drawings. In light of the fact that the drawings cannot be used to limit the scope of Claim 19 and that Claim 19 contains no absolute size requirement for the "recessed region," I conclude that the upper surface of the Val pin contains a "recessed region."

■ b. *Edge region*—No where in the '345 patent is the term "edge region" given a special definition apart from its ordinary meaning. Unless used otherwise by the patentee, the words of a claim are to be given their ordinary accustomed meaning in light of the subject matter and context of the invention. *See ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1580 (Fed.Cir.1988). In the present case, the claim language simply defines "edge region" functionally in terms of the location of the initial actuation engagement with the ball valve. The drawings, illustrating the applicant's best embodiment at the time the application was filed, confirm the ordinary meaning of edge region as being that area in the vicinity of where the recess merges with the rest of the upper surface of the head of the valve actuator.

Further, evidence of the ordinary meaning of words used in a claim may be found by reference to any standard dictionary. *Casler v. United States*, 15 Cl.Ct. 717, 9 U.S.P.Q.2d 1753, 1765 (1988) (in determining the scope of the disputed claim, court may consider "texts such as dictionaries which explain common usage of the disputed claim terms"), *aff'd mem.*, 883 F.2d 1026 (Fed.Cir.1989). It is proper for a court to take judicial notice of the contents of a dictionary. *B.V.D. Licensing Corp. v. Body Action Design, Inc.*, 846 F.2d 727, 728–29 (Fed.Cir.1988). For the purpose of this opinion, I shall take judicial notice of the definitions contained in *Webster's Ninth New Collegiate Dictionary* (Merriam–Webster Inc., Springfield, Mass. 1987) ("*Webster's*").

In *Webster's*, "edge" is defined as

2 a: the line where an object or area begins or ends: BORDER b: the narrow part adjacent to a border c: a point near the beginning or the end; . . . .

*See* Appendices for Plaintiff's Post Trial Brief, Appendix B. Further, "region" is defined as:

3 b: an indefinite area surrounding a specified body part 4: a sphere of activity of interest: FIELD. . . .

*See* Appendices for Plaintiff's Post Trial Brief, Appendix B. Therefore, the ordinary meaning of "edge region" in the context of the claimed recessed region would be equivalent to the narrow area surrounding or adjacent to the edge.

This definition of "edge region" is not inconsistent with the usage of that term during prosecution of the patents-in-suit. At no time did Ziggity more narrowly define the spatial orientation or configuration of that edge. Instead, reference to the edge region is made only with respect to its contact point and leveraging function.

c. *Confronting*—Just as with the term "recessed region," there is no special definition of the term "confronting" given in the specification of the '345 patent. Certainly nothing in the dictionary definition of "confronting" requires that term to mean "touching." In *Webster's*, "confronting" is defined as "opposing," "bringing face-to-

face," or "encountering." *See* Appendices for Plaintiff's Post Trial Brief, Appendix B.

In the '345 patent, plaintiff defines its claim limitations in terms of the interrelationship of the components and their function and, in fact, stated:

By "confronting" the applicant refers only to the spacial relationship between the valve ball and the actuator pin head which, *although not necessarily touching when the valve is closed,* is intended to be so close, only a short distance away, that only slight actuation force and movement is necessary.

*See* Defendants' Exhibit 4, Amendment of March 11, 1986, paper no. 15, at 3. Therefore, Claim 19 contains no special requirement that the ball valve must actually be touching the valve actuator, other than during the actuation engagement. In fact, in the specification of the '345 patent, a preferred embodiment of the invention is described as having the upper surface of the valve actuator head "adjacent to and slightly spaced from the lowermost portion" of the ball valve. *See* Plaintiff's Exhibit 43 at column 4, lines 33–34. The description "adjacent to and slightly spaced from the lowermost portion" stems from the original disclosure and cannot be considered "new matter." *See infra* Discussion, Section II. E. Another preferred embodiment is shown in Figure 2 of the '345 patent which shows part of the ball valve touching the edge region of the recess in the non-actuated or resting state.

As stated before, the purpose of the specification is to set forth the best embodiment of the invention known to the patentee at the time the patent application was filed. The specification cannot be held to limit the scope of the claims to cover only the disclosed embodiment. However, the specification can be used to help construe the claims, without limiting their scope. If Eldon Hostetler had considered contact between the ball valve and the valve actuator to be an important aspect of his invention, he should have included that requirement and limitation in his claim.

The patent statute provides in pertinent part:

an element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital or structure, material, or acts in support thereof, and such claim shall be construed to cover all corresponding structure, material, or acts described in the specification *and equivalents thereof.*

35 U.S.C. § 112 (emphasis added). Therefore, I conclude that the spatial orientation of the recess as "confronting" the ball valve should be construed to include all such equivalent orientations which allow the recess to perform its specified function with respect to the other elements of the claimed combination in the poultry watering environment—and *not* limited to actual contact between the recess and the ball valve.

 d. *Spaced apart*—Finally, defendants contend that their valve actuator contacts the ball valve substantially on center, and, therefore, that the location of the engagement is not "spaced apart from the lowermost portion" of the ball valve, as required in Claim 19. This contention is without merit.

The width of the recess in the head portion of Val's valve actuator is .060 inch, which is 20 times larger than the depth of the recess. *See* Plaintiff's Exhibit 30, bates Nos. 115454 and 115457. Since the recess is formed by a ball punch having the same radius as the ball valve, *see* Trial Transcript 2/16/90 at page 15, line 16 thru page 16, line 15, it is geometrically impossible upon lateral movement of the pin portion for the center of the head portion of the valve actuator to hit the lowermost point of the ball valve. Because, upon lateral movement of the pin portion, the edge region provides that initial actuation engagement with the ball valve,[1] the valve actuator will hit the ball approximately .030 inch (i.e. half of the width of the recess) from the lowermost portion of the ball. Hence, it is clear that, upon lateral movement of the pin portion, the initial actuation engagement is provided at a location apart from the lowermost portion, or center, of the ball valve.

 Therefore, I conclude that defendants have literally infringed Claim 19 of the '345 patent.

### 2. *Literal infringement of the remaining claims*

Just as with Claim 19 of the '345 patent, each and every element and feature of Claims 1–2, 6–13, and 20–24 is found in the Val nipple drinker.[2] Therefore, defendants also literally infringe those claims.

In addition, plaintiffs also maintain that on occasion the Val nipple drinker will also infringe Claims 3–5 of the '345 patent and Claims 3–5 of the reexamined '088 patent. Plaintiffs contend that there are instances in which

the dimension of the thickness of the actuator pin head is so large that the deburring punch creates a larger recess in the head of that pin and [, therefore,] that the ball valve protrudes into that recess and *perhaps* even touches or is immeasurably close to the edge of that recess. In such circumstances since there is a statistical probability these circumstances exist because of Defendants'

---

1. Defendants do *not* contend that, if there is an edge region on the upper surface of the head portion of Val's valve actuator, the edge region does *not* provide the initial actuation engagement with the ball valve. Defendants simply argue that there is no edge region. During the trial, Mr. Steudler, Jr. admitted that *the pin* provides the initial actuation engagement with the ball valve. *See* Trial Transcript 2/26/90, at p. 72 line 22–p. 73 line 9. Unfortunately, plaintiff's counsel did *not* specifically ask Mr. Steudler, Jr. whether *the edge region* of the pin provides the initial actuation engagement with the ball valve. Therefore, since I conclude that there is an edge region, I will assume that the edge region provides the initial actuation engagement with the ball valve because defendants do not contend otherwise.

2. This determination was made only after this court laboriously compared each element within each claim with the accused device. I note that defendants do *not* contend that their nipple drinker does *not* infringe these additional claims of the '345 patent. Rather, defendants contend only that their nipple drinker does *not* infringe Claim 19.

manufacturing techniques, Defendants' nipple drinkers would include each and every element of Claims 3–5 of the '345 patent and Claims 3–5 of the Reexamined patent. *See* Plaintiff's Post Trial Brief at page 46. Apparently, plaintiff bases this argument upon the testimony of defendants' expert witness, Mr. Boehringer, but fails to cite to his testimony in the trial transcript which supports their argument.

Defendants argue that Mr. Boehringer's testimony does not support a statistical variation in the dimension of the thickness of the actuator pin. *See* Trial Transcript 2/22/90 at pages 119–121; Defendants' Exhibit 280.

I conclude that Mr. Boehringer's testimony does *not* support plaintiff's argument. Although Mr. Boehringer did measure the head heights of 179 randomly selected Val pins and charted the results, *see* Defendants' Exhibit 280, he did *not* conclude that the pins with the thickest heads were so large that the deburring punch would create a large recess in the head of that pin and that the ball valve would protrude into that recess and would, perhaps, even touch the recess or be immeasurably close. Rather, plaintiff draws that conclusion without any evidence in support thereof.

■ This court will *not* make a finding of infringement based upon possibilities that are not supported by evidence. Hence, I conclude that the Val nipple drinker does *not* literally infringe Claims 3–5 of the '345 patent and Claims 3–5 of the reexamined '088 patent.

C. Infringement Under the Doctrine of Equivalents

■ Even though an accused device may avoid the literal language of the claims, plaintiffs may nevertheless prove infringement based on the doctrine of equivalents. The doctrine of equivalents prevents an infringer from appropriating the essence or heart of an invention by avoiding the literal words of a patent claim. *Atlas Powder Co. v. E.I. Du Pont De Nemours & Co.*, 750 F.2d 1569, 1579 (Fed.Cir. 1984). Infringement based on equivalents can be established if the accused device and the claimed invention perform substantially the same function in substantially the same way to yield substantially the same result. *Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

■ In applying the doctrine of equivalents to determine if there is infringement, an owner of a patent is estopped or prevented from taking positions which are inconsistent with positions that he took in the Patent Office in order to get the patent in the first place. This is called the doctrine of prosecution history estoppel. *See Hughes Aircraft Co. v. United States*, 717 F.2d 1351 (Fed.Cir.1983). The doctrine of prosecution history estoppel is merely designed to preclude a patent owner from obtaining a claim construction that would resurrect subject matter surrendered during the prosecution of the patent before the Patent Office, as reflected in the file history. Thus, application of the doctrine of equivalents requires consideration of the purpose and context of amendments and arguments submitted during prosecution of the patent application to determine what subject matter has, in fact, been surrendered by the patentee.

■ With respect to Claim 19 of the '345 patent, the analysis for prosecution history estoppel is very straightforward. Claim 19 of the '345 patent was originally introduced as Claim 32 in the Amendment of September 8, 1986. *See* Defendants' Exhibit 4. That claim was never amended and, thus, no subject matter was surrendered in response to prior art. Therefore, the scope of Claim 19 of the '345 patent is no less broad under the doctrine of equivalents. *See Senmed, Inc. v. Richard–Allan Medical Indus., Inc.*, 888 F.2d 815, 821 (Fed.Cir.1989). The only arguments submitted in support of Claim 19 (Claim 32 in the following remarks) were as follows:

Claims 14, 15 and 17 have been amended and new Claims 19–37 have been included so as to more particularly point out and distinctly claim the subject mat-

ter of the present invention, as discussed with the Examiner during the interview. In particular, the present claims define an arrangement wherein the recessed portion of the actuating pin head includes an edge which is cooperatively associated with the ball valve in that it provides initial leveraging actuation engagement with the ball valve in response to lateral movement of the pin with respect to the housing. The point of engagement between this edge and the ball valve is off-center or spaced apart from the lowermost point of the ball valve in vertical arrangements or, more generally, that point on the ball valve which extends furthest toward the level or position of valve actuator seat within the housing. It will be readily understood by those of ordinary skill in the art from Figure 4 that the "level" of the valve actuator seat is at the surface of that seat upon which the valve actuator bears. Where that surface includes a central bore to the outlet, the lowermost point of the ball valve is also closest to the center of the bore.

The off-centered leveraging arrangement of the present invention is clearly illustrated in Figure 4. This feature significantly increases the responsiveness of the present invention to lateral or tilting actuation and thereby permits wide spread utilization. New independent Claims 19, 32 and 36 and the dependent Claims therefrom have been included to further point out the structural details of the present invention and the functional results thereof.

As discussed during the interview, none of the references of record teach or suggest the advantages or structural arrangement of the present invention. Thus, it is respectfully submitted that this case is now in condition for allowance, and passage to issue is respectfully solicited.

*See* Defendants' Exhibit 4.

The function of the invention claimed under Claim 19 is to properly water fowl and small animals. *See* Plaintiff's Exhibit 43. In a general sense, the claimed invention achieves this function by use of a ball valve/actuator structure having leveraged actuation through initial actuation engagement provided by a recess structure in the actuator at a location spaced apart from the lowermost portion of the ball valve. As a result, the claimed invention provides at least the following advantages: (1) a watering device which is more responsive to actuation by poultry to meter the correct amount of water to the poultry; (2) better fluid sealing when the ball valve is closed; and (3) a longer useful life.

The function of defendants' nipple drinkers is also to properly water fowl and small animals. *See* Plaintiffs' Exhibit 35. Defendants' nipple drinkers also achieve this function by use of a ball valve/actuator structure having leveraged actuation through initial actuation engagement provided by a recess structure in the actuator at a location spaced apart from the lowermost point of the ball valve. As a result, defendants' nipple drinker also provides: (1) a watering device which is more responsive to actuation by poultry to meter the correct amount of water to the poultry, (2) better fluid sealing when the ball valve is closed, and (3) a longer useful life.

Therefore, because defendants' nipple drinkers perform substantially the same function in substantially the same way to yield substantially the same result as the invention set forth in Claim 19 of the '345 patent, defendants infringe Claim 19 of the '345 Patent under the doctrine of equivalents.

Defendants contend that they avoid infringement under the doctrine of equivalents because the Val nipple drinkers function differently from Ziggity's in that the Val drinkers employ a different type of leveraged actuation. Defendants assert that the invention claimed in Claim 19 requires "distance leverage" while the Val drinker employs "force leverage."

Every lever has advantages of force and distance in proportion to the distance of the point of engagement of the lever from the fulcrum. Defendants use valve actuators that have recesses smaller that the recess shown in the '345 patent as the preferred

embodiment of the invention as of January 25, 1980. Thus, it follows from elementary physics that the location of the initial actuation engagement in the Val nipple drinker is closer to the fulcrum of the lever than in the Ziggity nipple drinker. Therefore, the ball valve in the Val nipple drinker can be lifted with less force than the ball valve in the Ziggity nipple drinker, but will not be lifted as high as the ball valve in the Ziggity nipple drinker. *See* Trial Transcript 2/20/90 at page 111, line 15 thru page 113, line 13. Consequently, the Val drinker can be said to maximize force and minimize distance; whereas, the Ziggity drinker can be said to maximize distance and minimize force. *See id.*

Although defendants are correct in stating that the Val drinker emphasizes force leverage and the Ziggity drinker emphasizes distance leverage, their contention that they avoid infringement under the doctrine of equivalents because of this difference in leveraged actuation is sophistry. Claim 19 of the '345 patent did *not* limit the subject matter of the invention to one or the other component—force or distance—of leveraged actuation. Therefore, Claim 19 must be interpreted to cover both types of leveraged actuation—a leveraged actuation which emphasizes force over distance as well as a leveraged actuation which emphasizes distance over force.

In essence, defendants' contention with respect to infringement under the doctrine of equivalents would imply into Claim 19 a limitation as to the size of the recess. As already discussed with respect to literal infringement, there is no reason to imply such a limitation into Claim 19 in light of the language of the claim, the specification, the prosecution history, or the prior art.

Infringement under the doctrine of equivalents does *not* require the two products to be identical. Therefore, in spite of the fact that the sizes of the recessed regions differ, there can be no doubt that Ziggity nipple drinker and the Val nipple drinker perform substantially the same function in substantially the same way to produce substantially the same result. Hence, I conclude that Val's 360 degree

trigger action nipple drinkers infringe under the doctrine of equivalents Claims 1–13 and 19–24 of the '345 patent and Claims 3–5 of the reexamined '088 patent.

## D. Willful Infringement

As a matter of law, if a patent is willfully infringed, then under 35 U.S.C. § 284 the patent owner is entitled to an award of increased damages up to three times the amount of actual damages. In addition, if a patent is willfully infringed, the court may consider the case "exceptional" pursuant to 35 U.S.C. § 285 and award attorney fees to the patentee.

The question of willful infringement is a question of the infringer's intent—a question of fact. "There are no 'hard and fast *per se* rules,' and the finding [of willful infringement] is based on the totality of the circumstances." *State Indus., Inc. v. Mor–Flo Indus., Inc.*, 883 F.2d 1573, 1581 (Fed.Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 725, 107 L.Ed.2d 744 (1990). Although infringement need only be proven by a preponderance of the evidence, clear and convincing evidence is required to show that the infringement was committed willfully. *Id.*

The question of willful infringement is by definition a question of the infringer's intent. Infringement is not willful if, based upon the totality of the circumstances, it is determined that defendants acted in good faith and with a reasonable basis for believing that they were not infringing the patents-in-suit. On the other hand, infringement is willful if, based upon the totality of the circumstances, it is determined that defendants acted in bad faith and without a reasonable basis for believing that they were not infringing the patents-in-suit. *Gustafson, Inc. v. Intersystems Indus. Products, Inc.*, 897 F.2d 508 (Fed.Cir.1990).

The facts which led to this present action are somewhat different than the typical patent infringement action. The parties in the present action were parties in a previous law suit, in which the parties entered into a Settlement Agreement in early 1987.

*See* Defendants' Exhibit 9. That Settlement Agreement, provided in pertinent part:

6. Defendants agree to cease making, using, and selling, as of April 1, 1987, allegedly infringing products having a recess in the head of the trigger pin as shown in Exhibit "B" attached to the Amended Complaint.

7. Plaintiff hereby releases from liability and covenants not to sue Defendants for any claim of infringement of Plaintiff's patents based on manufacture, use, and/or sale of Defendants' new product design which substitutes a *flat head trigger pin*, as shown in Exhibit "A" attached hereto, into a drinker assembly. Plaintiff agrees that this new product design does not infringe any of Plaintiff's patents or patent applications or any continuations, continuations in part, divisions, reissues or reexaminations thereof....

*See id.* at page 2 (emphasis added). Unfortunately, the parties defined the term "flat head trigger pin" only by way of a drawing attached to the agreement as Exhibit A.

Pursuant to the Settlement Agreement, Val attempted to design around the patents-in-suit by switching from a recess-headed trigger pin with a recess of a depth of approximately .032 inch to, what it considered essentially, a flat-headed trigger pin with a deburring mark on its head of a depth of approximately .003 inches, or less than 1/10th that of the former trigger pin. Through cross-sectional diagrams, Val advertised its nipple drinkers as having flat-headed trigger pins. *See* Defendants' Exhibits 147–161.

At a hearing held on June 12, 1987 with respect to the previous lawsuit, Ziggity mentioned concern over whether defendants breached the Settlement Agreement by manufacturing and using the trigger pins with the smaller recesses. *See* Plaintiff's Exhibit 65. For nineteen months thereafter, Ziggity did not raise any more objections concerning Val's newly designed trigger pin. *See* Trial Transcript 2/21/90 at page 124, lines 9–15. During that time period, Val grew increasingly confident

that Ziggity had accepted its new trigger pin as a legitimate design around Ziggity's patents. *See id.* at page 206, lines 1–16. In fact, Val was so confident, in light of the Settlement Agreement, that its new pins did not infringe the Ziggity patents, it purchased an additional machine to manufacture its new pins, which was more effective at removing the cut off burr than the original machine. *See id.* at page 124, lines 9–15.

Then in January 1989, Ziggity initiated this present lawsuit against defendants, alleging that Val's new pins were not flat and, therefore, infringed the Ziggity patents-in-suit.

The idea of manufacturing and using a flat-headed trigger pin as a design around Ziggity's patents was first presented to Val by its patent counsel, Mr. Vincent L. Ramik, in mid-July 1986. *See* Defendants' Exhibit 121; Trial Transcript 2/20/90 at page 97, line 20 thru page 98, line 10. In June 1987, Val presented Mr. Ramik with examples of what it considered flat-headed trigger pins. *See* Defendants' Exhibits 278–1 thru 278–4; Trial Transcript 2/20/90 at page 98, line 11 thru page 100, line 24. At that time, Mr. Ramik provided Val with his verbal opinion that its new pins were flat and, thus, did not infringe either of the two Ziggity patents-in-suit. *See* Trial Transcript 2/20/90 at page 100, line 25 thru page 101, line 18; Trial Transcript 2/21/90 at page 86, line 2 thru page 87, line 9.

■ Based on the totality of the circumstances, I find that defendants acted in good faith in attempting to design around the patents-in-suit and had a reasonable basis for believing that their new trigger pins were flat and, thus, not infringing the patents-in-suit. First and most important, Vallorbs and Fred Steudler, Jr. are and have been for many years, as was Fred Steudler, Sr., involved in the screw machine industry and have developed an expertise in manufacturing small precision parts. In fact, Vallorbs manufactures the trigger pins for the Val nipple drinker. In contrast, Ziggity does *not* manufacture any of the component parts of its nipple drinker and has no expertise in the screw machine

industry. Hence, it is understandable why defendants understood the term "flat" in the Settlement Agreement as that term is understood in the screw machine industry. *See* Defendants' Exhibits 163–172. Defendants' expert, Mr. Boehringer, admitted as an expert in the use of screw machines, *see* Trial Transcript 2/22/90 at page 109, lines 5–13, testified that, within the custom of the screw machine trade, the heads of Val's trigger pins are "absolutely flat and remarkably so." *See id.* at page 121, lines 5–7. Unfortunately, as is so often the case, the parties did not foresee the problem with the interpretation of the term "flat." Second, as early as June 9, 1987 and after examining samples of their new pins, Mr. Ramik, defendants' patent counsel, gave defendants a verbal opinion that their new pins were flat. Finally, defendants did not become aware that Ziggity did not consider the heads of the new Val trigger pins to be flat pursuant to the Settlement Agreement until Ziggity initiated this present lawsuit.

### E. Liability of the Defendants

#### 1. *Val*

Val makes, uses, and sells the infringing nipple drinkers. Thus, Val is clearly liable as an infringer under 35 U.S.C. § 271(a). However, Val is believed to be essentially judgment-proof.

Similarly, defendants admit that Mr. Steudler, Sr. was, and that Mr. Steudler, Jr. is, actively involved in selling the infringing drinkers. *See* Trial Transcript 2/16/90 at page 119, lines 8–18. Plaintiff contends that, to the extent of those infringing sales, Mr. Steudler, Sr. and Mr. Steudler, Jr. are personally liable under § 271(a) for selling the infringing nipple drinkers. In support of that contention, plaintiff points out that section 271 merely states "whoever" and does not make exception for salesmen, agents or corporate officers. Therefore, plaintiff concludes that salesmen of infringing products, even if acting as employees of a corporation, are still personally liable to the extent of their infringement. Plaintiff offers no case law to support this bold conclusion. Because I conclude that the two individual defendants

are personally liable under 35 U.S.C. § 271(b), I need not decide whether they are also liable under section 271(a).

#### 2. *Vallorbs*

■ Vallorbs manufactures for and sells to Val the trigger pins and valve seats used in the infringing Val nipple drinkers. These components are important material parts of the claimed invention. Vallorbs knows that those components are specially made for use in the infringing nipple drinkers because Vallorbs managers Val. Those components are not staple articles or commodities of commerce and have no substantial non-infringing use. Therefore, Vallorbs is liable as a contributory infringer under 35 U.S.C. § 271(c).

■ Further, defendants acknowledge that Vallorbs manages Val and controls Val's actions. *See* Plaintiff's Exhibit 68, page 24, line 9 thru page 25, line 9. Therefore, the management of Vallorbs makes the decisions concerning the products that Val sells. Therefore, Vallorbs induced Val's infringement of the patents-in-suit and, under 35 U.S.C. § 271(b), Vallorbs is liable as an infringer. *Power Lift, Inc. v. Lang Tools, Inc.*, 774 F.2d 478 (Fed. Cir.1985). For that matter, even without absolute management control, the mere sale of devices, such as the trigger pins used in the Val drinker, which are not usable in any manner other than in conjunction with infringing devices constitutes inducement. *Chisum v. Brewco Sales and Mfg., Inc.*, 726 F.Supp. 1499, 1512–13 (W.D.Ky.1989).

■ Also, in light of the near total integration of Val and Vallorbs through common management, *see* Trial Transcript 2/21/90 at page 182, common employees, and common physical facilities, *see* Plaintiff's Exhibit 68, page 24, lines 5–24, the activities of Val and Vallorbs in making, using, and selling the infringing nipple drinkers should be viewed as those of a single entity. Even Vallorbs' own senior employees and managers consider Vallorbs to be the manufacturing arm for the nipple drinker program. *See* Plaintiff's Exhibit 68, page 24, line 12 thru page 25, line 9. Despite separate books and records to

maintain the formality of independent existence, Val and Vallorbs have complete unity of interest with respect to the infringing nipple drinkers and are, in fact, one business. Therefore, if Val is a direct infringer, then so is Vallorbs.

### 3. *Individual Defendants*

Ziggity maintains that the two individual defendants are personally liable under 35 U.S.C. § 271(b) for inducing Val and Vallorbs to commit infringement. The parties have opposing views as to the controlling legal standard for imposing such joint liability. Defendants assert that, in order to establish personal liability under section 271(b), plaintiff must prove that the individual defendants actively and knowingly aided and abetted the direct infringement of the corporate defendants. Defendants also argue that plaintiff has insufficient evidence to establish personal liability of the individual defendants under an alter ego theory. Plaintiff states that it is *not* attempting to establish personal liability by contending that Mr. Steudler, Sr. and Mr. Steudler, Jr. are the alter egos of Val and Vallorbs. Plaintiff maintains that it can establish personal liability under section 271(b) merely by showing that the individual defendants exercised sufficient control over the corporate defendants to be considered the "moving force" behind the infringement.

The Court of Appeals for the Federal Circuit has interpreted 35 U.S.C. § 271(b) broadly to "include liability of corporate officials who actively aid and abet their corporation's infringement." *Power Lift, Inc. v. Lang Tools, Inc.*, 774 F.2d 478, 481 (Fed.Cir.1985). The court in *Power Lift* cited with approval *International Manufacturing Co. v. Landon, Inc.*, 336 F.2d 723, 728–29 (9th Cir.1964). *Id.* In *Landon,* the court concluded that a director or officer of a corporation is subject to personal liable under section 271(b) without regard to whether he was the alter ego of his corporation, as long as he was "the moving, active conscious force" behind the corporation's infringement. 336 F.2d at 729.

Approximately, one year after the decision in *Power Lift*, the Court of Appeals for the Federal Circuit in *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565 (Fed.Cir.1986), stated:

> [I]t is well settled that corporate officers who actively aid and abet their corporation's infringement may be personally liable for inducing infringement under § 271(b) *regardless of whether the corporation is the alter ego of the corporate officer.*

*Id.* at 1578–79 (emphasis added).

■ Therefore, it is clear that plaintiff can establish liability of the individual defendants under section 271(b) without proving that the corporate defendants were the alter egos of the individuals.

Defendants assert that, in order to be personally liable under section 271(b), one must knowingly aid and abet another's direct infringement. *See Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed.Cir.1988). Plaintiff does *not* dispute that assertion. However, the parties disagree as to how the "knowing" requirement should be interpreted. It appears that defendants are equating "knowing inducement" with "willful infringement," whereas plaintiff equates "knowing" with conscious awareness of one's actions.

■ Willfulness or intent to infringement is not a prerequisite to a finding of infringement. *See* 35 U.S.C. § 271. Therefore, common sense mandates that the "knowing" requirement under section 271(b) cannot be equal to the "willful" requirement in order to get enhanced damages under section 284. In this regard it is important to note that section 271(b) does *not* use the word "knowing" and section 284 does *not* use the word "willful." Instead, these requirements have been imposed through case law.

I conclude that the "knowing" requirement judicially imposed under section 271(b) is merely a requirement that the corporate officer be conscious and aware of his activities—not that he was aware that his activities amounted to infringement.

As the Court of Appeals for the Federal Circuit noted in *Orthokinetics:*

> Corporate officers are presumably aware of what they are doing, and in that sense they can be said to have acted "willfully." However, that does *not* mean that their acts must rise to the level recognized by the law as constituting willful infringement before they can be liable for infringement by their corporation. *Hence the district court erred in positing willful infringement as a prerequisite for the imposition of personal liability for the corporation's direct infringement.*

806 F.2d at 1579 (emphasis added).

Courts have imposed liability on a corporate officer and director as a result of the effective control that the individual had over his corporation and his active participation in the activities which amounted to infringement. Active participation sufficient to invoke personal liability has been characterized as "the moving force" behind the infringement, *White v. Mar–Bel, Inc.,* 509 F.2d 287, 292 (5th Cir.1975); "the moving, active, conscious force behind the infringement," *Superior Testers, Inc. v. Damco Testers, Inc.,* 315 F.Supp. 934, 935 (E.D.La.1970), *Rohm and Haas Co. v. Dawson Chemical Co.,* 557 F.Supp. 739, 819 (S.D.Tex.1983); or "direct participation in and control of the infringing design, manufacture, and sale," *A. Stucki Co. v. Schwam,* 634 F.Supp. 259, 265 (E.D.Pa. 1986).

In the present case, Mr. Steudler, Sr. and his son were without a doubt the moving force every step of the way. They were the principal officers, directors, and managers of all activities on a day to day basis. *See* Plaintiff's Exhibit 68, page 75, line 20 thru page 76, line 11; page 442, line 24 thru page 443, line 1. As corporate officers, they were certainly aware of what they were doing and of their activities, which Ziggity has shown to constitute infringement. As this court has already concluded, in order to establish personal liability, it is *not* necessary to show that the individuals were aware that their actions amounted to infringement.

Mr. Steudler, Sr. and Mr. Steudler, Jr. actively participated in both the manufacture and sale of the infringing products. *See* Trial Transcript 2/26/90 at page 119, lines 8–18; page 42, line 21 thru page 43, line 19. Mr. Steudler, Sr. ran the business as he saw fit, *see* Plaintiff's Exhibit 68, page 115 and pages 443–45; oversaw every expense, *see id.* at page 11, lines 6–7; page 13, lines 14–16; and controlled all the financial matters by himself, *see* Trial Transcript 2/22/90 at page 49, lines 19–25. To his employees, he personified the business. *See* Trial Transcript 2/15/90 at page 190, lines 17–20. His wife, although nominally corporate President and 50 percent shareholder, totally relied upon his judgment. *See* Plaintiff's Exhibit 67.

The management of Vallorbs viewed Val as Mr. Steudler, Jr.'s program. *See* Plaintiff's Exhibit 66, lines 19–25. He designed the infringing products and controls the manufacture and sale of those products. *See* Plaintiff's Exhibit 68, page 67, lines 22–24. Mr. Steudler, Jr. established Val's marketing plan. *See id.* page 59, lines 21–24. After the death of his father, Mr. Steudler, Jr. and his brother, Richard, have come to nearly personify the business. *See* Trial Transcript 2/15/90 at page 190, lines 17–20.

Therefore, it is clear that Mr. Steudler, Sr. was the guiding hand of the overall business of Val and Vallorbs and, within that context, his son, Mr. Steudler, Jr. was the moving force behind the infringing nipple drinkers at Val. As such, both individuals are liable under 35 U.S.C. § 271(b) for inducing infringement of the patents-in-suit.

## II. PATENT VALIDITY ANALYSIS

Defendants have several bases for contending that plaintiff's patents-in-suit are not valid. A United States Letters Patent is presumed valid. The relevant statutory provision is Section 282 of the Patent Statute which provides in pertinent part as follows:

> A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent

form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

35 U.S.C. § 282.

Shortly after its formation, the Court of Appeals for the Federal Circuit in *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530 (Fed.Cir.1983), delineated the burden of establishing invalidity of a patent:

> The presumption [of validity] like all legal presumptions, is a procedural device, not substantive law. It ... requires the decision maker to employ a decisional approach that starts with acceptance of the patent claims as valid and that looks to the challenger for proof of the contrary. Thus the party asserting invalidity not only has the procedural burden of proceeding first and establishing a prima-facie case, but the burden of persuasion on the merits remains with that party until final decision. The party supporting validity has no initial burden to prove validity, having been given a procedural advantage requiring that he come forward only after a prima-facie case of invalidity has been made. With all the evidence in, the trial court must determine whether the party on which the statute imposes the burden of persuasion has carried that burden.

*Id.* at 1534.

■ Furthermore, the party contesting the validity of a patent must prove invalidity by clear and convincing evidence. "This heavy burden [of proof] is deeply rooted in the judicial process and reflects the deference owed to the considered judgment of an expert, such as a Patent Examiner." *Spalding & Evenflo Cos. v. Acushnet Co.*, 718 F.Supp. 1023, 1031 (D.Mass.1989).

■ The presumption mandated by section 282 is applicable to all challenges to the validity of the patent. *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed.Cir.1986) ("the presumption of validity goes to validity of the patent in relation to the patent *as a whole*, not just to nonobviousness under section 103"), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987).

■ It is neither necessary nor appropriate for a court to declare a patent valid. A trial court is required only to decide whether the patent challenger has carried its burden of establishing invalidity in the particular case before the court. *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1569 (Fed.Cir.), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). When the burden has been carried, the court should declare the patent invalid. When the burden has not been carried, a court need only so state. Thereupon, the patent simply remains valid until another challenger carries the burden under section 282.

### A. Invalidity Under 35 U.S.C. § 103 (Obviousness)

Defendants challenge the validity of plaintiff's patents-in-suit on the basis of obviousness. 35 U.S.C. § 103. Section 103 of the Patent Statute provides in pertinent part:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in § 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

35 U.S.C. § 103.

■ Therefore, a patent is invalid if the invention as a whole would have been obvious to one of ordinary skill in the art, to which the invention pertains, at the time the invention was made. A determination of whether the subject matter of the claims at issue would have been obvious under section 103 involves the following factual findings:

1. the scope and content of the prior art;

2. the level of ordinary skill in the art;

3. the differences between the claimed subject matter and the prior art; and

4. where relevant, objective evidence of nonobviousness—the secondary consideration, such as long-felt need, commercial success, failure of others, copying, unexpected results.

*See Perkin–Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 894 (Fed.Cir.), *cert. denied,* 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984); *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966); *see also Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1538 (Fed.Cir.1983) ("evidence arising out of the so-called 'secondary considerations' must always when present be considered in route to a determination of obviousness"). These factual findings serve as the foundation upon which the court bases its ultimate legal conclusion regarding the obviousness of the claimed subject matter as a whole.

### 1. *Scope and content of the prior art*

 Pertinent prior art has been defined as that which one of ordinary skill in the art would reasonably be expected to look to for a solution to the problem which the patented invention solves. *Stratoflex,* 713 F.2d at 1535. The prior art is not to be narrowly confined to the methods and inventions of the subject art, but extends to other analogous arts. *Graham,* 383 U.S. 1, 86 S.Ct. 684; *L.D. Schreiber Cheese Co. v. Clearfield Cheese Co.,* 540 F.Supp. 1128, 1134–35 (W.D.Pa.1982), *aff'd,* 716 F.2d 891 (3d Cir.1983). However, the more remote the prior art is from the context of the subject matter, the less persuasive it becomes on the question of obviousness. *L.D. Schreiber,* 540 F.Supp. at 1135. An inventor is only presumed knowledgeable of prior art in the field of his endeavor that is reasonably pertinent to a particular problem which the invention solved. *Union Carbide Corp. v. American Can Co.,* 724 F.2d 1567 (Fed.Cir.1984).

In the present case, the problem which Mr. Hostetler was attempting to solve was to design and construct a reliable and cost-effective nipple-type watering device for chickens which was suitable for chickens of all ages and in all environments. *See* Trial Transcript 2/13/90 at page 43, line 4 thru page 45, line 23. Nipple watering devices are used by one-day old chicks in floor or broiler operations, as well as by mature adult laying hens in cage operations. *See id.* at page 37, line 4 thru page 38, line 3. Therefore, the nipple drinker must be just as accessible to the day old chicks as it is to the mature hens. In order to be accessible to day old chicks, the water from the nipple drinker must flow upon very slight lateral movement of the trigger pin.

 Therefore, in the present case, the relevant prior art is that art which a person with ordinary skill in the art of nipple-type watering drinkers for fowl and small animal could reasonably be expected to look for solutions to problems relating to water flow upon slight lateral movement of the trigger pin, as well as other problems relating to designing a nipple drinker that is suitable to all chickens of all ages in all environments. Defendants contend that the relevant prior art should extend to fluid valves generally. Plaintiffs contend that the relevant prior art should be limited to nipple-type watering devices for chicken, other fowl, and small animals.

As stated above, the breadth of the prior art is defined by the problem which the invention solved. Therefore, it would seem reasonable that, if the patented invention solved more than one problem, each problem would have its own relevant prior art. The problems encountered in nipple drinkers, and the reasons that they were not successful in the United States until the Ziggity nipple drinker was introduced, were that they leaked and they were not applicable to all types of chickens in all types of environments. From the standpoint of the leaking problem, it is logical that one with ordinary skill in the art would look to fluid valves generally. However, with respect to the problems associated with designing a nipple drinker that was applicable to all

types of chickens, i.e. developing a trigger pin that could easily be activated by one-day old chicks, it is logical that one with ordinary skill in the art of nipple watering devices for chickens, other fowl, and small animals would look *only* to prior art relating to nipple watering devices for chickens, other fowl, and small animals. A nipple drinker is activated by a chicken or a small animal by moving the trigger pin, either vertically or laterally. Therefore, there is no reason why one with ordinary skill in the art of nipple-type watering devices would look to a field as broad as fluid valves generally to solve a problem specifically related to activation of the valve actuator (i.e. the trigger pin) by a chicken, other fowl, or small animal. Granted, water leakage is a common problem in delivering water in areas other than to chickens, other fowl, and small animals. *See* Trial Transcript 2/16/90 at page 153, line 8 thru page 154, line 2. On the other hand, however, there are problems associated with delivering water to chickens, especially day-old chicks, which are *not* analogous to problems in other areas of water delivery. Chickens do not swallow and, therefore, can only accept a very small amount of water upon each peck of the trigger pin. Furthermore, day-old chicks must be able to access water just as the older chickens. Consequently, the water must flow upon very slight actuation of the trigger pin.

The field of search by the Patent Examiner is relevant objective evidence of the scope of the prior art. *E.I. Du Pont De Nemours & Co. v. Berkley and Co.,* 620 F.2d 1247, 1266 (8th Cir.1980). The Patent Examiners who examined each of the four applications leading to the patents-in-suit searched only outside the art of animal husbandry as a final step in issuing the last of the four applications and concluded that the claims were allowable because the claimed structure was *not* shown in the prior art within the environment of the invention.

In asserting their obviousness defense, defendants rely on the following: (1) the Clark Patent (Defendants' Exhibit 123); (2) the Mull Patent (Defendants' Exhibit 130); (3) the Kagan Patent (Defendants' Exhibit 131); (4) the Downin Patent (Defendants' Exhibit 125); (5) the Monnier French Patent (Defendants' Exhibit 126); (6) and the Maury Patent (Defendants' Exhibit 128). Of those patents, the Clark Patent, the Kagan Patent, and Mull Patent were of record during the prosecution of the applications which matured into the patents-in-suit and plaintiff admits that they are relevant prior art. *See* Trial Transcript 2/20/90 at page 156, lines 9–19. Plaintiff however, contends that Downin, Monnier, and Maury are outside the scope of the relevant prior art and, thus, should not be considered by this court.

Downin, Maury, and Monnier are all from the valve art in general. Downin is patent for a ball valve in a water faucet; Maury is a patent for a stopcock; and Monnier is a patent for an air gun intended to project a jet of compressed air for the purpose of cleaning mechanical or other parts. Therefore, in keeping with this court's finding that prior art in fluid valves is relevant prior art to the extent that it relates to general principles of water flow and cutoff, I will consider the Downin and Maury patents. The Monnier patent, however, involves a valve which controls the flow of air. Therefore, it is outside the scope of relevant prior art. Even if the Monnier could be considered relevant prior art, it is so remote from the subject art of nipple-type watering devices for chickens and small animals that it would have very little persuasive value. *See Schreiber,* 540 F.Supp. at 1135.

Therefore, within the relevant prior art are other chicken drinkers. Representative of prior art chicken nipple-type watering devices is the Fox Products Co. U.S. Patent to Clark 3,756,199, issued September 4, 1973. *See* Defendants' Exhibit 123.

## 2. *Level of ordinary skill in the art*

The level of ordinary skill in the art is established by evidence showing the technical competence and experience of skilled artisans working the area of the subject invention and by the manner in which problems were solved. Section 103 provides in relevant part:

A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that *the subject matter* as a whole would have been obvious at the time the invention was made *to a person having ordinary skill in the art to which said subject matter pertains.*

35 U.S.C. § 103. With respect to this second factual inquiry, the "art to which said subject matter pertains" is clearly the art of designing and manufacturing nipple-type watering devices for fowl and small animals, in particular chickens.[3]

The only objective evidence in the record of the level of ordinary skill in the art of designing and manufacturing nipple-type watering devices for chickens is as follows. Mr. Eldon Hostetler, the inventor of the patents-in-suit, has an eighth grade education and many years of experience in developing and designing watering and feeding devices for fowl and small animals. *See* Trial Transcript 2/13/90 at pages 25–30; Trial Transcript 2/14/90 at page 59. Mr. Fred Steudler, Jr. testified that he has a degree in industrial engineering, *see* Trial Transcript 2/21/90 at page 51, lines 20–23, and Dr. Andrews stated that he knew of a farmer who designed his own poultry watering system. *See* Trial Transcript 2/14/90 at page 88. Finally, Mr. Steudler, Jr. testified that he believed that Mr. Clark, the inventor of the Clark Patent, had a college degree. However, Mr. Steudler admitted that he did not know the field of study in which Mr. Clark majored in college. *See* Trial Transcript 2/21/90 at page 59 & page 175.

 Section 103 requires that a claim be declared invalid only when the invention set forth in the claim would have been obvious "to one of *ordinary skill* in the art to which said [invention] pertains." As an aid in determining obviousness, that requirement precludes consideration of whether the invention would have been obvious to the rare genius in the art, or to a

judge or other layperson after learning all about the invention. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir.1983). Inventors, such as Mr. Hostetler, Mr. Clark, and Mr. Steudler, Jr., are presumed to have extraordinary skill in the art. *See, e.g., Kloster Speedsteel AB v. Crucible Inc.*, 793 F.2d 1565, 1574 (Fed.Cir. 1986); *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 454 (Fed.Cir. 1985). Further, defendants consider Mr. Steudler, Jr. to be the most knowledgeable person in the entire nipple-drinker industry. *See* Plaintiff's Exhibit 68, page 426, lines 14–18. Therefore, I conclude that the level of ordinary skill in the art of designing and manufacturing nipple-type watering devices for chickens is someone having knowledge of the behavioral characteristics of chickens ranging from one-day old chicks to adult chickens, as well as a reasonable degree of mechanical aptitude acquired through either an applicable education or relevant experience in the field, but not necessarily the same level of education and experience as inventors in the art, such as Mr. Hostetler, Mr. Clark, and Mr. Hostetler, Jr. "A person of ordinary skill in the art is ... presumed to be one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate, whether by patient, and often expensive, systematic research or by extraordinary insights...." *Standard Oil*, 774 F.2d at 454.

### 3. *Differences between the prior art and the claims at issue*

After defining the prior art and the level of ordinary skill in the art of the claimed invention, it is necessary to identify and evaluate the differences between the prior art and the claims at issue.

The Clark patent, which was of record throughout the prosecution of the patents-in-suit, is a patent for a nipple-type animal operated watering device. Defendants con-

---

**3.** It appears from the way in which section 103 is drafted that "the prior art" is broader than "the art to which said subject matter pertains." *See, e.g., In re Nilssen*, 851 F.2d 1401, 1403 (Fed.Cir.1988) (an inventor is attributed with

"knowledge of all prior art in the field of the inventor's endeavor and of prior art solutions for a common problem even if outside of that field").

tend, and plaintiff does not contend otherwise, that the only differences between Claim 1 of the '345 patent and Figure 6 of the Clark patent are the shapes of the valve member and the head of the valve actuator. The Clark nipple-drinker employs a flat valve and a valve actuator with a flat head, whereas the Ziggity nipple drinker defined in Claim 1 employs a valve with a convex shape and a valve actuator with a concave shape.

Defendants cite the Kagan patent, a nipple drinker for animals, to teach the use of a ball valve in a nipple drinker. The Kagan nipple drinker is different from the Ziggity nipple drinker in that it can only be activated by an animal upon vertical actuation of the trigger pin.

Defendants cite the Downin and Maury patents to teach use of a valve actuator with a concave head in conjunction with a convex ball valve. Defendants, however, never discuss the differences between the Downin and Maury patents and the claimed invention. Defendants then argue that, if you apply the teaching of these secondary references (Downin and Maury) to use of valve actuator with a concave head in conjunction with a convex ball valve to the Clark reference, there are no differences between the Clark patent and the Ziggity patent. *See* Trial Transcript 2/16/90 at page 187, lines 11–15.

▉ Defendants' argument is flawed. Even though the Patent Examiner did *not* have Downin and Maury before him during the prosecution of the patents-in-suit, he did have Clark, Kagan, and Mull. Mull, a patent for a readily portable animal watering through which includes a valve mechanism, demonstrates the relationship between convex ball valve and a concave valve actuator.[4] Therefore, to the extent that defendants cite Downin and Maury for the purpose of demonstrating the relationship of convex ball valves and concave sealing surfaces, Downin and Maury are merely cumulative of the art of record and add nothing new. The relationship between convex ball valves and concave sealing surfaces does not in and of itself teach the subject matter of the claimed invention. When prior art which was *not* considered by the Patent Examiners but which is cumulative of prior art that was considered by the Examiners is relied upon by the party challenging the validity of the patent, the deference to the United States Patent Office remains intact. *FMC Corp. v. Manitowoc Co.,* 835 F.2d 1411 (Fed.Cir.1987).

▉ Defendants' obviousness argument is flawed for another reason. Defendants attempt to make out a defense of obviousness by looking to the drawings of prior art patents to find every element of the patents-at-issue. Defendants contend that Clark plus Downin and Maury equals Hostetler [Clark + (Downin + Maury) = Ziggity]. However, defendants never explain how the convex to concave shapes employed in Downin and Maury teach the desirability of employing these shapes in a chicken nipple drinker so as to allow a small amount of water to flow upon slight actuation of the trigger pin. "Where the party asserting invalidity must rely upon a combination of prior art references to establish invalidity, that party bears the burden of showing some teaching or suggestion in these references which supported their use in combination" to resolve the problem or problems solved in the patented device. *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.,* 776 F.2d 281, 293 (Fed.Cir.1985). Therefore, defendants have not met their burden on this aspect of the defense.

▉ Ziggity's patented invention is *not* a ball valve actuated by a concave-headed valve actuator. Ziggity's patented invention is a nipple-type drinker for chickens and small animals which employs a ball valve and a concave-headed valve actuator in such a way as to improve on the design of nipple-drinkers that had previously been in the market by eliminating the problems associated therewith. Ziggity does not contend that any element of its patented invention is new. What Ziggity does contend is

---

4. In their post-trial brief, defendants admit that Mull teaches the relationship between a convex ball valve and a concave sealing surface. *See* Defendants' Post–Trial Brief at 47–48.

that the structural arrangement of these old elements results in a nipple drinker which has the advantage of increased responsiveness to lateral or titling actuation, thereby permitting wide-spread utilization. *See* Defendants' Exhibit 4. Defendants seem to forget that an invention is *not* obvious simply because it contains old and well-known elements. *Environmental Designs v. Union Oil Co. of Cal.*, 713 F.2d 693, 698 (Fed.Cir.1983), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984); *see also Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1546 (Fed.Cir.1984). "Virtually all inventions are combinations [of several elements] and virtually all are combinations of old elements." *Environmental Designs*, 713 F.2d at 698. In fact, plaintiff admits that its claimed invention is a combination of structural elements which were known to exist separately. A patent may issue on a combination of old elements and still be nonobvious if the elements are assembled or combined in such a way as to produce a new or advanced or improved result. *Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed. Cir.1984). Hence, the critical question is whether the invention *as a whole* was taught or suggested by the prior art, *not* merely whether individual elements or features of the invention are found somewhere in the prior art.

It is common to find elements or features of most inventions somewhere in the prior art. *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1549 (Fed.Cir.1983) ("Humans must work with old elements, most if not all of which will normally be found somewhere in an 'examination of the prior art'."). Recognizing this reality, defendants searched the prior art for mechanical elements which look like the segregated elements of the patent claims at issue. "In essence, defendants have used the [patent] claim[s] as a bill of materials and gone to the world's largest hardware store (the USPTO)[5] to find these mechanical elements in various bins (prior patents) and then assembled them into a combination like the claimed combination." *See* Plaintiff's Revised Post Trial Brief at page 130. However, defendants cannot establish an obviousness defense simply by showing that the specific elements claimed in the combination patent existed at the time the invention was made. Instead, defendants must show that it would have been obvious to one of ordinary skill in the art of nipple-type watering devices for fowl and small animals at the time the invention was made to arrange those mechanical elements in a nipple-type watering device in the manner claimed in the patent-at-suit. The only evidence which defendants have in support of their theory that plaintiff's claimed invention as a whole would have been obvious at the time the invention was made to one of ordinary skill in the art is the bald conclusory statement of their expert Mr. Ramik.[6] *See* Trial Transcript 2/16/90 at page 187, lines 17–24.

### 4. *Secondary considerations*

The obviousness test is acknowledged to be a very elusive test, and one which imposes a heavy burden on judges and juries who are not technically trained. *See, e.g., Graham v. John Deere Co.*, 383 U.S. 1, 35–36, 86 S.Ct. 684, 702–703, 15 L.Ed.2d 545 (1966); *Reiner v. I. Leon Co.*, 285 F.2d 501, 503–04 (2d Cir.1960); *Harries v. Air King Products Co.*, 183 F.2d 158, 162 (2d Cir. 1950) (L. Hand). To assist in applying the test, the courts have developed "inferences" or "subtests," which focus on objective factors rather than technical issues. These objective factors are intended to "lend a helping hand to the judiciary which ... is most ill-fitted to discharge the technologi-

---

5. The abbreviation "USPTO" stands for the United States Patent and Trademark Office.

6. When asked whether he had an opinion as to whether it would have been obvious to combine the teachings of Maury, Monnier, or Downin with the basic disclosure of Clark, Mr. Ramik stated:

I believe it would be clearly obvious to one skilled in the art to combine this prior art, so to speak, at the time of the alleged invention. And as such, that would render Claim 1 [of the '345 patent] as we have it reproduced, in my opinion, invalid.
*See* Trial Transcript 2/16/90 at page 187, lines 17–24.

cal duties cast upon it by patent legislation," as well as to "guard against slipping into use of hindsight ... and to resist the temptation to read into the prior art the teachings of the invention in issue." *Graham v. John Deere Co.*, 383 U.S. 1, 35–36, 86 S.Ct. 684, 703, 15 L.Ed.2d 545 (1966).

> Enroute to a conclusion on obviousness, a court must not stop until *all* pieces of evidence on that issue have been fully considered and each has been given its appropriate weight. Along the way, some pieces will weigh more heavily than others, but decision should be held in abeyance, and doubt maintained, until all evidence has had its say. The relevant evidence on the obviousness-nonobviousness issue ... includes evidence on what has now been called "secondary considerations." It is error to exclude that evidence from consideration.

*Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1539 (Fed.Cir.1983). Accordingly, evidence rising out of the so-called "secondary considerations" must always, when present, be considered before a legal conclusion under section 103 is reached.

### a. *Commerical success of patented invention*

■ A showing of commercial success of the claimed invention is a relevant consideration in resolving the issue of obviousness under section 103 because it is objective evidence of the nonobviousness of the claimed invention. *See, e.g., Bio–Rad Laboratories Inc. v. Nicolet Instrument Corp.*, 739 F.2d 604, 611–12 (Fed.Cir.), *cert. denied*, 469 U.S. 1038, 105 S.Ct. 516, 83 L.Ed.2d 405 (1984); *Lindemann Maschinenfabrik Gmbh v. American Hoist and Derrick Co.*, 730 F.2d 1452, 1461 (Fed.Cir. 1984).

The Model 60 Ziggity Nipple Drinker, which was offered for sale in the Spring of 1979, has met with huge commercial success. The Ziggity Nipple Drinker has revolutionized the watering of chickens. Prior to 1979, virtually all chickens were watered by cup, bell, and trough drinker systems. This fact is undisputed. Mr. Hostetler so testified, *see* Trial Transcript 2/13/90 at page 31, lines 16–19; Dr. Andrews so testi-

fied, *see* Trial Transcript 2/14/90 at page 73, lines 21–23; and Mr. Hershey so testified, *see* Trial Transcript 2/22/90 at page 70, lines 17–24. In 1990, eleven years later, virtually all new watering systems sold are either the Ziggity nipple drinker system or the Val nipple drinker system. Mr. Wallace so testified, *see* Plaintiff's Exhibit 49(b), page 19, lines 3–7; Mr. Allen so testified, *see* Plaintiff's Exhibit 51(b), page 18, lines 10–19; and Mr. Hershey so testified, *see* Trial Transcript 2/22/90, page 70, line 25 thru page 71, line 1.

Dr. Andrews testified that the market resistance to nipple drinkers was such that it would have been hard for a nipple drinker company to break into the market unless it had a good product and could demonstrate that it worked. *See* Trial Transcript 2/14/90 at page 82, lines 20–23.

Nipple drinkers presently comprise nearly all of the chicken watering products sold. *See* Trial Transcript 2/15/90 at page 13 lines 1–2. Mr. Robinson, Ziggity's Sales Manager, testified that the Ziggity Nipple Drinker comprises approximately 70 percent of the nipple market and the Val Nipple Drinker comprises nearly 30 percent of the nipple market, with all other brands of nipple drinkers comprising less than 5 percent of the market. *See* Trial Transcript 2/15/90 at page 31, line 24 thru page 32, line 12.

Defendants contend that there is no nexus or direct correlation between Ziggity's commercial success and the design of its claimed invention, and, therefore, that Ziggity's commercial success cannot be considered objective evidence nonobviousness. Defendants contend that Ziggity's success is a result of factors other than the design of its claimed invention such as: (1) an expanding poultry market; (2) the presence of Val as a competitor is the marketplace; (3) Ziggity's water regulator, not patented under the patents-in-suit; and (4) numerous non-patented improvements in their nipple.

■ It is true that, if there is no nexus or direct correlation between commercial success and the patented features of the

invention, commercial success is not a factor dictating in favor of nonobviousness. *See, e.g., Vandenberg v. Dairy Equipment Co.,* 740 F.2d 1560, 1567 (Fed.Cir.1984). However, defendants' contention that Ziggity's commercial success is not related to the features of its patented nipple drinker is without merit and against the weight of the evidence. The evidence at trial demonstrates that the Ziggity nipple drinker has substantially displaced from the market all other forms of open reservoir drinker systems, *see* Trial Transcript 2/22/90 at page 10, lines 25–71, and that currently Ziggity enjoys 70 percent of the nipple drinker market. *See* Trial Transcript 2/15/90 at page 31, line 24 thru page 32, line 12. While a growing market may explain the rapid increase in Ziggity's sales, it cannot explain why Ziggity has been able to garner 70 percent of that market. Furthermore, the fact that Ziggity has touted the virtues of its regulator does not detract from the testimony that the nipple drinker is the determining factor in the purchase of a nipple-type watering system. *See* Trial Transcript 2/15/90 at page 33. The question is whether there is a connection between the features of the patented invention and its commercial success, *not* whether the features of the patented invention are the only reasons for its commercial success.

There is no question that there is a clear nexus between the claimed features of the Ziggity drinker and its commercial success. Numerous other nipple drinkers were previously offered for sale, but none were accepted in the market place until the Ziggity nipple drinker. The ability to water one-day old debeaked chicks made the Ziggity nipple drinker successful. The features of the claimed invention, in particular its off-centered leveraged actuation of the ball valve, permitted this result. The Ziggity nipple drinker has been accepted by integrators who control virtually all of the chicken processing and egg production market in the United States. *See* Trial Transcript 2/15/90 at page 22, lines 3–19. Integrators do not approve watering devices until they have been shown through tests and trials to work successfully. Mere advertising will not convince them. Integrators evaluate and rate watering devices by considering the mortality rate, the total weight gain of the birds, and the cost per pound of producing that weight. *See* Trial Transcript 2/15/90 at page 17, line 21 thru page 23, line 11. Therefore, it is clear that there is a direct correlation between the performance of the Ziggity drinker constructed in accordance with the claimed invention and the tremendous commercial success that the Ziggity nipple drinker has achieved.

### b. *Failure of other nipple drinkers*

As noted above, Mr. Hostetler, Dr. Andrews, and Mr. Hershey all testified that the European-style nipple drinkers were not acceptable devices. The nipple drinker shown in the Clark patent was also not successful because of its inability to control water flow. *See* Plaintiff's Exhibit 55, Red Tab 1, page 4 of Amendment of January 10, 1986. Indeed, as evidenced by the virtual dominance of the chicken nipple-type watering device market by Ziggity and Val, it is clear that there have been no commercially successful nipple watering devices subsequent to the Ziggity patented invention. Even Mr. Hostetler, who was intimately familiar with the poultry industry and experienced in designing revolutionary and successful products for that industry, *see* Trial Transcript 2/13/90 at pages 26–29, needed several years of patient systematic research before finding the right combination of structural elements for a successful nipple drinker.

### c. *Copying and adoption by competitors*

Another secondary consideration, evidencing nonobviousness, is the copying or adoption of the claimed invention by others. *Diversitech Corp. v. Century Steps, Inc.,* 850 F.2d 675, 679 (Fed.Cir.1988) (citing *Windsurfing Int'l, Inc. v. AMF, Inc.,* 782 F.2d 995, 1000 (Fed.Cir.), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986)). Imitation is said to be the most sincere form of flattery. The copying or imitation of a patented invention

by a party is significant evidence that the party recognized the commercial value and significance of the invention at the time the party began to make the device.

Once the success of the Ziggity nipple drinker was clearly established, defendants began producing their own nipple drinker in 1983. *See* Trial Transcript 2/21/90 at page 185, lines 17–20. Defendants copied virtually every feature of the Ziggity nipple drinker. The original nipple drinker manufactured by defendants was identical to the Ziggity nipple drinker in every respect, except that it used a stainless steel seat, instead of rubber, and the housing was yellow, instead of red. The housing of defendant's nipple drinker was designed to fit into the saddles utilized by Ziggity. The trigger pins and ball valves were virtually identical. *See* Trial Transcript 2/16/90 at page 122, lines 5–20.

Monoflo copied the Ziggity nipple drinker. *See* Plaintiff's Exhibit 100. Impex copied the Ziggity nipple drinker. *See* Plaintiff's Exhibit 102.

### d. *Recognition and praise of patented invention*

Recognition and praise of the patented invention by competitors in the industry is also a strong indication of nonobviousness. *See W.L. Gore & Assocs., Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1555–56 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). Upon being challenged with infringement of the patents-in-suit, both Monoflo and Impex agreed to redesign their nipple drinkers to eliminate the recess in the head of their trigger pins. *See* Plaintiff's Exhibits 1 & 2.

### e. *Long felt need in the industry*

Another form of objective evidence of nonobviousness is that the patented invention filled a long felt need in the industry to which it pertains. *See Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144, 1150 (Fed.Cir. 1983).

Mr. John Fredericks, General Manager of Creighton Brothers, which in 1977 was the largest poultry farm in the world, *see* Trial Transcript 2/13/90 at page 33, lines 7–10, told Mr. Hostetler that there was a definite need for a nipple drinker that worked better than the nipple drinkers available on the market at that time. Indeed, it was Mr. Hostetler's recognition of this long felt need, as expressed by Mr. Fredericks, that motivated him to develop a nipple drinker system. *See id.*

Long before Ziggity's invention, Mr. Steudler, Jr. recognized that nipple drinkers were the way to go because of the inherent advantages of closed watering systems. *See* Trial Transcript 2/16/90 at pages 53–54. However, Mr. Steudler, Jr. continued to design and sell cup watering systems because, despite his personal belief of the innovations being made by persons such as Mr. Clark, *see* Trial Transcript 2/21/90 at page 58, the market as a whole did not agree and was not willing to accept such nipple drinkers. *See* Trial Transcript 2/16/90 at page 54.

### f. *Claimed invention achieved unexpected results and was contrary to conventional wisdom*

The development of an invention which appears to be contrary to the conventional wisdom and which obtains unexpected good results is additional evidence of nonobviousness of the claimed invention. *See Perkin–Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 895–96 (Fed.Cir.), *cert. denied,* 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984). At the time that Mr. Hostetler began developing a nipple drinker system, he was aware of the fact that nipple drinker systems were not favored in the United States poultry producing market and, thus, that he was proceeding contrary to conventional wisdom. In fact, even with Mr. Hostetler's experience, his first attempts to solve the industry problems involved the use of cup drinkers. *See* Trial Transcript 2/13/90 at page 31, lines 3–15.

### g. *Contemporaneous invention by another of a similar invention*

Defendants maintain that evidence of a contemporaneous invention by another of a

similar invention shows that the making of the invention was obvious to people of ordinary skill in the relevant art at the time the invention was made by the inventor of the patents-in-suit. For this proposition, defendants cite to *In re Merck & Co.*, 800 F.2d 1091 (Fed.Cir.1986), and make reference to the Russian Certificate of Authorship No. 738,564, filed June 6, 1977, more than a year prior to the invention by Mr. Hostetler of the patents-in-suit. *See* Defendants' Exhibits 136 and 137.

In *Merck*, the Court of Appeals for the Federal Circuit stated that "evidence of contemporaneous invention is probative of 'the level of knowledge in the art at the time the invention was made.'" 800 F.2d at 1098. The court did *not* say that it was evidence of the level of knowledge of the hypothetical person with ordinary skill in the relevant art at the time the invention was made. As stated earlier, a determination of obviousness under section 103 should *not* be done be inquiring into what other inventors (i.e. patentees) knew at the time the invention was made. *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 454 (Fed.Cir.1985). "Inventors, as a class, ... possess something ... which sets them apart from the workers of ordinary skill...." *Id.*

▮ Furthermore, evidence of a contemporaneous invention, in and of itself, is never sufficient to establish that an invention was obvious at the time that it was made. *See, e.g., Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1380 n. 4 (Fed.Cir.1986) (the simultaneous development of a similar invention may or may not be indicative of obviousness depending on the surrounding circumstances and the other evidence in the case), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987); *In re Merck*, 800 F.2d at 1098 (holding of obviousness affirmed on the basis of the teachings of the prior art references in combination, *not* on the basis of the contemporaneous invention); *Environmental Designs v. Union Oil Co. of Cal.*, 713 F.2d 693, 698 n. 7 (Fed.Cir.1983) ("[t]he virtually simultaneous making of the same invention does not in itself preclude patentability of that invention"), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984).

In any event, the Russian Disclosure is of little probative value because so little is known about how it operates, *see* Trial Transcript 2/20/90 at page 158, lines 24–25; page 159, lines 21–22; page 160, lines 8–11, that defendants cannot support their argument that it is "the same invention" as the invention claimed in the patents-in-suit.

### h. *Protracted prosecution history*

Defendants also assert that the "tortuous path the patent had going through the Patent Office" is an adverse consideration, indicative of obviousness. In support of that assertion, defendants cite *Phillips Electronic & Pharmaceutical Industries Corp. v. Thermal & Electronics Industries, Inc.*, 450 F.2d 1164, 1175 (3d Cir. 1971).

In *Phillips*, a single ultimate patent was issued in 1962 based upon an original conception in 1950. *Id.* That is hardly similar to the present case, in which the original application was filed in January of 1980 and, based upon that application, a patent issued on August 18, 1981, a second patent issued on January 1, 1985 after having been lost in the Patent Office for over two years, and a third patent issued on January 20, 1987, which was a continuation of the second patent.

Upon cross-examination and taking into account the fact that the first continuation application which matured into the '088 patent had been lost for two years, the fact that the reexamination of the '088 patent was occasioned by himself, the fact that the applications which resulted in the reexamination certificate and the issuance of the '345 patent were withdrawn from issue, and the fact that substitute Examiners were involved, Mr. Ramik, defendants' expert witness, testified that the prosecution history of Mr. Hostetler's patent applications was fairly normal and not unlike the family of applications that he had filed on behalf of Mr. Steudler, Jr. *See* Trial Transcript 2/20/90 at pages 163–179.

Furthermore, there are cases which, having considered this issue, have taken the completely opposite view holding that the presumption of validity is enhanced by evidence of a protracted prosecution history. *See, e.g., CMI Corp. v. Metropolitan Enters., Inc.,* 534 F.2d 874, 880 (10th Cir. 1976); *Rohm and Haas Co. v. Owens Corning Fiberglass Corp.,* 196 U.S.P.Q. 726 (N.D.Ala.1977). In *Rohm and Haas,* the court stated:

> The presumption of validity which normally attached to a patent is further strengthened in this case where that patents were given extended scrutiny by the Patent and Trademark Office and its tribunals on matters within their specific field of expertise, including the interpretation and pertinency of the prior art.

196 U.S.P.Q. at 740.

### 5. *Conclusion with respect to the defense of obviousness*

■ Based on all of the evidence presented with respect to the defense of obviousness under section 103, I conclude as a matter of law that defendants have failed to meet their heavy burden of overcoming the validity of the patents-in-suit with clear and convincing evidence. The sole source of defendants' evidence of obviousness came from defendants' long-time patent attorney and expert witness, Vincent Ramik.

In general, objective factual evidence going towards a section 103 determination is preferable to statements of opinion on the issue. *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.,* 776 F.2d 281 (Fed.Cir. 1985). However, when presented, "[o]pinion testimony rendered by experts must be given consideration, and while not controlling, generally is entitled to some weight." *Id.* The opinion testimony of a party having a direct interest in the pending litigation is less persuasive than opinion testimony from a disinterested party. *Id.* Furthermore, an expert's opinion may be rendered of little probative value in a validity determination if his opinion is not factually supported. *Id.*

■ Based on these principles, I conclude that Mr. Ramik's testimony should be given very little probative value. First of all, Mr. Ramik clearly has a direct interest in the present case, and his testimony lacks credibility from that deficiency only. For a number of years, Mr. Ramik has served as defendants' patent attorney and was attorney of record in this action, as well as in a preceding action between Ziggity and defendants. However, less than one month before trial commenced in the present action, Mr. Ramik withdrew his appearance as counsel of record and became the defendants' expert witness in the areas of "Patent Office procedures; file history analyses [sic]; factors affecting invalidity and unenforceability; the structure and function of drinkers and valves in general, including in the chicken watering art; and the issues of noninfringement, prior analysis, licensing and reasonable royalty." *See* Trial Transcript 2/16/90 at page 143, lines 13–19; page 143, line 24 thru page 148, line 13. Consequently, Mr. Ramik can hardly be considered independent of his clients.

Second, Mr. Ramik never explains why it would have been obvious to one with ordinary skill in the art at the time the invention was made to arrange the mechanical elements in a nipple-type watering device in the manner claimed in the patents-at-suit. Mr. Ramik simply concludes that it would have been. One of the reasons for the weakness of his testimony is that he never explains how Downin, Maury, and Monnier teach or suggest the use of a concave valve actuator in conjunction with a convex ball valve in a nipple drinker in order to achieve increased responsiveness of the drinker to lateral or tilting actuation, and thereby permitting utilization with one-day old chicks as well as mature chicks.

As stated earlier, defendants failed to meet their burden of establishing how the secondary prior art references motivate and suggest the use of a ball valve and a valve actuator with a concave head in a nipple drinker for chickens, similar to the one disclosed in the Clark patent. *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.,* 776 F.2d 281, 293 (Fed.Cir.1985). An inventor is not going to change the shape

of his valve and the head of his valve actuator simply because he likes convex and concave shapes better than flat shapes. An inventor is going to change the shape of his valve and valve actuator because that change will provide a functional advantage over the old valve and valve actuator. Defendants never established how the secondary references which they cited teach the functional advantage of the ball valve used in conjunction with a valve actuator with a concave head over a flat valve or a ball valve used in conjunction with a valve actuator with a flat head.

Therefore, upon consideration of all the evidence, I conclude that defendants have failed to establish that the invention as a whole would have been obvious to a person of ordinary skill in the art of nipple drinkers for chickens at the time when the invention was made because (1) I do not find Mr. Ramik to be a credible witness; (2) Mr. Ramik did not support his opinion of obviousness with a factual basis; (3) Mr. Ramik never established how the secondary references upon which he relied teach the use of a ball valve and a valve actuator with a concave head in a nipple drinker for chickens; and (4) the evidence in support of the secondary considerations overwhelmingly supports a conclusion of nonobviousness.

### B. Invalidity Under 35 U.S.C. § 102 (On Sale Bar)

Defendants contend that the patents-in-suit are invalid under section 102(b) of the Patent Statute which provides:

> A person shall be entitled to a patent unless—
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States,

35 U.S.C. § 102(b).

The policies behind the "on-sale bar" have been set forth by the Court of Appeals for the Federal Circuit:

> First, there is a policy against removing inventions from the public which the public has justifiably come to believe are freely available to all as a consequence of prolonged sales activity. Next, there is a policy favoring prompt and widespread disclosure of new inventions to the public. The inventor is forced to file promptly or risk possible forfeiture of his invention [patent] rights due to prior sales. A third policy is to prevent the inventor from commercially exploiting the exclusivity of his invention substantially beyond the statutorily authorized 17–year period. The on-sale bar forces the inventor to choose between seeking patent protection promptly following sales activity or taking his chances with his competitors without the benefit of patent protection. The fourth and final identifiable policy is to give the inventor a reasonable amount of time following sales activity (set by statute as 1 year) to determine whether a patent is a worthwhile investment. This benefits the public because it tends to minimize the filing of inventions of only marginal public interest.

*UMC Elec. Co. v. United States,* 816 F.2d 647, 652 (Fed.Cir.1987), *cert. denied,* 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988).

Prior to the decision in *UMC,* the three part test set forth in *Timely Products Corp. v. Arron,* 523 F.2d 288 (2d Cir.1975), was the test most commonly used by the courts. The test set forth in *Timely Products* was as follows:

> (1) The complete invention claimed must have been embodied in or obvious in view of the thing offered for sale. Complete readability of the claim on the thing offered is not required because whatever is published (or on sale) more than one year prior to the filing of a patent application becomes part of the prior art over which the claim must be patentable.
>
> (2) The invention must have been tested sufficiently to verify that it is operable and commercially marketable. This is simply another way of expressing the principle that an invention cannot be offered for sale until it is completed, which

requires not merely its conception but its reduction to practice.

(3) Finally, the sale must be primarily for profit rather than for experimental purposes.

523 F.2d at 302 (citations omitted).

In reviewing the test set forth in *Timely Products*, the majority in *UMC* concluded that

reduction to practice of the claimed invention has not been and should not be made an absolute requirement of the on-sale bar.

We hasten to add, however, that we do not intend to sanction attacks on patents on the ground that the inventor or another offered for sale, before the critical date, the mere concept of the invention. Nor should inventors be forced to rush into the Patent and Trademark Office prematurely.

816 F.2d at 656.

■ Therefore, in *UMC*, the Federal Circuit Court of Appeals reaffirmed the entire 150 year old body of law relative to the "on-sale" bar with the slight modification that reduction to practice is not an absolute element of the on-sale defense and bar. Nevertheless, it is clear from a thorough reading of the majority's opinion in *UMC* that the thing offered for sale must have been shown to work for its intended purpose or the inventor knew or was satisfied that the invention would serve its intended purpose.

The critical date in this case with respect to the "on-sale" bar is January 21, 1979—one year prior to the filing date of the original application upon which the patents-in-suit are based.

■ The evidence relied upon by defendants in support of their on-sale defense consisted of a multitude of exhibits and pure speculation that such exhibits demonstrated that the claimed invention was offered for sale prior to the critical date.

Defendants rely on the answers to interrogatories provided by Robert Hostetler in connection with a warranty action pending in the United States District Court for the District of Connecticut, as well as the Affidavit of Eldon Hostetler signed in connection with such answers to interrogatories. *See* Defendants Exhibits 76, 77, and 170–2. In his answers to the interrogatories, Robert Hostetler stated that drinkers of the type disclosed in the patents-in-suit were "introduced" in December 1978. Although it is unclear what Mr. Robert Hostetler meant by the term "introduced," it is clear that no drinker of the type of the claimed invention was offered for sale in December 1978. *See* Trial Transcript 2/14/90 at page 14, lines 20–24. Mr. Eldon Hostetler testified that he did not have the pins, seats, and housings necessary for drinkers of the type disclosed and claimed in the patents-in-suit until January 1979. *See* Trial Transcript 2/14/90 at page 57, line 22 thru page 58, line 13. Therefore, even if it could be speculated that something was "introduced" in December of 1978, it could have only been an "introduction" of the mere concept of the invention. As the court in *UMC* stated "we do not intend to sanction attacks on patents on the ground that the inventor or another offered for sale, before the critical date, the mere concept of the invention." *UMC*, 816 F.2d at 656. In addition, speculative evidence hardly constitutes proof by clear and convincing evidence.

■ Defendants' interpretation of the interrogatory answers that "introduced" means "on sale" is pure speculation. It is equally plausible that Robert Hostetler was referring to testing of the product at his father's poultry house. Furthermore, the defendants could have deposed Robert Hostetler to clarify what he meant by the term "introduced." Despite defendants' heavy burden of proof as to this issue, defendants never deposed Robert Hostetler to clear up any ambiguity with respect to what Robert Hostetler meant when he stated that certain Ziggity drinkers were introduced in December 1978.[7] Considering the large

---

7. In their post trial brief, defendants suggest that a negative inference should be drawn from the fact that plaintiff did not call Robert Hostet-

ler as a witness. I agree with defendants that a negative inference should be drawn for failing to call Robert Hostetler as a witness, either

monetary stakes in this action, it would seem that if defendants were themselves convinced of their interpretation of Robert Hostetler's interrogatory answers, the cost of travel to Robert Hostetler's home in Netherlands for resolving any ambiguity would have been inconsequential.

The entire evidence on the development of the claimed invention renders it clear that numerous modifications to the basic nipple design were made to solve productions and operational problems with the drinker, and that the drinker of the claimed invention was first conceived on or about September 14, 1978. *See* Plaintiff's Exhibit 23, at 61. The first 2000 sample trigger pins were received by Ziggity on September 29, 1978. *Id.* at 70. The first order of production quantities of trigger pins was issued October 20, 1978. *Id.* at 77. The first 6,500 production quantity trigger pins were received December 11, 1978. *Id.* The modified drinker bodies and prototype seats for use with the recess headed trigger pins were not even invoiced by Ziggity's supplier, Bender Mold & Machine, until January 16, 1979. *Id.* at 114. Mr. Hostetler testified that the seats and bodies available for use with the recess headed trigger pins in October 1978 would not work with the recess headed trigger pins. *See* Trial Transcript 2/14/90 at page 57, line 22 thru page 58, line 13.

Therefore, even *if* Robert Hostetler had discussed the subject matter of the patents-in-suit in general terms with customers in December 1978, it is clear from the evidence that the claimed invention disclosed in the patents-in-suit had not been developed to a commercially satisfactory stage in December 1978. *See R.E. Phelon Co. v. Wabash, Inc.,* 640 F.Supp. 1383, 1401 (N.D.Ind.1986) (even though salesman for patent holder had discussed that subject matter of the patent in general terms with a customer more than one year prior to the application, the patent was not invalid because the invention of the patent had not been developed to a commercially satisfactory stage at that time when the discussion took place).

In other words, the evidence shows that drinkers of the type of the claimed invention could not have been in existence prior to January 1979. Furthermore, the uncontroverted testimony of Mr. Hostetler was that no drinker of the type of the claimed invention was sold prior to January 25, 1979. Additionally, the earliest invoice referring to a model 60 drinker, which was the model designation for the drinker with a flat-bottomed, recess-headed pin, was March 31, 1979. *See* Plaintiff's Exhibit 23, at 159. The January 15, 1979 Price List, which is a list of all the products that Ziggity offered for sale as of January 15, 1979, did *not* include a reference to a model 60 drinker. *See* Plaintiff's Exhibit 23–112; Trial Transcript 2/13/90, page 93, lines 12–15. However, there is a reference to the model 60 drinker in the July 1, 1979 Price List. *See* Plaintiff's Exhibit 23–171.

Defendants also attempt to establish that "at least one actual sale of drinkers embodying the invention was made (DX 57)." All that Defendants' Exhibit 57 actually establishes is that 600 "# 50 Nipples (trigger action)" were sold and shipped to Cap-It-All on December 14, 1978. During the trial, defendants' counsel attempted to get Mr. Hostetler to concede that the use of the phrase "trigger action" in Defendants' Exhibit 57 meant and referred to nipple drinkers having the flat-bottomed, recess-headed trigger pins. However, Mr. Hostetler did not concede that point:

Q. Isn't it true that those were, in fact, drinkers with recessed heads and flat bottomed heads—the ones that were sold in December of 1978, the ones that are referred to here in Defendant's Exhibit 57?

A. They were either 6 or 8. We referred to them as trigger drinkers.

through direct testimony or deposition testimony. However, the negative inference should be drawn against defendants—not plaintiff. The burden is on the defendants to prove by clear and convincing evidence that the patents-in-suit are invalid. *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1534 (Fed.Cir.1983). A patentee, like Ziggity, is never required to prove facts establishing validity. *Railroad Dynamics, Inc. v. A. Stucki Co.,* 727 F.2d 1506, 1516 (Fed.Cir.), *cert. denied,* 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984).

Q. Well, didn't you refer to the drinkers shown in 10 and 11—10, 11, and 12 as trigger drinkers?

A. We refer—all our drinkers that we manufactured from the day we started until today are referred to as trigger action drinkers because the bird has to move a pin in order to get a drink.

Now unfortunately, we didn't add the 360 degrees when we switched from one to the other or some other identification. But the word triggering and drinker is—is a direct reference to a drinker that has a nipple type drinker, that has a pin on it. You trigger it when you get a drink from it.

*See* Trial Transcript 2/14/90 at page 31, lines 8–25.

Thus, with respect to Defendants' Exhibit 57, after straining to establish a sales of the claimed invention of the patents-in-suit prior to the critical date, the direct repeated testimony of Mr. Hostetler was that the nipple drinkers which are the subject of Defendants' Exhibit 57 are the nipple drinkers described in Plaintiff's Exhibit 3, drawing 6 or 8, and not drinkers having the recess-headed trigger pin of the claimed invention.

In *Cambridge Products Ltd. v. Penn Nutrients, Inc.,* Civil Action No. 88–4423, 1989 WL 63169 (E.D.Pa. June 8, 1989) (1989 Westlaw 63169), this court considered defendant's on-sale bar defense with respect to plaintiff's patent upon a poultry feed additive. In that case, defendants attempted to establish invalidity under 35 U.S.C. § 102(b) based upon an incorrect advertisement which appeared to indicate that the invention had been on sale prior to the critical date. Plaintiff explained that the advertisement was in error and that a corrected advertisement had been published once the error had been discovered. This court held:

Defendant is of course not compelled to take at face value plaintiffs' contention about the infelicitous language of their advertising. However, to counter this position, defendant must come forward with some evidence showing that GV–11 was in fact marketed more than a year before the Jackson patent application. If this was indeed the case, evidence of pre–1972 manufacturing and sales could have been easily obtained. The marketing of a poultry feed additive to America's farmers is scarcely a covert undertaking. Even if plaintiffs were somehow able to conceal their own corporate records of pre–1972 manufacture and sales of GV–11, defendant could have easily gathered such evidence from the plaintiffs' pre–1972 customers. The fact that defendant has not come forward with any such evidence undermines any favorable inference that might have been drawn from the plaintiffs' statement, in their "uncorrected" advertisement, that GV–11 has been "protecting investments" for "a quarter of a century."

*Id.* at 4.

As in *Cambridge Products,* defendants in the present action have not presented this court with any direct evidence to support their on-sale bar defense. If defendants really believed that the invention was on sale more than one year before the filing date, they could have covered 70 to 80 percent of the broiler market by contacting five companies and could have covered virtually the entire market by contacting 50 companies to determine what nipple drinkers were sold by Ziggity prior to the critical date.[8] Ziggity's sales of nipple drinkers were "scarcely a covert undertaking." Therefore, any favorable inference that defendants might draw from the more than 70 exhibits that they rely upon to establish an on-sale bar defense is undermined by their failure to establish direct evidence through Ziggity's customers.[9] Further-

---

8. Mr. Robinson, Ziggity's National Sales Manager, testified that the entire poultry market is controlled by integrators and that there are approximately 50 major integrators in the United States and that four to five of the integrators control about 70 to 80 percent of the market.

*See* Trial Transcript 2/15/90 at page 22, line 3 thru page 23, line 12.

9. This court cannot help but wonder why defendants failed to follow up with all the leads which they had from the 70 exhibits which they introduced into evidence in support of their on-

more, any favorable inference is completely overshadowed by the direct and uncontroverted testimony of Mr. Hostetler that the invention was not on sale prior to the critical date.

Defendants have fallen far short of meeting their burden of establishing by clear and convincing evidence that the invention was on sale prior to the critical date. Not only have the defendants failed to establish that the claimed invention was on sale prior to January 21, 1979, the evidence presented actually establishes that the claimed invention was first offered for sale four days after the critical date, at the Southeastern Poultry Trade Association Show on January 25, 1979. Therefore, I conclude that the patents-in-suit are *not* invalid under 35 U.S.C. § 102(b).

### C. Invalidity Because of Inequitable Conduct

Defendants contend that the patents-in-suit are invalid because plaintiff intentionally withheld material information from the Patent Examiner and, thus, obtained its patents through the use of inequitable conduct.

 Inequitable conduct arises when material prior art is not disclosed to the Patent Office and the motivation for not disclosing the material prior art is an intent to deceive the United States Patent and Trademark Office during the course of its examination of the pending application. *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 872 (Fed.Cir. 1988), *cert. denied,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989). Therefore, in order to establish the defense of inequitable conduct, defendants must establish by clear and convincing evidence (1) that the information not disclosed to the Patent Office was material, and (2) that, by not disclosing that material information, plaintiff intended to deceive the Patent Office.

With respect to the materiality element, it has been held that "a reference that

would have been merely cumulative is not material." *J.P. Stevens & Co. v. Lex Tex Ltd.,* 747 F.2d 1553, 1559 (Fed.Cir.1984). With respect to the intent element, the Federal Circuit Court of Appeals stated:

> We adopt the view that a finding that particular conduct amounts to "gross negligence" does *not* of itself justify an inference of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive.

*Kingsdown,* 863 F.2d at 876 (emphasis added).

By failing to rely on any of the undisclosed prior art, upon which they base their inequitable conduct defense, in formulating a basis for their obviousness defense, defendants have virtually conceded that the art which was not disclosed and which they contend gives rise to a finding of inequitable conduct was not material.

In the present case, defendants contend that Ziggity failed to disclose six different categories of material information. I shall briefly discuss each category.

#### 1. *Ziggity drinker 2*

 Defendants contend that Ziggity Drinker 2 (Defendants' Exhibit 138–3) was Ziggity's standard drinker sold in mid–1978 and, thus, is prior art to the claimed invention of the patents-in-suit. Defendants further contend that Drinker 2 is material for the purpose of their inequitable conduct defense and, therefore, should have been disclosed to the Patent Office.

Plaintiff claims that Drinker 2 shown in Defendants' Exhibit 138–3 is actually a composite of several drinkers manufactured by Ziggity, in particular drawings 5, 6, and 8 of Plaintiff's Exhibit 3. Plaintiff further maintains that drawings 5 and 6 of Plaintiff's Exhibit 3 represent Ziggity's standard drinker sold in mid–1978—*not*

---

sale bar defense. In other words, why did not defendants attempt to establish what was actually sold to Cap–It–All? Why did not defendants attempt to establish what was sold to Rytman

Grain? Why did not defendants attempt to establish what seats were made by Michigan Modling?

Drinker 2, which is a composite of drawings 5, 6, and 8 of Plaintiff's Exhibit 3.[10]

Additionally, plaintiff contends that some of the drawings in Defendants' Exhibit 138 are not accurate and others are depictions of devices that were never constructed, tested, or sold. Plaintiff contends that Defendants' Exhibit 138–2, 138–3, and 138–4 are all inaccurate because they fail to disclose a leaf on the lower seat in the body of the drinker. *See* Plaintiff's Exhibit 3, drawing numbers 4, 5, 6, 7, 8, and 9. Further, Mr. Hostetler testified that these leafs were important. *See* Trial Transcript 2/14/90 at page 56, line 25 thru page 57, line 5; page 57, line 22 thru page 58, line 9. Mr. Hostetler also testified that a drinker as depicted in Defendants' Exhibit 138–5, wherein a flat-bottom pin with a recess is shown in use with a seat having no leaf and incorporating an insert molded steel washer, never existed. *Id.* at page 57, lines 11–21.

With plaintiff's contentions as to the inaccuracies of the drawings in Defendants' Exhibits 138 in mind and in an effort not to confuse the issue more than it already is, I shall continue to refer to Ziggity's standard drinker sold in mid–1978 as Drinker 2, depicted in Defendants' Exhibits 138 and 138–3, but only to the extent that it depicts a drinker like the ones shown in drawings 5 and 6 of Plaintiff's Exhibit 3.

Although Drinker 2 was not disclosed to the Patent Office, it is prior art pursuant to 35 U.S.C. § 102(b), in that it was "in public use or on sale in this country more than one year prior to the date of the application for patent in the United States." However, what Drinker 2 discloses over Drinker 1, which was prior art of record, is a nipple drinker that can be activated by vertical or side-to-side motion of the trigger pin. The Clark patent which was a primary reference throughout the prosecution history of the patents-in-suit also discloses a nipple drinker which can be activated by vertical or side-to-side motion of the trigger pin.

Therefore, Drinker 2 is cumulative of the prior art of record and *not* material. *J.P. Stevens & Co. v. Lex Tex Ltd.,* 747 F.2d 1553, 1559 (Fed.Cir.1984). Consequently, Drinker 2 cannot form a basis for defendants' inequitable conduct defense.

### 2. *Ziggity drinker 3*

Defendants also contend that Drinker No. 3 (Defendants' Exhibit 138–4 and Plaintiff's Exhibit 3, drawing 7) is material and, thus, should have been disclosed to the Patent Office. Defendants contend that Drinker No. 3 differs from Drinker No. 2 only in that a galvanized steel washer was molded as an insert at the throat of the drinker outlet and further contend that Drinker No. 3 was the drinker shipped to Rytman Grain and Creighton Brothers.

In order for Drinker No. 3 to form a basis for their inequitable conduct defense, defendants must first establish that Drinker No. 3 is prior art under 35 U.S.C. § 102(b), in that it was "in public use or on sale in this country more than one year prior to the date of the application for patent in the United States." Defendants have failed to produce clear and convincing evidence to establish that Drinker 3 was on sale or in public use prior to the critical date. Furthermore, even if they had, Drinker 3 would *not* be material for the same reason the Drinker 2 is *not* material. As defendants have conceded, Drinker No. 3 differs from Drinker No. 2 only in that a galvanized steel washer was molded as an insert at the throat of the drinker outlet. Therefore, Drinker 3 cannot form the basis of defendants' inequitable conduct defense.

### 3. *Ziggity's sale of "trigger action" drinkers to Cap–It–All in December 1978*

Next, defendants reiterate their on-sale bar defense contending that the sale of nipple drinkers like Drinker 5 shown in Defendants' Exhibit 138–6 to Cap–It–All in December 13, 1978 constitutes a statutory bar to the patents-in-suit under 35 U.S.C.

---

**10.** Plaintiff's Exhibit 3 is an exhibit which consists of 13 schematic drawings which, according to plaintiff, demonstrate the genesis of the Ziggity nipple drinker. Defendants' Exhibits 138, and 138–1 thru 138–8, on the other hand, parallel the references to drinkers sold by Ziggity according to Ziggity's 1981 answers to interrogatories in another litigation. *See* Defendants' Exhibit 76.

§ 102(b). As stated earlier, defendants have failed to establish that the drinkers sold to Cap–It–All in December 1978 were of the type depicted in Defendants' Exhibit 138–6.

Alternatively, defendants contend that, even if the drinkers sold to Cap–It–All were not like Drinker 5, but instead were similar to Drinkers 2 or 3 (Defendants' Exhibits 138–3 and 138–4), the sale of those drinkers to Cap–It–All before the critical date would still be highly material information which should have been disclosed to the Patent Office. This alternative argument is merely a reiteration of defendants' first two bases for establishing their inequitable conduct defense. As already stated, Drinker 2 and Drinker 3 cannot form the basis for defendants' inequitable conduct defense.

### 4. *Ziggity's interrogatory answers and answer to request for production of documents*

Defendants next contend that Ziggity's 1981 answers to plaintiff's interrogatories in the M & M Poultry product liability litigation (Defendants' Exhibit 76), and the accompanying responses to the document production request (Defendants' Exhibit 77), are highly material to the patentability of the invention claimed in the patents-in-suit and should have been disclosed to the Patent Office. *See* Trial Transcript 2/20/90 at page 74, line 8 thru page 76, line 14. Defendants maintain that the interrogatory answers establish a prima facie case that the patents-in-suit are barred under 35 U.S.C. § 102(b). Defendants also maintain that the interrogatory answers confirm that Drinkers 1, 2, and 3 were sold prior to December 1978.

As I concluded with respect to defendants' on-sale bar defense, the interrogatory answers do *not* establish that the patents-in-suit are barred under 35 U.S.C. § 102(b). Furthermore, other than merely concluding that the interrogatory answers confirm that Drinkers 1, 2, and 3 were on sale prior to December 1978, defendants do not educate this court as to how they reach that conclusion. Furthermore, there is no dispute that Drinker 1 and Drinker 2, at least to the extent that it depicts a drinker similar to drawings 5 and 6 in Plaintiff's Exhibit 3, were on sale prior to the critical date.

### 5. *Dutch Search Report and the Boegli Patent*

Next defendants attempt to base their inequitable conduct defense upon plaintiff's failure to disclose to the United States Patent and Trademark Office the Boegli reference, U.S. Patent No. 3,385,267 (Defendants' Exhibit 8, Bates Nos. 03204–03208), found in Ziggity's foreign patent application corresponding to the '036 patent. In support of basis for their defense of inequitable conduct, defendants contend that it is standard practice for a U.S. patent practitioner to disclose material prior art cited in related foreign applications to the U.S. patent examiner pursuant to the duty of candor and good faith. *See* Trial Transcript 2/20/90 at page 65, line 1 thru page 66, line 20.

I conclude that the Boegli patent is *not* material and, thus, that plaintiff did *not* breach its duty of candor and good faith. In Ziggity's Dutch application, the Boegli reference was cited as a secondary reference showing only background "state of the art." *See* Defendants' Exhibit 6, Bates No. 03196; Trial Transcript 2/20/90 at page 90, line 18 thru page 91, line 5. Likewise, when the Boegli patent became prior art of record in the prosecution of the patents-in-suit, it was considered by the Patent Examiner to be a secondary reference and cumulative of other references already of record. *See* Trial Transcript 2/20/90 at page 140, line 1 thru page 141, line 14.

Finally, not even defendants' patent expert, Mr. Ramik, relied upon the Boegli patent in forming his opinion as to obviousness. Mr. Ramik acknowledged that the Parker patent, U.S. Patent No. 2,044,629; the Weingard patent, U.S. Patent No. 3,077,896; and the Abrams patent, U.S. Patent No. 3,010,435 were all of record and all disclosed multiple seats for a ball valve. In fact, Mr. Ramik testified that "stepped seats are notoriously old in the art." *See* Trial Transcript 2/20/90 at page 135, lines

11–12. Therefore, the Boegli patent, cited because it teaches the use of multiple seats for a ball valve, is unquestionably cumulative of the prior art of record and, therefore, not material. Indeed, the Boegli patent is just another example of something that is notoriously old in the art.

Defendants rely on *A.B. Dick Co. v. Burroughs Corp.*, 798 F.2d 1392 (Fed.Cir. 1986), for the proposition that inequitable conduct can occur even though an allegedly material reference is independently discovered by the Patent Examiner during the prosecution of the application which matured into the patents-in-suit. In other words, the defendants contend that the fact that a Patent Examiner independently discovers a material reference, which was known by, but not disclosed, by the applicant, does *not* cure inequitable conduct in failing to disclose the material reference in the first place. Because the Federal Circuit has held unequivocally that cumulative prior art is not material prior art, I conclude that the holding of *A.B. Dick* applies only in a case in which the non-disclosed prior art independently discovered by the examiner was not cumulative of any of the art of record.

In the present action, once Boegli was cited as prior art, Ziggity's patent counsel, Mr. Knoblock, strongly traversed the Patent Examiner's rejection stating:

> Boegli shows only a serrated ball seating engaged by the head of a pin, but does [not] teach or suggest the combination of two valve elements, namely, a ball and a pin head cooperating with multiple spaced valve seats. It is submitted that complete reorganization of parts in an unsuggested manner was required to produce applicant's claimed construction.

*See* Defendants' Exhibit 2, paper no. 11 at 4. In response to that argument, the Patent Examiner issued a notice of allowance of the claims and the '088 patent was issued. No amendment was made to the claims to overcome the disclosure of Boegli and no claims were cancelled.

Defendants also contend that Ziggity is guilty of inequitable conduct for failing to disclose the Junkers reference, German Patent 2,306,390 (Defendants' Exhibit 8, Bates Nos. 03165–03184). Mr. Ramik, defendants' patent counsel, who cited every reference he knew to the Patent Office when he filed his request for reexamination, did *not* cite Junkers. Junkers discloses a flat disk membrane type valve which is unseated by a push rod in an elaborate relief valve mechanism. With references of record, such as Kagan (Defendants' Exhibit 131) which discloses a nipple drinker with a ball valve, it is difficult to understand how Junkers is material prior art.

### 6. *British Search Report and the Wilmot Patent*

Finally, defendants contend that Ziggity is guilty of inequitable conduct for its failure to cite the Wilmot reference, Great Britain 1,135,095 (Defendants' Exhibit 8, Bates Nos. 03029–03032) and the Belart reference, Great Britain 1,361,380 (Defendants' Exhibit 8, Bates Nos. 03528–03535), which were cited by the British Patent Examiner in reference to the Ziggity's British patent application corresponding to the United States applications for the patents-in-suit. *See* Defendants' Exhibit 7, Bates No. 3439.

Wilmot, a patent relating to valve arrangements for the delivery of drinking water to poultry, was of record during the prosecution of the '088 patent. The Patent Examiner used the Wilmot reference in combination with the Boegli reference to state his initial rejection of the claims in the application which matured into the '088 patent. Wilmot is not material for the same reason that Boegli is not material—it is cumulative of other references of record. Furthermore, Wilmot was not cited by Mr. Ramik, defendants' patent counsel, when he filed his request for reexamination, and it was not cited by either of the Patent Examiners who reexamined the '088 patent. *See* Plaintiff's Exhibit 42.

Defendants' contention that the failure to cite the Belart British Patent No. 1,361,-380, is also without merit. Belart discloses a pressure activated valve suitable for use in anti-skid systems for vehicles and a ball valve being unseated in response to the

pressure of a hydraulic brake system by a plunger. Belart is clearly less pertinent than many of the references of record cited in the '036 case. Furthermore, Belart, just like Wilmot, Junkers, and Boegli, was not cited by Mr. Ramik, defendants' patent counsel, when he filed his request for reexamination or when he formulated his opinion with respect to the obviousness of the patents-in-suit.

Therefore, with respect to defendants' defense of inequitable conduct before the United States Patent Office, I conclude that plaintiff did *not* withhold any material prior art from the Patent Office. I further conclude that, to the extent that any material prior art was withheld, plaintiff did *not* do so with the intent to deceive the Patent Office.

It appears that defendants have pieced together much of their inequitable conduct defense by scouring through all of file histories of Mr. Hostetler's United States patents and their foreign counter-part applications (Mr. Hostetler has filed almost 50 patents involving poultry watering and feeding equipment) looking for references which are arguably material and which were not disclosed to the Patent Office during the prosecution of the patents-in-suit. Although the following quotation was written by Chief Judge Markey of the Federal Circuit with respect to appeals, the thought is equally applicable to patent trials in district courts:

> Appeals in patent cases should not be mere games played with pieces of paper called references and the patents-in-suit. Lawsuits arise out of the affairs of people, real people with real problems.

*Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1544 (Fed.Cir. 1984).

### D. Invalidity Under 35 U.S.C. § 112

Defendants contend that the Ziggity patents are invalid because the specification fails to contain, as required by 35 U.S.C. § 112, "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains to make and use the same." For all intents and purposes, defendants' argument under section 112 is merely a reiteration of their argument with respect to the scope of the claims of the patents-in-suit. This court has already decided that the scope of the claims at issue are not limited with respect to the size of the recess in the head of the trigger pin.

Defendants allege that the patents-in-suit are invalid because Ziggity did not disclose the exact tolerances and dimensions found critical or important in manufacturing Ziggity's actual commercial products embodying the claimed invention.

The evidence that defendants offer in support of this contention is the testimony of their patent expert, Mr. Ramik. *See* Trial Transcript 2/20/90 at pages 40–41. During that testimony, Mr. Ramik stated that, in his opinion, "there are no sufficient critical features to provide the best mode of operation to allow one skilled in the art to determine precisely the invention, its operability." *Id.* at 41.

Upon reviewing Mr. Ramik's opinion and defendants' post-trial brief, it appears that the defendants are blurring the distinction between two separate requirements set forth in the first paragraph of section 112—the "enabling disclosure" requirement and the "best mode" requirement. With respect to the enabling disclosure requirement, the question is whether the disclosure in the specification is sufficient to enable those skilled in the art to practice the claimed invention. With respect to the best mode requirement, the question is whether the inventor concealed the best mode known to him at the time that he filed his patent application for carrying out his invention. To add to the confusion, defendants also appear to blur the requirements set forth in the first paragraph of section 112 with the "particularly point out" requirement set forth in the second paragraph of section 112. The bottom line is that defendants' so-called defense under section 112 is very vague, very confusing, and very poorly written—but maybe that was the point.

The first and second paragraphs of section 112 provide as follows:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms *as to enable any person skilled in the art to which it pertains,* or with which it is most nearly connected, *to make and use the same,* and shall *set forth the best mode* contemplated by the inventor of carrying out his invention.

The specification shall conclude with one or more claims *particularly pointing out and distinctly claiming* the subject matter which the applicant regards as his invention.

. . . .

35 U.S.C. § 112 (emphasis added).

■ In determining whether defendants infringed the claims of the patents-in-suit, this court has already discussed at length the scope of the claims at issue. Just because the claims at issue contain no language limiting them to specific tolerances and dimensions does not mean that the words or terms used in the claims are vague and imprecise. Therefore, I conclude that defendants have failed to prove by clear and convincing evidence that the claims at issue do *not* particularly point out and distinctly claim the subject matter of the claimed invention.

With respect to defendants' argument as it relates to the enabling disclosure requirement and the best mode requirement under the first paragraph of section 112, a case exactly on point is *Christianson v. Colt Industries Operating Corp.,* 822 F.2d 1544 (Fed.Cir.1987). In *Christianson,* the defendant argued that the patents-in-suit were invalid for non-compliance with the best mode and enablement provisions of section 112. The district court held that Colt violated section 112 by failing to disclose in each of its nine patents all its dimensions, tolerances, and production drawings needed to mass produce the M–16 rifle. In reversing the district court's holding on this issue, the Court of Appeals for the Federal Circuit stated:

Patents are not production documents, and nothing in the patent law requires that a patentee must disclose data on how to mass-produce the invented product, in patents obtained on either individual parts of the product or on the entire product.

*Thus the law has never required that a patentee who elects to manufacture its claimed invention must disclose in its patent the dimensions, tolerances, drawings, and other parameters of mass production not necessary to enable one skilled in the art to practice (as distinguished from mass-produce) the invention.* Nor is it an objective of the patent system to supply, free of charge, production data and production drawings to competing manufacturers. And that is well, for such a requirement would be irrational. Many inventions are never manufactured; the decision to manufacture may be taken well after the patent has issued; printing a thousand or more documents in the patent would often be required. For those and other reasons, the law requires that patents disclose inventions, not mass-production data, and that patents enable the practice of inventions, not the organization and operation of factories. The requirement for disclosure of sufficient information to enable one skilled in the art to practice the best mode of the claimed invention is and has been proven fully adequate for over 150 years.

. . . .

As with the enablement, so with the best mode. The best mode requirement assures that inventors do not conceal the best mode known to them when they file a patent application, but the "best mode" is that of practicing the claimed invention. It has nothing to do with mass production or with sales to customers having particular requirements.

*Id.* at 1562–63 (citations omitted) (emphasis added).

Therefore, I conclude that defendants have failed to establish by clear and convincing evidence that the specifications of the patents-in-suit do not enable a person

skilled in the art to practice the claimed invention or that Mr. Hostetler did not set forth the best mode known to him at the time that he filed his patent application of carrying out his claimed invention.

### E. Invalidity Under 35 U.S.C. § 132 (New Matter)

Defendants also challenge the validity of the patents-in-suit under 35 U.S.C. § 132.

Section 132, which prohibits the addition of new matter to the disclosure of the invention, provides in pertinent part:

No amendment shall introduce new matter into the disclosure of the invention.

35 U.S.C. § 132. New matter is defined as, any departure from or addition to the disclosure which does not conform to at least the specification, claims, or drawings. 37 C.F.R. § 1.118. However, "matter which is added that is deemed inherent in the original application is not considered new matter." *Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1438–39 (Fed.Cir.1984).

■ Moreover, the fact that the Patent Office permitted an amendment to be entered necessarily means that it did not consider that amendment to be "new matter" within the meaning of section 132. *Dart Indus., Inc. v. E.I. Du Pont De Nemours & Co.*, 348 F.Supp. 1338 (N.D.Ill.1972), *rev'd on other grounds*, 489 F.2d 1359 (7th Cir.1973), *cert. denied*, 417 U.S. 933, 94 S.Ct. 2645, 41 L.Ed.2d 236 (1974); *Baldwin–Lima–Hamilton Corp. v. Tatnall Measuring Sys. Co.*, 169 F.Supp. 1 (E.D.Pa. 1958), *aff'd*, 268 F.2d 395 (3d Cir.), *cert. denied*, 361 U.S. 894, 80 S.Ct. 198, 4 L.Ed.2d 151 (1959). The implicit determination by the Patent Office is presumptively correct. *Reeves Bros., Inc. v. United States Laminating Corp.*, 282 F.Supp. 118, 130 (E.D.N.Y.1968), *aff'd*, 417 F.2d 869 (2d Cir.1969).

Defendants base their defense under section 132 on three theories. I will briefly discuss each of defendants' new matter theories.

■ First, defendants contend that the inclusion of the words "but slightly spaced apart from" in the '088 patent amounted to the inclusion of new matter. Ziggity voluntarily cancelled the words "but slightly spaced from" in the specification of the '036 patent. No office action or rule required this cancellation. The '088 patent, because it is a continuation application, is required to ignore this disclaimer and return to the original disclosure. 37 C.F.R. § 1.60(a). Ziggity did not choose to cancel those words in the '088 patent. Defendants cite no case law in support of their theory that some form of estoppel should be asserted against the patents-in-suit as a result of using the previously cancelled language.

■ Second, defendants contend that the inclusion of the word "slight" to the 4/9/84 amendment to the '088 patent amounted to the inclusion of new matter. Defendants claim that the word "slight" and a description of ball rotation were allegedly added to some of the claims without corresponding language having first been in the specification. The word "slight" and a description of ball rotation were not included in all the infringed claims of the patents-in-suit. Even if that inclusion were impermissible new matter, the claims without that inclusion, such as Claim 19 of the '345 patent, would be unaffected.

■ Moreover, new matter does not include that which is already inherently disclosed in the patents-in-suit. *Litton Sys.*, 728 F.2d at 1438–39. In the present case, under defendants' theory the original disclosure taught that the valve could be actuated by *any* pin movement because there was no ball-pin spacing. *See* Defendants' Post–Trial Brief at 136. "Slight" is certainly an inherent subset of "any." Therefore, the applicant could validly choose to narrow the claim to cover only slight movement. *Aerosol Research Co. v. Scovill Mfg. Co.*, 334 F.2d 751, 756 (7th Cir.1964); *Reeves Bros.*, 282 F.Supp. at 130. Additionally, "slight" movement was actually in the original disclosure as an inherent result of the words "but slightly spaced from."

Finally, defendants contend that the 9/8/86 amendment to the '345 patent, which allegedly included for the first time language to the effect that leveraged actuation of the ball causes rotation of the ball relative to the upper seat, amounted to the inclusion of new matter. Contrary to defendants' contentions, the issue of ball rotation or "spinning" was also discussed in the 3/10/86 amendment to the Reexamined patent. *See* Defendants' Exhibit 3. In that context, the inherent ball rotation of the claimed invention was noted as a distinguishing feature with respect to a prior patent when combined with the other elements of the invention. Therefore, because claims may be amended to distinguish over prior references, *see, e.g.,* 37 C.F.R. § 1.111(b), the inclusion of language referring to ball rotation or spinning is *not* new matter.

Hence, I conclude that defendants have *not* met their burden of establishing that an amendment during the prosecution of the patents-in-suit introduced new matter into the disclosure of the invention. The evidence presented by defendants on the issue of new matter was the testimony of their expert witness, Mr. Ramik. The bald conclusions of Mr. Ramik are wholly insufficient to overcome the presumption of validity set forth in section 282 and the implicit determination of the Patent Office, in permitting the amendments to be entered, that the amendments did not contain any new matter. Accordingly, the patents-in-issue are *not* invalid or unenforceable under section 132.

Defendants are reminded that they do *not* meet their burden of proving invalidity by clear and convincing evidence simply because they presented expert testimony which Ziggity did not controvert with its own expert. A patentee, like Ziggity, is never required to prove facts establishing validity. *Railroad Dynamics, Inc. v. A. Stucki Co.,* 727 F.2d 1506, 1516 (Fed.Cir.), *cert. denied,* 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984).

## III. DAMAGES ANALYSIS

A patentee whose patent has been infringed and *not* been shown to be invalid or unenforceable is entitled to damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284.[11]

The relief granted to patentees under section 284 is designed to provide patent owners with complete compensation. *General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 655, 103 S.Ct. 2058, 2062, 76 L.Ed.2d 211 (1983). The question to be asked in determining damages is " 'how much had the Patent Holder ... suffered by the infringement. And that question [is] primarily: had the Infringer not infringed, what would the Patent Holder ... have made?' " *Aro Mfg. Co. v. Convertible Top Replacement Co.,* 377 U.S. 476, 507, 84 S.Ct. 1526, 1543, 12 L.Ed.2d 457 (1964) (quoting *Livesay Window Co. v. Livesay Industries, Inc.,* 251 F.2d 469, 471 (5th Cir.1958)).

The amount of damages is not affected by the number of claims infringed because the patent is infringed regardless of whether one, some, or all of its claims are infringed. The Court of Appeals for the Federal Circuit has recognized different sources of damages for which the patent owner may recover compensation, including: (1) lost profits on sales that the patent owner lost as a result of the infringement, *Gyromat Corp. v. Champion Spark Plug Co.,* 735 F.2d 549, 556 (Fed.Cir. 1984); (2) lost profits on sales that the patent owner actually made, *Lam, Inc. v.*

---

**11.** Section 284 provides:

Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.

The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances.

*Johns–Manville Corp.*, 718 F.2d 1056, 1065 (Fed.Cir.1983); and (3) a reasonable royalty on infringing sales even if the patent owner would not have obtained these sales, *Bio–Rad Laboratories, Inc. v. Nicolet Instrument Corp.*, 739 F.2d 604, 616–17 (Fed. Cir.), *cert. denied*, 469 U.S. 1038, 105 S.Ct. 516, 83 L.Ed.2d 405 (1984). These damage awards are designed to make the patent owner whole—i.e., to place the patent owner in the condition he would have been in had the infringement not occurred. *Aro Mfg.*, 377 U.S. at 507, 84 S.Ct. at 1543.

 The amount of damages must be proven only by a preponderance of the evidence. In proving damages, the patent owners' burden of proof is not absolute, but rather one of reasonable probability. The court is free to use its discretion in choosing a method for calculating damages, as long as the measure of damages is just and reasonable. *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 653–54 (Fed.Cir.), *cert. denied*, 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985). A computation of damages is not always amenable to a precise determination. " 'While the damages may not be determined by mere speculation or guess, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate'." *Paper Converting Machine Co. v. Magna–Graphics Corp.*, 745 F.2d 11, 22 (Fed.Cir.1984) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250–51, 75 L.Ed. 544 (1931)). Any doubt as to the correctness of a damage award is to be resolved against the infringer. *State Indus., Inc. v. Mor–Flo Indus., Inc.*, 883 F.2d 1573, 1577 (Fed.Cir. 1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 725, 107 L.Ed.2d 744 (1990).

### A. Lost Profits

Plaintiff contends that it is entitled to two types of lost profits—(1) lost profits from lost sales and (2) lost profits from price erosion.

 In order to get lost profits, plaintiff need not prove lost profits with abso-lute certainty. Instead, plaintiff must show that there is a reasonable probability that it would have made the sales of nipple drinkers sold by the defendants and that it would have increased the price of its nipple drinkers but for the infringement. *State Indus., Inc. v. Mor–Flo Indus., Inc.*, 883 F.2d 1573, 1577 (Fed.Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 725, 107 L.Ed.2d 744 (1990); *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649 (Fed.Cir.), *cert. denied*, 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985). " 'The patent owner does not need to negate all possibilities that a purchaser might have bought a different product or might have foregone the purchase altogether,' " in order to recover under a lost profits analysis. *State Indus.*, 883 F.2d at 1577.

### 1. *Lost profits as a result of lost sales*

Patent owners have typically recovered lost profits on lost sales in those instances in which the patent owner and the alleged infringer are the only manufacturers in the market. *See, e.g., id.*; *Bio–Rad*, 739 F.2d at 615; *Lam, Inc.*, 718 F.2d at 1065. Even when the patent owner and the infringer are not the only competitors in the market, the patent owner's market share can be used as a measure of its lost sales. *State Indus.*, 883 F.2d at 1578.

 Plaintiff can establish that there was a probability that it would have made the sales but for the infringement through either direct or circumstantial evidence. The Federal Circuit Court of Appeals has recognized that the proper method for determining lost profits on lost sales through circumstantial evidence is the test set forth in a 1978 Sixth Circuit decision written by Chief Judge Markey, *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir.1978). *See Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 672 (Fed.Cir.1988); *Carella v. Starlight Archery and Pro Line Co.*, 804 F.2d 135, 141 (Fed.Cir.1986); *Central Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1578 n. 5 (Fed.Cir.1983). The test set forth in *Panduit* requires that plaintiff establish four elements: (1) a demand for the patented

product; (2) manufacturing and marketing capability of the patent owner to meet the demand for the product; (3) absence of acceptable non-infringing substitutes; and (4) the amount of profit the patent owner would have made. *Panduit,* 575 F.2d at 1156.

If the patent owner is only able to establish a reasonable probability that it would have made some of defendants' sales but for the infringement, the damages awarded may be split between lost profits as actual damages to the extent that they are proven and a reasonable royalty for the remainder of the sales. *See State Indus.,* 883 F.2d at 1577; *TWM Mfg. Co. v. Dura Corp.,* 789 F.2d 895, 898 (Fed.Cir.), *cert. denied,* 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986).

In calculating the profit that the patent owner would have made but for defendants' infringement, the incremental income approach to the computation is well accepted. *Paper Converting Machine Co. v. Magna–Graphics Corp.,* 745 F.2d 11, 22 (Fed.Cir.1984). The incremental income approach recognizes economies of scale in increased production and separates fixed costs from variable costs when determining profits.

In the present case, there is direct evidence of lost sales from customer testimony. *See* Plaintiff's Exhibit 51–B, at page 28, lines 17–24. However, as these are not the only customers who would have bought from Ziggity, it is necessary to conduct an analysis of the circumstantial evidence in order to obtain a more accurate assessment of the lost profits.

a. *Market demand for the patented product*

Ziggity's Model 60 drinker was the first commercial embodiment of the claimed invention. Ziggity had been selling various other cup and nipple drinkers prior to marketing the Model 60 drinker. However, when the Model 60 drinker replaced those other drinkers in Ziggity's product line in 1979, Ziggity's sales increased dramatically, at least doubling in amount nearly every year. As a result, Ziggity has grown from a start-up company is 1977 to the industry leader today, having a 70 percent market. *See* Trial Transcript 2/25/90 at page 31, line 24 thru page 32, line 12. The demand for Ziggity's nipple drinker has virtually driven cup drinkers out of business. *See* Plaintiff's Exhibit 51–B, page 18. Naturally, Ziggity's commercial embodiments of the patented invention have been modified and given new model numbers in the years since 1979 to reflect changes in housing dimensions and the addition of extra features, but the core invention remains.

Demand for the patented invention is also confirmed by the number of competitors that have copied it. Apart from defendants, Monoflo and Impex also copied the claimed invention thereby infringing the patents-in-suit. *See* Plaintiff's Exhibits 1, 2, 100, and 102. Since changing their product designs at Ziggity's insistence to remove the recess in the trigger pin head and, thus, avoid infringement, Monoflo and Impex have become relatively insignificant competitors.

Defendants contend that Ziggity's nipple drinker is defective and unpopular because of poor materials and quality control. However, this argument, if true, actually supports the proposition that the claimed invention is in demand. The advantages of the leveraged actuation of Ziggity's drinkers must compensate for the potential leaks from rubber seats or else Ziggity would not have sold the millions of drinkers that it has.

Therefore, I conclude that Ziggity has established that there was and is a market demand for the commercial embodiment of its patented invention.

b. *Manufacturing and marketing capability to meet the market demand*

The record clearly establishes that Ziggity has the manufacturing and marketing capacity to exploit all of the demand for its patented product, even to the extent of covering all of defendants' sales. *See* Trial Transcript 2/15/90 at page 71, lines 13–22, and page 73, line 7–11. As Ziggity's own

sales have grown, Ziggity has regularly increased its manufacturing and marketing resources. *See* Trial Transcript 2/15/90 at pages 72–74. Ziggity has recently built its own new manufacturing plant and offices and is already planning further enlargement. *See id.* at page 73, line 12 thru page 74, line 2. Ziggity has an employment waiting list with over 130 applicants for manufacturing positions from which Ziggity can and does obtain additional employees. *See id.* at page 72, lines 1–7. Ziggity has regularly increased the size of its sales and service staff and has recently created and filled the position of general manager to increase its management capacity. Finally, in order to respond to normal, but unpredictable, market fluctuations, Ziggity has excess manufacturing capacity already built into its organization, as demonstrated by Ziggity's timely response to large and sudden purchase orders in the past. *See id.* at page 71, lines 4–12. One of the reasons that Ziggity is able to maintain this flexibility is that it does not manufacture any of the component parts in its nipple drinker. Only assembly is required at Ziggity. *See id.* at page 72, lines 17–25.

### c. *Absence of acceptable non-infringing substitutes*

Ziggity's 70 percent market share coupled with Val's nearly 30 percent market share demonstrates the virtual absence of acceptable non-infringing substitutes. *See* Trial Transcript 2/15/90 at page 31, line 24 thru page 32, line 12. All of the other competitors combined amount to approximately 5 percent of the total sales of nipple drinkers. *See id.* at page 32, lines 8–12; Plaintiff's Exhibit 51B, page 27, lines 7–16.

The relevant product market for consideration is that of nipple drinker watering systems. *See* Trial Transcript 2/15/90 at page 13, lines 1–2; and page 139, line 16 thru page 140, line 3. By 1987, the market attitude toward nipple drinkers had reversed itself from the attitudes held in the 1970's. See Plaintiff's Exhibit 51–B, page 31, lines 9–21. All new chicken houses have been installing nipple drinkers—not cups, troughs, or bells. *See id.* at page 18, lines 17–19. In today's market, once a customer tries nipple drinkers, he will almost always stay with that concept of watering poultry and not change to another type of watering system. *See* Plaintiff's Exhibit 51–B. In general, the industry consists of those poultry growers who use nipple drinkers and those who do not and, if there is any crossover, it is in favor of using nipple drinkers. *See id.* Thus, I conclude that it is *not* likely that any of defendants' customers would have bought a watering system other than a nipple drinker system had the infringing nipple drinkers not been available.

It is certainly possible that some of defendants' customers would never have purchased a product from Ziggity under any circumstances and that some customers would have purchased from another manufacturer of nipple drinkers to avoid a monopoly of the market and encourage competitive bidding on the sales of nipple drinker watering systems. Consequently, based upon a market share analysis of lost profits, I conclude that it is reasonable to assume that Ziggity would have obtained at least that portion of defendants' infringing sales which equaled its market share. *State Indus.*, 883 F.2d at 1578 (sustaining district court's award of 40 percent of infringer's sales based on patent owner's 40 percent market share, but noting that a higher percentage would not have been improper). In other words, it is reasonable to assume that Ziggity would have obtained 70 percent of defendants' sales of nipple drinker watering systems but for the infringement.

Defendants maintain that none of their customers would have bought from Ziggity if defendants could not sell their infringing drinkers because defendants would have sold a nipple drinker with a flat-headed trigger pin with no visible recess. However, as defendants have never even attempted to do this, even in an effort to avoid this costly litigation, there is no evidence to show that such a nipple drinker would have been an acceptable substitute. In fact, there is circumstantial evidence of record to the opposite effect—Monoflo and

Impex sell nipple drinkers with visible flat-headed trigger pins and their sales are minimal. *See* Trial Transcript 2/15/90 at page 32, lines 8–12. Defendants also intensely argue that the use of a flat-headed trigger pin would produce a better product, such that their customers would naturally buy it. However, as defendants have chosen not to spend any additional resources to make their trigger pins flat-headed, one can only assume that the advantages of such a product would be so insignificant that customers would not be willing to pay any more money for the product. On the other hand, given that defendants have chosen to spend hundreds of thousands of dollars in defending this litigation in an effort to preserve their right to make trigger pins with the visible recess, a contrary assumption can be drawn—i.e., that there is a functional advantage to having the visible recess in the head of the trigger pin. In any event, this discussion is purely rhetorical because in order to qualify as an acceptable non-infringing substitute, the product must be on the market, *Central Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1579 (Fed.Cir.1983), and defendants have never manufactured and sold a nipple drinker with a trigger pin that has no visible recess on its head.

Accordingly, I find that Ziggity has established that there are no acceptable non-infringing substitutes for its patented invention. To the extent that there are other manufacturers of non-infringing nipple drinkers, i.e. nipple drinkers lacking the patented invention, I find that their products are *not* acceptable substitutes as evidenced by their minimal sales and almost insignificant percent of the nipple drinker market.

d. *Lost profits sustained by the patentee*

If Ziggity had obtained additional sales from defendants' customers, it would naturally have incurred some additional costs in doing so. However, not all of Ziggity's business costs would have increased as a result of those sales. Those costs that would have increased are referred to as "variable" costs, and those costs that would not have increased are called "fixed" costs. By awarding the patent owner its incremental profits under the lost profits analysis, the variable costs are accounted for and the fixed costs are largely ignored. *State Indus.*, 883 F.2d at 1578.

Ziggity has met its burden of providing this court with detailed computations and supporting documentation on the amount of lost profits. *See* Plaintiff's Exhibit 47. Ziggity's expert damages witness, Mr. Alexander, performed an exhaustive and thorough analysis of Ziggity's financial records. *See id.* Further, he sought and obtained independent corroboration of important factors in his analysis. Based upon his analysis, Mr. Alexander concluded that Ziggity's incremental profit on additional sales was 36.02 percent in 1987, 35.33 percent in 1988, and 35.47 percent in 1989. *See id.* at Tab B, page 1, at note 4.

Ziggity and defendants actually sell their products at different prices and with different recommended accessory and component configurations. *See* Plaintiff's Exhibits 35 and 36. Thus, in order to determine the sales revenue Ziggity would have received from defendants' nipple sales, it is necessary to look at the actual quantity of infringing nipple drinkers sold by defendants. Then, by multiplying that sales revenue by Ziggity's incremental profit at that time, you arrive at the profit revenues lost with those sales. The additional profit revenues, if any, lost from convoyed sales is determined by multiplying the lost nipple profit revenue by Ziggity's convoyed sales factor at that time. By adding these two profit revenues, you arrive at the total profit revenue that Ziggity would have received for sales driven by that quantity of nipple drinkers. Finally, by multiplying that total sales revenue by Ziggity's market share, and accounting for interest, you arrive at the total actual lost profit amount based on lost sales.

Plaintiff's Exhibit 47 summarizes Mr. Alexander's results using this method of calculation. I find that Mr. Alexander was an extremely credible and competent witness,

and I adopt his calculations with respect to lost profits from lost sales as my own.

## 2. Lost profits as a result of price erosion

Ziggity also seeks lost profits as a result of price erosion, contending that, but for defendants' infringement, it would have raised the price of its nipple drinkers by at least $.05 per drinker on January 1, 1988. Ziggity asserts that, because of the availability of a functionally similar infringing nipple drinker product through defendants, it was forced to keep its nipple drinker watering system prices low, even in the face of rising manufacturing costs.

■■■ Lost profits as a result of price erosion is a recoverable category of damages. *Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056, 1065 (Fed.Cir.1983). In determining the amount of profits to which a patent owner is entitled based on sales that patent owner actually made, the difference between the money the patent owner would have made if the infringement did not occur and the amount of money the patent owner actually made from such sales must be calculated. Just as with lost profits from lost sales, patent owners can generally recover lost profits from price erosion in a two supplier market. *Lam*, 718 F.2d at 1067.

In the present case, the nipple drinker watering system market currently has, for all intents and purposes, just two suppliers—Ziggity and the defendants. Together, Ziggity and the defendants account for at least 95% of all nipple drinker sales. Although there are other competitors in the nipple drinker market, such as Monoflo and Impex, they are not significant. Therefore, for the purpose of determining damages, I find that the nipple drinker market is a two supplier market.

Normally, one would consider elasticity of supply and demand to be a barrier to price increases because when prices go up demand can decrease such that the net change in profit may be minimal. However, in the present nipple drinker market that elasticity appears to be minimal. This may result, at least in part, from the recent expansion in the poultry market because of consumer demand for more poultry products. *See* Plaintiff's Exhibit 51B at page 31. In addition, as Ziggity had not raised its prices in many years, the nipple drinker market would most likely have been more tolerant of a price increase.

Taking these factors into consideration and being conservative in estimation, Mr. Alexander concluded that it would have been reasonable to assume that Ziggity would have raised its prices by at least $.05 per drinker on January 1, 1988. *See* Plaintiff's Exhibit 47, Tab B, at page 2. Further, this price erosion factor would also be applicable to the lost sales that Ziggity would have had from defendants' customers, although factored down to $.018 per drinker because only the incremental profit on those additional sales would apply. *See id.* As with his calculations with respect to lost profits from lost sales, I adopt Mr. Alexander's calculations with respect to lost profits from price erosion as my own.

## B. Reasonable Royalty

■■■ When the patent owner is unable to prove lost profits in an amount that exceeds a reasonable royalty or the patent owner is not entitled to lost profits because he would probably not have obtained the sale absent the infringement, the patent owner is still entitled to receive at a minimum an award of a reasonable royalty for each infringing sale. *See* 35 U.S.C. § 284; *Bio–Rad Laboratories, Inc. v. Nicolet Instrument Corp.*, 739 F.2d 604, 614–15 (Fed. Cir.), *cert. denied*, 469 U.S. 1038, 105 S.Ct. 516, 83 L.Ed.2d 405 (1984).

■■■ This reasonable royalty is determined by discovering what royalties would have resulted from "fictitious negotiations" between the patent owner and the infringer. *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1079 (Fed.Cir.1983). However, certain constraints in this analysis must be considered, most significantly the assumption that both parties to the fictitious negotiations agree that the patent is valid. *See Deere & Co. v. International Harvester Corp.*, 710 F.2d 1551, 1557 (Fed. Cir.1983). Another constraint in this analy-

sis is that the fictitious negotiations must be considered to have occurred at the time period immediately prior to the infringement. *Hanson*, 718 F.2d at 1079; *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1158 (6th Cir.1978).

Within these fictitious negotiations constraints, there are numerous factors to be considered in determining the reasonable royalty that would result to the patent owner. In *Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y.1970), *modified*, 446 F.2d 295 (2d Cir.1971), *cert. denied*, 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971), the district court listed, without rating relative importance, the following factors as pertinent in the reasonable royalty determination:

1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty;

2. The rates paid by the licensee for the use of other patents comparable to the patent in suit;

3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold;

4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly;

5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promotor;

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales;

7. The duration of the patent and the term of the license;

8. The established profitability of the product made under the patent; its commercial success; and its current popularity;

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results;

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention;

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use;

12. The portion of the profit or the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions;

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;

14. The opinion testimony of qualified experts;

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

318 F.Supp. at 1120.

I shall discuss each of these factors with respect to the facts of the present action:

*Factor 1*—There are no licenses of the patents-in-suit, and, thus, there is no established royalty. Contrary to defendants' as-

sertions, Ziggity never granted a license to Monoflo and Impex. The closest the parties came to licensing of the patents-in-suit came in July of 1987 when defendants paid Ziggity an agreed upon damage amount of $12,000 for breach of the Settlement Agreement. *See* Defendants' Exhibit 76. Considering the number of full concavity-type nipple drinkers involved, that payment translated to $.077 per nipple drinker, or about 12 percent of the selling price of the defendants' drinkers in 1987. *See* Plaintiff's Exhibit 47, Tab B, at page 3. However, the conditions of that payment were significantly different than those of the "fictitious negotiation." Ziggity was not giving a license for prospective sales in order to make money. The damage award was to clean up and finish the matter, and thereby stop defendants from using the patented invention.

 Defendants argue that the Eldon Hostetler's agreement with Ziggity to assign Ziggity his patent rights in exchange for royalties on gross sales is evidence tending to establish what a reasonable royalty should be between Ziggity and Val. Eldon Hostetler agreed to assign his patent rights, including his rights to the patents-in-suit, in exchange for "royalties in the amount of 5% of the first $250,000 of annual gross sales income, 3% of the annual gross sales income in excess of $250,000 but not exceeding $1,000,000, and 1% of the annual gross sales income exceeding $1,000,000." *See* Defendants' Exhibit 281.

I agree with defendants' argument. The assignment of patent rights from Eldon Hostetler to Ziggity is hardly comparable to a licensee agreement between two business competitors, such as Ziggity and Val. Eldon Hostetler owns part of Ziggity and, therefore, has an interest in assigning his patent rights to Ziggity in exchange for a low royalty rate. What is a reasonable royalty rate between an inventor and his own company is clearly not a reasonable royalty rate between two competitors in the same line of business. Thus, the reason for *Georgia–Pacific* factor 5.

*Factor 2*—Because defendants pay no patent license fees to anyone, the second *Georgia–Pacific* factor is of no assistance in this case.

*Factor 3*—Because Ziggity is an actual competitor with no plans to leave the market, the license that it would grant would be non-exclusive. Normally, non-exclusive licenses have less value than exclusive licenses. However, in this case, since Ziggity is the only other manufacturer and seller of the patented device, a non-exclusive license would still have considerable value in allowing defendants to retain their nearly 30 percent market share. Furthermore, the license would most likely not be restricted in terms of territory and types of customers.

*Factor 4*—Obviously, Ziggity has a strong policy of policing against patent infringement, *see* Plaintiff's Exhibits 1 and 2, and has granted no license to any infringer or other party. Thus, Ziggity seeks to preserve its patent monopoly, and any license obtained contrary to that policy would be of greater value and cost to the licensee because it would tend to limit the number of other competitors with equivalent products.

*Factor 5*—Because Ziggity and defendants are direct competitors in the same territory and Ziggity is able to satisfy the entire market demand, *see* Trial Transcript 2/15/90 at page 71, lines 13–22 and page 73, lines 7–11, Ziggity has little incentive to license defendants to help promote the product. Such promotion may have been useful to Ziggity many years ago, but as of 1987 the patented nipple drinker was well established and popular in the market. *See* Plaintiff's Exhibit 51B, page 31.

*Factor 6*—The patented nipple drinker drives the sale of the entire nipple drinker system, most of which is made up of non-patented products. *See* Plaintiff's Exhibits 35 and 36. From June 1987 to December 1989, at least 84 percent of defendants' nipple drinkers were sold convoyed with drinker systems. *See* Plaintiff's Exhibit 47, Tab E, at page 1. Collateral products such as saddles and adapters had no value apart from the nipple drinkers since they were specially made to fit those drinkers. End user customers usually order whole

systems, not individual components. *See* Plaintiff's Exhibit 51B at page 25, line 23 thru page 26, line 1. Rarely, if ever, is one manufacturer's nipple drinker used in another manufacturer's watering system except as a replacement for worn units. *See id.* at page 26, lines 2–6. The nipple drinkers are heavily featured in both parties' advertising. *See* Plaintiff's Exhibits 35 and 36. Certainly each component of the watering system is important. However, it is the nipple drinker that each party stresses at trade shows and in promoting the watering systems. *See* Trial Transcript 2/14/90 at page 29, line 25 and page 30, line 6; Trial Transcript 2/16/90 at page 199, lines 8–18; Plaintiff's Exhibits 35 and 35. Finally, the extent of convoyed sales is substantial for both parties. *See* Plaintiff's Exhibit 47. From June 1987 to December 1989, defendants sold $4,938,065.79 in nipple drinkers and $7,152,390.21 in convoyed products. *See id.*, Tab B, at page 3. For analytical purposes, convoyed sales can be viewed as a "factor" to be added to the sales of the patented drinker to show the total of infringement sales. This factor is illustrated as the ratio of drinker sales to convoyed sales. In 1987, the time setting for the fictitious negotiations, Ziggity's average convoyed sales factor was 1.67, *see id.*, Tab B, at page 1, and defendants' average convoyed sales factor was 1.22, *see id.*, Tab B, at page 2. Thus, both parties sold a significant amount of convoyed goods.

*Factor 7*—The term of the patents-in-suit is until 1998. Hence, in 1987, eleven years remained before defendants could have freely used the patented invention.

*Factor 8*—By 1987, the patented invention was the standard nipple drinker of the market. Its popularity thrust Ziggity from obscurity to market dominance in a few short years. As evidenced by each parties' sales, the patented drinker has remained popular. *See* Plaintiff's Exhibit 47. In 1987, defendants would not have been faced with the licensing of a new or unknown product. After four years of sales, defendants knew by 1987 that the patented nipple drinker would sell, even at a price higher than most other nipple drinkers. As of 1987, Ziggity's incremental profit on

their nipple drinkers was 36.02 percent and its net operating profit was 23.51 percent. *See* Plaintiff's Exhibit 47, Tab C, at page 1. From the evidence of record, it is not clear what defendants' professed profitability of their nipple drinkers was in 1987. However, it is clear that Val was generating half of Vallorbs' gross revenues. *See* Plaintiff's Exhibit 29.

*Factor 9*—The utility and advantages of the patented invention over prior devices is primarily its ease of triggering, proper sealing, and enhanced useful life. The value of these advantages is demonstrated in the complete reversal of the market perception of nipple drinkers since marketing of the patented product. Other nipple drinkers had been offered for sale, but none of them achieved the widespread acceptance of the patented invention.

*Factor 10*—Ziggity's commercial embodiments of the patented invention provide numerous advantages to their end users. See Plaintiff's Exhibit 36. Most importantly, they provide poultry growers with higher profits. Bird weight and feed conversion are increased, contamination rates are decreased, necessary labor is reduced, and medicinal and chemical expenses are reduced. *See* Plaintiff's Exhibit 51B at page 17. In short, Ziggity's nipple drinker is extremely marketable, as evidenced by the integrator recommendations, *see id.* at page 7, and progressively increasing sales.

*Factor 11*—Between June 1989 and December 1989, defendants sold 7,823,253 infringing nipples. *See* Plaintiff's Exhibit 47, Tab B, pages 3 and 9. A thorough and well-reasoned analysis of Val's financial records and business operations reveals that Val's net income resulting from sales of the infringing drinkers and convoyed products was at least 26 percent of its sales even as of 1987. *See id.*, Tab D, page 10. Further, defendants admit that they have used the patented invention to save money in their manufacturing operations. Defendants claim to be able to make a non-infringing product, but that it would cost more. That cost savings is a measure of the invention's value to defendants and evidence of what a reasonable royalty should

be because, as long as defendants still save some costs through the use of the patented invention after the royalty payment, they are still more profitable than if they did not obtain the license.

*Factor 12*—There are no other known patent licenses in the nipple drinker industry. Therefore, factor 12 is of no assistance in this case.

*Factor 13*—Ziggity has many patents, other than the patents-in-suit, that are applied in its poultry watering systems. Defendants have stressed the importance of the Ziggity regulator patent to the realizable profit from the watering systems. The regulator product is no doubt important, but that product was on the market years before the patented nipple drinker and did not drive up Ziggity's sales with anywhere near the success of the patented nipple drinker. In addition, the regulator has widespread application to other types of watering systems and did not itself cause market acceptance of nipple drinkers. Similarly, Ziggity's other patented products are of value, but their value is largely toed to and driven by the patented nipple drinker. *See* Plaintiff's Exhibit 36.

Defendants' nipple drinker may indeed have certain advantages because of the material out of which its valve seat is manufactured. However, their metal seat arrangement is worthless without the patented invention. Monoflo and Impex use metal seats in their nipple drinkers without using recess-headed trigger pins, and they remain in the market only to the extent that they are trying, largely unsuccessfully, to get sales. *See, e.g.,* Plaintiff's Exhibits 49B, 50B, and 51B. Furthermore, defendants are compensated for this advantage by the higher price that they charge for their nipple drinker and the higher profit margin that they obtain. *See* Plaintiff's Exhibit 47, *compare* Tab C, page 1 *with* Tab D, page 11.

*Factor 14*—Both parties presented opinion testimony of qualified experts on the issue of a reasonable royalty.

Plaintiff's expert, Mr. Alexander, who I find to be an extremely credible and competent witness, was of the opinion that the reasonable royalty damage component in this case would be somewhere between 10 and 25 percent. *See* Trial Transcript 2/15/90, at pages 128–131.

Defendants presented two witnesses who offered their opinion as to what a reasonable royalty would be in this case between Ziggity and Val. Mr. Ramik testified that, in his opinion, a reasonable royalty would be "somewhere within the one to two percentile or even less than that, a fraction of it." *See* Trial Transcript 2/20/90, at page 121, lines 5–19. Mr. Ramik based his opinion on the fact that many of the features of the patented invention were not new and had previously been in the public domain. *See id.* As an example of those features that had previously been in the public domain, Mr. Ramik cited the Clark patent. *See id.* It appears to this court that Mr. Ramik is intermingling liability issues with damages issues. Damages issues become relevant only if the patentee establishes infringement and the infringer fails to establish invalidity. The fact that certain isolated features of the patented invention may have previously existed in the public domain may be relevant to an obviousness defense, but is *not* relevant to what a reasonable royalty would have been in 1987 between Ziggity and Val. Therefore, I find Mr. Ramik's opinion with respect to reasonable royalty not credible. In any event, it is ludicrous to think that a prudent patentee with 70 percent of the relevant market would license its patented invention to its only significant competitor in exchange for a one to two percent royalty.

Based upon the assumption that defendants had a noninfringing alternative (i.e.—cold heading), Mr. Boehringer, defendants' other expert, testified that in his opinion a reasonable royalty would only be one-half of one percent. *See* Trial Transcript 2/22/90, at page 128, line 25 thru page 131, line. As I have already concluded, in order for a product to be considered an acceptable noninfringing alternative it must be on the market. Defendants' hypothetical nipple drinker with a flat-headed pin with no visible recess has never been on the market and, therefore, there is no way to deter-

mine if, in fact, it would have been acceptable. Moreover, the fact that defendants did *not* agree to manufacture trigger pins without the visible recess in an effort to avoid the expense of this patent litigation leads me to believe that defendants did not, as they have continuously professed throughout this litigation, have an acceptable alternative. Therefore, because Mr. Boehringer's reasonable royalty opinion was based on the unsubstantiated assumption that defendants could use a cold-headed trigger pin in their nipple drinker and still maintain their market share, I shall not credit his reasonable royalty opinion with any weight.

*Factor 15*—If a patentee was prudent, he would not grant a license unless doing so would increase his revenues. Accordingly, Mr. Alexander, plaintiff's damages expert, explored in depth the fifteenth *Georgia–Pacific* factor. Based upon an incremental profit approach, Ziggity's profit margin (36.02%) and market share (70%) were so high in 1987 that Ziggity would have needed a royalty rate of over 23 percent on all Val's sales of nipple drinker watering system products in order to obtain more revenue by licensing than by selling alone. *See* Plaintiff's Exhibit 47, Tab C, at page 1. Alternatively, based upon a net operating income approach, Ziggity's net operating profit percentage in 1987 was 23.51 percent. Based on that percentage and a market share of 70 percent, Ziggity would have only needed a royalty rate of over 15 percent. *See id.* On the other hand, a licensee would not be prudent to accept a license which required a royalty of more than his current profit margin. Val's profit margin in 1987 was at least 26 percent. *See id.*, Tab D, at page 11.

The proposition set forth in factor 15 requires that the licensor and licensee reach an agreement to license the patented invention. Therefore, the analysis turns on the minimum amount of profit a prudent businessman would require. In 1987, the evidence showed that the prime lending rate equaled 8.62 percent. *See* Plaintiff's Exhibit 47, Tab B, at page 1, note 3. Because this lending rate reflects the market

cost of money in order for a prudent businessman to invest in a license, as opposed to some other investment, he should at least obtain a profit on the license of 8.62 percent. Based upon Val's profit margin in 1987 of 26 percent, that would leave only 17.37 percent available for Val to pay as a royalty to Ziggity. The minimum that Ziggity should accept, based upon the net operating income approach, is 15 percent. *See id.*, Tab C, at page 1.

Defendants maintain that their bargaining position in the hypothetical negotiations in 1987 would have been enhanced because they had the alternative of manufacturing visually-flat cold-headed pins. As I have already stated, the proposition that defendants could have used cold-headed pins in their nipple drinkers and still have maintained their market share was unsubstantiated in 1987 and remains unsubstantiated.

 Upon consideration of all of the applicable *Georgia–Pacific* factors, I conclude that a reasonable royalty would *not* be less than 15 percent. Because I have found that Ziggity has met its burden with respect to obtaining lost profits on 70 percent of Val's sales of infringing nipple drinkers and convoyed products, the royalty rate of 15 percent shall apply to the remaining 30 percent of Val's sales of infringing nipple drinkers and convoyed products. In any event, based upon Mr. Alexander's thorough analysis, it is clear that the minimum royalty that Ziggity would be willing to accept as a prudent patentee would be 15 percent, regardless of defendants bargaining position.

### C. Sales Base

 Under both the lost profits analysis and the reasonable royalty analysis, it is necessary to determine the sales base to which the results of those analyses are to be applied. It is typically the case that the patented product is sold in conjunction with other products that are not claimed in the patents-in-suit. This occurs either when the patented product is sold as a component in a larger apparatus or when the sales of other products are expected as a

result of the sales of the patented product. When the patented element is the basis for consumer demand for the entire apparatus of which the patented element is a part, the courts apply what is called the "entire market value rule." *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1580 (Fed. Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 725, 107 L.Ed.2d 744 (1990). Under this rule, the recovery of damages is computed based upon "the value of an entire apparatus containing several features, even though only one feature is patented." *Paper Converting Machine Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 22 (Fed.Cir. 1984).

■ When sales involve convoyed or related parts, "[u]nder the entire market value rule, it is not the physical joinder or separation of the contested items that determines their inclusion or exclusion from the compensation base, so much as their financial and marketing dependence on the patented item under standard marketing procedures for the products in question." *Leesona Corp. v. United States*, 599 F.2d 958, 974, 220 Ct.Cl. 234, *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979). Therefore, the test for application of the "entire market value rule" when convoyed or related items are involved is whether the patentee would have anticipated the sale of related unpatented products because of and in addition to the patented product. *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 900–901 (Fed.Cir.), *cert. denied*, 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986). In other words, the patented product must create the demand for the related but unpatented products.

■ In the present case, there is no doubt that the patented nipple drinker creates the consumer demand for the components of the entire watering system. *See* Plaintiff's Exhibit 56. Nipple drinkers are marketed in concert with all the remaining components of the watering system. *See* Plaintiff's Exhibits 35 and 36. When end users (farmers) of the nipple drinkers place an order, it is almost always an order for a complete system. *See* Plaintiff's Exhibit 51B, at page 25, line 23 thru page 26, line

4. However, the end users may occasionally order a spare or replacement part separately.

Therefore, I conclude that Ziggity can anticipate the sale of the unpatented components of the nipple drinker watering system together with the patented nipple drinker. I also conclude that Mr. Alexander's entire market analysis is reasonable and conservative. *See* Plaintiff's Exhibit 47, Tab E. Under his analysis, only those products directly tied to nipple drinker sales, as evidenced by the invoice itself, have been included with the sales valued of the nipple drinker to determine the total infringement sales for which compensation is due. *See id.*, Tab E, at page 1. Therefore, Ziggity does not seek compensation for isolated sales of Val's pressure regulators, even though such regulators are the type of product that Ziggity could anticipate selling but for Val's infringement of the patents-in-suit. Likewise, Ziggity does not claim compensation for spare parts or replacement parts unless they are directly tied to the patented drinker, as evidenced by the invoice.

### D. Prejudgment Interest

■ Section 284 of title 35 of the United States Code provides that the court "shall award ... damages adequate to compensate for the infringement ... together with interest and costs as fixed by the court." The prejudgment interest rate is not limited by any statutory rate, but is within the sound discretion of this court. *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1066 (Fed.Cir.1983).

In *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983), the United States Supreme Court concluded that "prejudgment interest should ordinarily be awarded under § 284." *Id.* at 656, 103 S.Ct. at 2063. The Court, however, went on to state:

> We do not construe § 284 as requiring the award of prejudgment interest whenever infringement is found. That provision states that interest shall be "fixed by the court," and in our view it leaves the court some discretion in awarding

prejudgment interest. For example, it may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit. There may be other circumstances in which it may be appropriate not to award prejudgment interest. We need not delineate those circumstances in this case. *We hold only that prejudgment interest should be awarded under § 284 absent some justification for withholding such an award.* *Id.* at 656–57, 103 S.Ct. at 2063 (emphasis added).

Defendants contend that prejudgment interest should not be awarded for the time period prior to the date this suit was filed because Ziggity failed to contact defendants prior to initiating this lawsuit to inform them that, in its opinion, their current trigger pins were still infringing its patents. I took Ziggity's failure to contact defendants prior to initiating this lawsuit into consideration when deciding whether defendants' infringement was willful and shall not consider it again with respect to the issue of prejudgment interest. The purpose of prejudgment interest is to compensate the patentee for its losses, not to punish the infringer. An infringer is liable for compensatory damages even though his infringement was *not* intentional.

I conclude that the fact that Ziggity failed to contact defendants prior to initiating this lawsuit is *not* a reason sufficient enough to justify a denial of prejudgment interest. Therefore, I shall award prejudgment interest to plaintiff on both the lost profits and reasonable royalty components of its compensatory damages award. *See Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 555–56, 557 (Fed.Cir. 1984) (court reversed district court for failing to award prejudgment interest on the lost profits portion of the damages award, while at the same time awarding prejudgment interest on the reasonable royalty portion of that award).

The rate of prejudgment interest and whether it should be compounded are matters left largely to the discretion of the district court. *Bio–Rad Laboratories, Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed.Cir.1986), *cert. denied*, 482 U.S. 915, 107 S.Ct. 3187, 96 L.Ed.2d 675 (1987). The average prime lending rate for the time period in question is an appropriate measure of the prejudgment interest rate. *See Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 823, 829 (Fed.Cir.1989) (court upheld district court's award of prejudgment interest at the prime rate compounded annually), *cert. denied*, —— U.S. ——, 110 S.Ct. 729, 107 L.Ed.2d 747 (1990).

In *Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.*, 874 F.2d 431 (7th Cir. 1989), the court offered some helpful advice, which is applicable to patent cases:

> [W]e suggest that district judges use the prime rate for fixing prejudgment interest where there is no statutory interest rate. That is a readily ascertainable figure which provides a reasonable although rough estimate of the interest rate necessary to compensate plaintiffs not only for the loss of the use of their money but also for the risk of default.

*Id.* at 436.

In the present case, the average prime lending rate was: (1) 8.65 percent in 1987; (2) 9.40 percent in 1988; and (3) 10.92 percent in 1989. *See* Plaintiff's Exhibit 47, Tab B, at page 1. Mr. Alexander's prejudgment interest analysis applied these prime lending rates respectively. *Id.* His analysis is conservative in that it assumes that the interest is compounded annually and not due until the end of each year. *Id.* Further, his analysis does not include interest payments due for 1989. *Id.* Therefore, I shall award Ziggity prejudgment interest at the prime rate compounded annually on both the lost profits and reasonable royalty components of its compensatory damages award, as set forth in Plaintiff's Exhibit 47.

### E. Increased Damages

Plaintiff also seeks increased damages under 35 U.S.C. § 284. Section 284 of the Patent Act provides that "the court may increase damages up to three times the

amount found or assessed." 35 U.S.C. § 284.

The decision to increase damages and the amount of the increase is within the sound discretion of the district court. The Federal Circuit Court of Appeals has stated:

If infringement be accidental or innocent, increased damages are not awarded for the infringement. If infringement be willful, increased damages "may" be awarded at the discretion of the district court, and the amount of increase may be set in the exercise of the same discretion.

*Kloster Speedsteel AB v. Crucible Inc.,* 793 F.2d 1565, 1580 (Fed.Cir.1986); *see also Ryco, Inc. v. Ag–Bag Corp.,* 857 F.2d 1418, 1429 (Fed.Cir.1988).

I have found that defendants' infringement was *not* willful. *See supra* Discussion, Section I(D). Therefore, in light of my finding of nonwillfulness, I shall deny plaintiff's request for increased damages pursuant to section 284.

### F. Attorney Fees

Finally, plaintiff seeks attorney fees under 35 U.S.C. § 285. Pursuant to section 285, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."

In an exceptional case and in the discretion of the trial judge, the purpose of section 285 is to compensate the prevailing party for its monetary outlays in prosecution or defense of a patent infringement suit. *Central Soya Co. v. Geo. A. Hormel & Co.,* 723 F.2d 1573, 1578 (Fed.Cir.1983). Therefore, section 285 is designed to discourage conduct which falls "within the scope of 'exceptional' by requiring the party acting exceptionally to bear the expenses of the opposing party." *Id.*

 A finding of willful infringement is legally sufficient to meet the criterion of an "exceptional" case for purposes of section 285 and, therefore, a proper basis for an award of attorney fees. *See Del Mar Avionics, Inc. v. Quinton Instrument Co.,* 836 F.2d 1320, 1329 (Fed.Cir.1987) ("finding of willful infringement is legally sufficient to meet the criterion of 'exceptional

case' "); *see also Ryco, Inc. v. Ag–Bag Corp.,* 857 F.2d 1418, 1429 (Fed.Cir.1988) (willful infringement may be a sufficient basis for finding a case "exceptional" for purposes of awarding attorney fees); *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.,* 853 F.2d 1557, 1567 (Fed.Cir.1988) ("our cases uniformly indicate that the willfulness of the infringement by the accused infringer may be a sufficient basis in a particular case for finding the case 'exceptional' for purposes of awarding attorney fees to the prevailing patent owner"); *Water Technologies Corp. v. Calco, Ltd.,* 850 F.2d 660, 674 (Fed.Cir.1988) ("[h]aving found this to be a case of willful infringement, the district court's discretionary award of attorney fees was proper"); *Bott v. Four Star Corp.,* 807 F.2d 1567, 1574 (Fed.Cir.1986) (award of attorney fees proper in light of the finding of willful infringement); *Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.,* 761 F.2d 649, 657 (Fed.Cir.) ("[h]aving found this to be a case of willful infringement, the district court's discretionary award of attorney fees and costs ... was proper"), *cert. denied,* 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985).

 I have found that defendants' infringement was *not* willful. *See supra* Discussion, Section I(D). Therefore, I find that this case is *not* exceptional based upon willful infringement. I further find that there is no other basis upon which to find this case "exceptional" for the purpose of awarding attorney fees under section 285. Hence, I shall deny plaintiff's request for attorney fees.

### G. Summary of Damages

I shall award plaintiff compensatory damages based on a 70 percent share of the market and a 15 percent royalty on nipple drinkers and related products and computed according to the following formula: (70% × Total Lost Profits) + (30% × Total Reasonable Royalty) + Ziggity Price Erosion Component + (70% × Val Price Erosion Component). *See* Plaintiff's Exhibit 47, Tab A, at page 1, note 2. Plaintiff's Exhibit 47 at page 3 of Tab A summa-

rizes the actual figures for each component of Ziggity's compensatory damages award. This page of Plaintiff's Exhibit 47 does not set forth prejudgment interest as a separate component of damages. Rather, each component has its own prejudgment interest subcomponent which has already been added into the final figure. For example, the figure for the lost profits component, $2,704,532.57, includes its own prejudgment interest subcomponent in the amount of $217,516.64. *See id.*, Tab B, at page 1 ($310,738.07 × 70%).

Accordingly, Ziggity shall recover a total of $3,835,090.46 in compensatory damages and prejudgment interest, which is broken down into components as follows:

1. Lost Profits from Lost
 Sales $2,704,532.57
2. Lost Profits from Price
 Erosion
 a. Ziggity Component $ 465,300.35
 b. Val Component $ 76,443.79
3. Reasonable Royalty $ 588,813.76

*See* Plaintiff's Exhibit 47, Tab A, at page 3.

## IV. ANALYSIS OF BREACH OF CONTRACT COUNTERCLAIMS

Defendants assert as counterclaims that Ziggity broke two contracts with defendants: (1) a Settlement Agreement entered into between the parties permitting defendants to manufacture and sell nipple drinkers with flat-headed trigger pins; and (2) an oral agreement to contact defendants prior to initiating further litigation between the parties.

### A. The Settlement Agreement

The Settlement Agreement from the previous litigation between the parties provides in pertinent part:

6. Defendants agree to cease making, using and selling, as of April 1, 1987, allegedly infringing products having a recess in a head of the trigger pin as shown in Exhibit "B" attached to the Amended Complaint.
7. Plaintiff hereby releases from liability and covenants not to sue Defendants for any claim of infringement of Plaintiff's patents based on manufacture, use

and/or sale of Defendants' new product design which substitutes a flat head trigger pin, as shown in Exhibit "A" attached hereto, into a drinker assembly. *See* Defendants' Exhibit 9, at page 2.

Defendants contend that their current trigger pins have flat heads and, therefore, that Ziggity breached paragraph 7 of the Settlement Agreement by initiating this present litigation. On the other hand, Ziggity maintains that the heads of defendants' current trigger pins are not flat and, thus, that it did not breach paragraph 7. Therefore, the crux of this breach of contract issue is the interpretation of the word "flat."

Initially, I must determine as a matter of law which category the contract provision at issue falls into—clear or ambiguous. *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 101 (3d Cir.1986). "[A]mbiguous writings are interpreted by the fact finder and unambiguous writings are interpreted by the court as a question of law." *Mellon Bank, N.A. v. Aetna Business Credit*, 619 F.2d 1001, 1011 n. 10 (3d Cir.1980).

In making the ambiguity determination, I must consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence offered in support of those meanings. *See Kroblin*, 805 F.2d at 101; *Mellon Bank*, 619 F.2d at 1011. Based on this evidence, I must decide whether "there is objective indicia that, from the linguistic reference point[s] of the parties, the terms of the contract are susceptible of differing meanings." *Mellon Bank*, 619 F.2d at 1011. A contract will be found to be ambiguous if it is reasonably susceptible to different constructions, is obscure in meaning through indefiniteness of expression, or has a double meaning. *See International Union v. Mack Trucks, Inc.*, 733 F.Supp. 938, 946 (E.D.Pa.1990); *Metzger v. Clifford Realty Corp.*, 327 Pa.Super. 377, 385, 476 A.2d 1, 5 (1984). However, "[a] contract is *not* ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general,

its meaning depends; a contract is *not* rendered ambiguous by the mere fact that the parties do not agree on the proper construction." *Metzger,* 327 Pa.Super. at 385, 476 A.2d at 5 (emphasis added).

In essence, defendants contend that, in spite of the fact that the head of their current trigger pin contains a recess visible with the naked eye, the head of their pin is flat because (1) based upon the definition of "flat" contained in Webster's Third New International Dictionary, it does not contain a noteworthy depression; and (2) it is flat according to the standards of the screw machine industry.

Ziggity maintains that, considering the circumstances under which the parties entered into the agreement and the common definition of "flat" as found in a Webster's dictionary, the head of defendants' current trigger pin is *not* flat.

 In deciding whether the term "flat" is ambiguous, I must consider the circumstances under which the Settlement Agreement was entered into, and the common and ordinary definition of the term "flat." The Settlement Agreement came as a result of patent infringement litigation over a known product of defendants. The recess in the head of the trigger pin is a central feature in Ziggity's claimed invention and the subject of much discussion during the reexamination proceedings. *See* Defendants' Exhibit 3. Since defendants participated in and received copies of the documents filed with respect to the reexamination proceedings, they were aware of the function and advantages of that recess as claimed, at least as propounded by Ziggity. Obviously, defendants were aware that Ziggity was concerned about the nature of the nipple drinker products that defendants would sell after April 1, 1987, as well as the possibility of future patent litigation against defendants. Therefore, the term "flat" must be construed in contrast with the scope of the claims of the patents-in-suit, and those claims set forth no dimensions limiting the meaning of the term "recess."

According to *Webster's Third New International Dictionary,* "flat" means:

1. having or marked by a continuous surface that is horizontal or nearly so without significant curvature or inclination and without noteworthy elevations or depression. . . .

*Webster's Third New International Dictionary* 865 (P.B. Gove, ed. 1961). *See* Defendants' Exhibit 173, at page 2. According to *Webster's Ninth New Collegiate Dictionary,* "flat" means:

2a: having a continuous horizontal surface

 b: being or characterized by a horizontal line or tracing without peaks or depressions. . . .

*Webster's Ninth New Collegiate Dictionary* 470 (1987). *See* Plaintiff's Revised Reply Brief, Appendix B.

Upon consideration of the words of the contract, the alternative meanings of the term "flat" suggested by the parties, and the nature of the objective evidence offered in support of those meanings, I conclude that the term "flat" is *not* ambiguous.

Now, I must proceed as a matter of law to interpret the term "flat." I note that, in the agreement, the term "flat" was only defined in terms of the drawing attached to the Settlement Agreement as Exhibit A. This drawing is not helpful in defining the term "flat." In that drawing the surface of the head of the pin may not be smooth, but the drawing does not include any visible recess. However, it may be that the recess would only show in the drawing if the drawing were a cross-sectional diagram of the trigger pin. Unfortunately, nowhere in the Settlement Agreement does it specify whether or not the drawing is a cross-section of a trigger pin.

Defendants maintain that I should consider the meaning of the term "flat" as that term is used in the screw machine industry. For two reasons, I decline to do so. First of all, both parties to the Settlement Agreement are not in the screw machine industry. Ziggity is not, and has never been, in the screw machine industry. Defendants on the other hand are screw machinists of long standing. It would be patently unfair to hold Ziggity to the defini-

tion of the term "flat" as that term is defined in a specialized industry in which it is not a member and in which it has no experience. Second, in light of their knowledge of the screw machine industry, defendants were in a superior position to request that a definition of "flat" within specified tolerances be included in the Settlement Agreement. However, because the term "flat" was not given a specific definition and because I have concluded that the term "flat" is unambiguous, I must resort to the natural and ordinary meaning of "flat." *Tookmanian v. Safe Harbor Water Power Corp.*, 505 F.Supp. 920, 922 (E.D.Pa.1981); *In re Spagnol Enters., Inc.*, 81 B.R. 337 (W.D.Pa.1987); *Pines Plaza Bowling, Inc. v. Rossview, Inc.*, 394 Pa. 124, 145 A.2d 672, 676 (1958).

Because both parties agree that it is appropriate for me to look to the dictionary definitions of "flat," I shall adopt the definitions from *Webster's* offered by the parties as the common and ordinary definitions of "flat."

Based on those definitions, I must determine if the head of defendants' trigger pin is flat. I conclude that, pursuant to either definition of flat and the circumstances under which the Settlement Agreement was entered into, defendants' trigger pin is *not* flat-headed. First, the recess or depression is visible with the naked eye. Second, by simple ruler measurement, the width of the recess is approximately 25 percent of the diameter of the head of the trigger pin. *See* Plaintiff's Exhibit 6; Trial Transcript 2/14/90 at pages 88–89. Using plaintiff's choice of definitions, I conclude that the visible recess is a depression and, thus, that the head of defendants' trigger pin is not flat. Using defendants' choice of definitions, I conclude that a recess or depression which is visible with the naked eye and which is 25 percent of the width of the trigger pin is clearly "noteworthy."

Because the heads of defendants' current trigger pins are *not* flat, plaintiff did *not* breach paragraph 7 of the Settlement Agreement by filing this lawsuit against defendants.

Defendants also raise the defenses of release and license. These defenses depend entirely upon the interpretation of the term "flat" as it is used in the Settlement Agreement. Because I have concluded that the heads of defendants' current trigger pins are *not* flat, there is no merit to the defenses of release and license.

## B. The Oral Agreement

On June 12, 1987, after ruling that defendants had breached the Settlement Agreement, *see* Defendants' Exhibit 9, by continuing to sell drinkers with full-concavity trigger pins and after establishing August 20, 1987 as the hearing date with regard to Ziggity's damages from that breach, Judge Cahn addressed Ziggity's counsel, David Melton:

THE COURT: And if you're going to file another suit, why don't you give Mr. McNulty [defendants' counsel] a call, telling him you're going to do it and talk to him before you do that. Maybe there is additional common ground that you could work on.

MR. MELTON: Certainly. We certainly will do that.

*See* Plaintiff's Exhibit 65, at page 89. That is the sum and substance of the "contract" allegedly breached by Ziggity.

■ At the outset, I conclude that defendants have *not* established that a contract actually existed because they have failed to show that they provided separate consideration for Ziggity's promise to contact them prior to filing another lawsuit. Defendants assert that they gave consideration by "agreeing" to the entry of Judge Cahn's order against them. *See* Trial Transcript 2/23/90, at page 139, lines 16–21. That, however, cannot be correct because the Order had been agreed to before the matter of calling defendants ever arose. *See* Plaintiff's Exhibit 65. The terms of the Order were not even mentioned, much less altered, after Judge Cahn's request to Ziggity's counsel. *See id.*, at page 89. Merely because two events happen on the same day does not mean that they are causally related.

Alternatively, defendants assert that they gave consideration in that they relied to their detriment on Ziggity's promise by purchasing a new punch machine and modifying it to do the deburring in a somewhat different process that would continue to leave a deburring depression of less than .003 inch. The total cost of the machine with its modifications was in excess of $75,000. *See* Trial Transcript 2/21/90, at page 123, line 23 thru page 124, line 24. Apparently ten months after the hearing with Judge Cahn, defendants purchased the new punch machine allegedly because they had not heard anything negative from Ziggity with respect to their new trigger pins and interpreted that lack of comment as Ziggity's blessing. Detrimental reliance is a substitute for consideration, *Robert Mallery Lumber Corp. v. B. & F. Assocs., Inc.*, 294 Pa.Super. 503, 509–13, 440 A.2d 579, 582–83 (1982) (citing Restatement (Second) of Contracts § 90), but only if that reliance is justified in light of the totality of the circumstances. *Schleig v. Communications Satellite Corp.*, 698 F.Supp. 1241, 1249 (M.D.Pa.1988); *Paul v. Lankenau Hospital*, 375 Pa.Super. 1, 9–11, 543 A.2d 1148, 1153 (1988) (quoting *Banas v. Matthews Int'l Corp.*, 348 Pa.Super. 464, 486 n. 12, 502 A.2d 637, 648 n. 12 (1985)). In light of all the surrounding circumstances, I find that defendants were *not* justified in relying on Ziggity's lack of comment during a ten-month period as a positive endorsement of their new trigger pins.

Even if defendants were able to establish that an oral contract existed and that Ziggity breached that contract by not contacting defendants prior to initiating this lawsuit, I conclude that defendants would be unable to recover any damages as a result of that breach. In essence, defendants contend that, because Ziggity failed to contact them prior to filing the complaint, they were forced to defend this lawsuit at a cost of more than $500,000. However, there is no direct connection to Ziggity's breach and the cost of defending this lawsuit, unless defendants can establish that, had Ziggity contacted them prior to initiating this lawsuit, the parties would have been able to work out their differ-

ences and thus avoid this lawsuit. Of course, defendants cannot establish that to be the case. If anything, the fact that the parties have not entered into any serious settlement discussions during the course of this litigation is circumstantial evidence tending to prove the exact opposite—that the parties would *not* have been successful in reaching a mutual agreement prior to the filing of the complaint. The filing of the complaint is *not* some magical date after which settlement is no longer possible. If the parties had been able to settle their differences prior to the filing of the complaint, they most likely would have been able to settle their difference after the filing of the complaint.

Furthermore, even if defendants could have established that this lawsuit would have been unnecessary had Ziggity contacted them prior to filing the complaint, defendants would still have been unable to recover any damages because they never sought to mitigate their damages. It is a matter of elementary contract law that "damages are not recoverable for loss that the injured party could have avoided with undue risk, burden, or humiliation." Restatement (Second) of Contracts § 350(1). Once Ziggity breached the contract, defendants were obligated to take reasonable steps to mitigate damages flowing from that breach. 11 Williston on Contracts § 1353 (3rd ed. 1968).

Defendants could have mitigated their damages by simply contacting Ziggity themselves after receiving the complaint. By initiating contact with Ziggity immediately after service of the complaint, defendants would in essence have received the same benefit as they would have received had Ziggity contacted them prior to filing the complaint—an opportunity to attempt to persuade Ziggity that litigation was unnecessary. If that contact had proven successful, then the parties would have reached a settlement and dismissed this action. *See* Fed.R.Civ.P. 41(a)(1). If that contact had proven unsuccessful, then defendants' costs in defending this lawsuit would no longer have been connected to

Ziggity's failure to contact defendants prior to filing the complaint.

▬▬▬ Ziggity's promise was *not* a promise *not* to sue and was *not* a promise to negotiate a settlement. Ziggity's promise was very simply a promise to contact defendants prior to initiating another lawsuit. The purpose of that promise was to provide defendants with an opportunity to persuade Ziggity that litigation was unnecessary. Defendants were *not* deprived of that opportunity simply because Ziggity failed to contact them prior to filing the complaint.

Defendants do not offer an explanation for why they did not contact Ziggity after receiving the complaint for the purpose of discussing settlement. In fact, defendants state in their post-trial brief that "[i]f Ziggity had apprised Defendants of any concern as to the current pins, Defendants could have negotiated a tolerance solution to the problem, or proved to Ziggity that there is no functional purpose to the deburring, or negotiated other manufacturing techniques." *See* Defendants' Post–Trial Brief, at page 22. In essence, by filing the complaint, Ziggity apprised defendants that, in its opinion, their current trigger pins were *not* flat. However, after the complaint was filed, defendants never did any of the things that they said they could have done in an effort to avoid litigation.

The three things that defendants mention in their post-trial brief, *see id.,* are things that defendants could have done just as easily after the complaint was filed as before. As I stated earlier, the filing of the complaint is *not* some magical date after which settlement is no longer possible. It is never too late to settle a pending lawsuit.

The long and the short of it is that defendants' counterclaim based upon Ziggity's alleged breach of an oral contract is totally without merit. Even if Ziggity breached its promise, defendants did *not* suffer any damages because they were never deprived of an opportunity to attempt to settle this lawsuit and avoid unnecessary litigation. It is ironic that a statement made by the judge in the previous litigation to the effect that the parties should keep open the lines of communication between them in an effort to avoid another lawsuit has, in fact, became an issue of contention in the very lawsuit that the judge was attempting to help the parties avoid.

## CONCLUSIONS OF LAW

1. This court has personal jurisdiction over the parties to this action.

2. This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338.

3. This court has subject matter jurisdiction over the breach of contract counterclaims:

(a) pursuant to 28 U.S.C. § 1332 because the controversy exceeds the sum or value of $50,000, exclusive of interest and costs, and is between citizens of different states;

(b) pursuant to the doctrine of pendent jurisdiction because the breach of contract counterclaims arise out of the same nucleus of operative facts as does the patent infringement claim.

4. Venue in this court in proper pursuant to 28 U.S.C. §§ 1391(b) and 1400(b).

5. At all relevant times, Ziggity has been the owner of all right, title, and interest in and to the '345 and '088 patents.

6. Defendants have literally infringed claims 1–2, 6–13, 19–24 of the '345 patent.

7. Defendants have infringed claims 1–2, 6–13, and 19–24 of the '345 patent and claims 3–5 of the '088 patent under the doctrine of equivalents.

8. Defendants Val and Vallorbs are liable as direct infringers under 35 U.S.C. § 271(a).

9. Defendant Vallorbs is liable as a contributory infringer under 35 U.S.C. § 271(c).

10. Defendants Vallorbs, Frederick Steudler, Sr., and Frederick Steudler, Jr. are liable for inducing infringement of the patents-in-suit under 35 U.S.C. § 271(b).

11. Based upon my factual findings with respect to obviousness, I conclude that defendants have failed to establish by clear

and convincing evidence that the claimed invention as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art of nipple drinkers for chickens, other fowl, and small animals.

12. Defendants have failed to prove by clear and convincing evidence that the claimed invention was in public use or on sale in this country more than one year prior to the date of the application for patent in the United States.

13. Defendants have failed to establish by clear and convincing evidence that plaintiff withheld material information from the United States Patent and Trademark Office. To the extent that plaintiff withheld material information, defendants have failed to prove by clear and convincing evidence that, in so doing, plaintiff intended to deceive the United States Patent and Trademark Office.

14. Defendants have failed to prove by clear and convincing evidence that the patents-in-suit are invalid because the specifications fail to contain and set forth, as required by 35 U.S.C. § 112, "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains ... to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

15. Defendants have failed to establish by clear and convincing evidence that any amendment to the patents-in-suit introduced new matter into the disclosures of the inventions, in violations of 35 U.S.C. § 132.

16. Plaintiff is entitled to recover the lost profits that it would have earned on 70 percent of defendants' infringing sales.

17. Plaintiff is entitled to recover the lost profits that it would have earned from an increased selling price for which it would have been selling its nipple drinkers but for defendants' infringement of the '088 and '345 patents.

18. Plaintiff is entitled to recover damages from sales of the unpatented components of defendants' watering systems convoyed with sales of the infringing drinkers.

19. A reasonable royalty on the portion of defendants' sales of infringing drinkers that Ziggity would not have made even with defendants' infringement is 15 percent.

20. Prejudgment interest of an average of 10 percent compounded annually is appropriate and necessary to fully compensate plaintiff.

21. Based on a combination of lost profits on 70 percent of defendants' infringing sales, lost profits because of price erosion, a 15 percent royalty on the remaining 30 percent of defendants' infringing sales, and prejudgment interest as of December 31, 1989, plaintiff's damages total $3,835,090.46.

22. In light of my finding that defendants' infringement was *not* willful, plaintiff's request for increased damages pursuant to 35 U.S.C. § 284 is denied.

23. This is *not* an exceptional case pursuant to 35 U.S.C. § 285. Therefore, plaintiff is *not* entitled to recover reasonable attorney fees.

24. The upper surface of the head of Val's trigger pin is *not* flat. Therefore, defendants' counterclaim for breach of contract of the Settlement Agreement, as well as defendants' defenses of release and license, are without merit.

25. To the extent that plaintiff had an obligation to contact defendants before commencing the present action and that obligation was not honored, defendants could have engaged in settlement discussions at any time during the pendency of this action. Therefore, because defendants were never deprived of their opportunity to discuss settlement with plaintiff, defendants have sustained no damages from plaintiff's alleged failure to honor their promise to contact defendants prior to commencing the present action.

26. Plaintiff shall recover its costs.

# VAL WATERING SYSTEMS

Drinker Assembly Cross-Section
- Removable Cap—holds assembly together
- O-Ring Seal
- Stainless Steel Ball Shut-Off
- Stainless Steel Triple-Seat
- Valve Body with Left or Right J-Type Connection
- 360° Stainless Steel Trigger Pin
- Patent Applied

## System Features

- Dryer manure is obtained by using the Val Drinker System because of the high quality, reliable Triple seal stainless steel seat, and an adequate volume of water delivered at a low (¼ lb. or less) more even pressure than any other closed watering system.
- Cage row water lines can be supplied from one end by either closed tank assembly (VT-121) a distance of 650 feet, or pressure regulator assembly (VR-122) a distance of 525 feet.
- Outside pipe connector is part of pipe, and allows maximum flow; one o-ring seal per connector allows expansion and contraction without leakage.
- Pipe connector being part of pipe has two legs which orient drinkers and keep them from turning. (Patent applied)
- Super simple installation, easily accomplished by anyone, pipes just push together and drinkers are inserted into pipe and twisted left or right, no threads, no special tools required.
- Water being accessible at all times from any angle at very low pressure with adequate volume make this closed watering system the cleanest, easiest and best way to water poultry.

## The Best in Poultry Watering
### Ask Any Chick!

## Drinker Features

- VAL Drinkers supply adequate water for 12 birds and trigger easier than any drinker on the market.
- 360° side action makes drinking accessible from any angle.
- All working parts of valve are high quality stainless steel.
- Triple Stainless Steel seal, minimizes water leaking problems.
- Drinkers snap on water line left or right by means of J type connection. (NO THREADS)
- Easily removed cap holds all parts of drinker assembly together.
- Water is accessible at all times, never a dry cup.
- Drinkers are completely self cleaning. There is no cleaner watering system.

# VAL WATERING SYSTEMS

**Water Filter Kit (VF-120)** For trouble free operation a VF-120 water filter kit per 60,000 birds is essential. The kit is installed on the wall ahead of the tanks or pressure regulators and has ¾" inlet and outlet fittings. Included are mounting brackets, hook-up for medicator, shut off valves to replace filter cartridges, 2 replacement filter cartridges, and pressure gauges which determine when the removeable cartridges require replacement.

**Water Meter (VM-142)** The VM-142 Val water meter is connected in line between the filter kit and the tanks or regulators. One meter per 60,000 birds is adequate. However, many growers use one meter per row

**End Assembly (VE-123)** The VE-123 End Assembly connects the ends of both lines in a tier with a clear easy to read stand pipe and a valve which allows flushing of lines at any time. The water level in the stand pipe at the end of the line should read 6 to 8 inches. Connecting the two lines together helps maintain an even pressure throughout the system.

**Tank Assembly (VT-121)** Tank assembly can supply a house from one end a distance of 650 feet and maintain a low (¼ lb.) even pressure by using a ball-top closed controlled tank, one tank to each tier. The enclosed tank is connected to the water supply and should maintain a water level of 6 to 8 inches higher than the water lines being supplied. The VT-121 Tank assembly is almost maintenance free and can supply a lower more even pressure over a longer distance than any regulator on the market.

**Regulator Assembly (VR-122)** The VR-122 regulator discharges a large volume of water ¼ pound pressure or more. It is a closed system and is easily adjustable from a 6" to 18' water level in a clear easy to read stand pipe, which should read 6 to 8 inches higher than the water lines being supplied. Val drinking systems can be supplied by this regulator from one end of the house a distance of 520 feet, one regulator to each tier. One regulator per line, 2 per tier are required for water lines 525' to 650' long.

NOTE: 28" of stand column height equals 1 pound pressure.

**VAL WATERING SYSTEMS**
P.O. Box 958 • Lancaster, PA 17603
717-392-3978

Interested In:
[ ] Layers [ ] Pullets [ ] Broilers

Name _____
Address _____
City _____ State _____ Zip _____

**Pipe Connector (VC-145)** Outside pipe connector allows maximum water flow and is glued to pipe at one end at the factory, one (1) o'ring seal on the other end of the connector allows expansion and contraction of pipe without leakage. Each connector has 2 legs which orient drinkers and keep them from turning. (Patent Applied)

*The*
*United*
*States*
*of*
*America*

## The Commissioner of Patents and Trademarks

*Has received an application for a patent for a new and useful invention. The title and description of the invention are enclosed. The requirements of law have been complied with, and it has been determined that a patent on the invention shall be granted under the law.*

*Therefore, this*

### United States Patent

*Grants to the person or persons having title to this patent the right to exclude others from making, using or selling the invention throughout the United States of America for the term of seventeen years from the date of this patent, subject to the payment of maintenance fees as provided by law.*

*Commissioner of Patents and Trademarks*

*Attest*

## NOTICE

*If the application for this patent was filed on or after December 12, 1980, maintenance fees are due three years and six months, seven years and six months, and eleven years and six months after the date of this grant, or within a grace period of six months thereafter upon payment of a surcharge as provided by law. The amount, number, and timing of the maintenance fees required may be changed by law or regulation.*

# United States Patent [19]

## Hostetler

[11] Patent Number: 4,491,088

[45] Date of Patent: * Jan. 1, 1985

[54] **WATERING SYSTEM FOR FOWL AND SMALL ANIMALS**

[75] Inventor: **Eldon Hostetler, Middlebury, Ind.**

[73] Assignee: **Ziggity Systems, Inc., Middlebury, Ind.**

[ * ] Notice: The portion of the term of this patent subsequent to Aug 18, 1998 has been disclaimed

[21] Appl. No.: **520,099**

[22] Filed: **Apr. 10, 1981**

### Related U.S. Application Data

[63] Continuation of Ser No 113 607, Jan 21, 1980, Pat No. 4,284,036.

[51] Int. Cl.³ .................. . ......... .... ........... A01K 7/00
[52] U.S. Cl. .................. ..................... ........ **119/72.5**
[58] **Field of Search** ......................... . 119/72.5, 75, 71

[56] References Cited

### U.S PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 241,884 | 5/1881 | Robinson . .. . .. | 119/75 |
| 1,310,320 | 7/1919 | Bodgd . . ...... .. | 119/75 |
| 3,385,267 | 5/1968 | Boegli . . . | 119/72 5 |
| 3,416,499 | 12/1968 | Wilmott .. ... . ...... | 119/72 5 |
| 3,566,844 | 3/1971 | Occhiodori . . . ... | 119/72 5 |
| 3,602,197 | 8/1971 | Fioretto . .. . | 119/72 5 |
| 3,716,030 | 2/1973 | Godshalk . . | 119/72 5 |
| 3,756,199 | 9/1973 | Clark . . .. | 119/72.5 |
| 3,838,664 | 10/1974 | Atchley . . . ... . | 119/72 5 |

*Primary Examiner*—Jay N. Eskovitz
*Attorney, Agent, or Firm*—Eugene C. Knoblock

[57] **ABSTRACT**

A valved discharge member for use with the water supply system for use with cages of fowl and small animals, wherein a valve element in the member engages two spaced valve seats and is unseated by movement laterally and upwardly of a pin extending through a discharge opening and projecting below the housing.

2 Claims, 4 Drawing Figures

Fig. 1

Fig. 2

Fig. 3

Fig. 4

4,491,088

1

# WATERING SYSTEM FOR FOWL AND SMALL ANIMALS

This application is a continuation of Ser. No. 113,607, filed Jan. 21, 1980, now U.S. Pat. No. 4,284,036, dated Aug. 18, 1981.

## SUMMARY OF THE INVENTION

This invention relates to a watering system for fowl and small animals and particulary to the watering system for use in connection with and accessible at the various cages or compartments in which fowl and small animals are reared, and/or cages in which hens and other fowl are retained so that eggs produced by them may be retained and collected.

Prior constructions of valve units of watering systems of this general type intended for providing fresh water have entailed or utilized constructions in which a housing of vertical tubular character, usually provided with a valve, is clamped or secured to a horizontal supply conduit at an opening through which water from the conduit may be discharged. The constructions of the valves of prior devices have utilized plastic bodies and metal parts, such as valve members, which parts have commonly been formed by usual machining methods but have been subject to the formation of ribs or projections thereon which, in repeated use for a period of time have caused wear of the plastic body, as by a sawing action. Progressive wear progressively increases the rate of flow liquid which is discharged incident to any given operation of the valve member, and the flow rate can become excessive and cause discharge of water in an amount in excess of the amount which the fowl or animal, and particularly a small chicken, can ingest. Also, the discharge of an excess amount of water incident to a given opening actuation of the valve can cause wetting of the fowl or animal within the cage and wetting of the fowl or animal within the cage and wetting of the litter within the cage with the result that the health of the occupant is endangered. This and other characteristics of prior devices have detracted from successful use and have required either frequency replacement of the watering device or removal thereof.

The present device is designed and constructed to eliminate the aforementioned and other deficiencies of prior devices and has for its principal object the successful elimination of the aforementioned and other limitations and disadvantages.

A further object is to provide a water discharge unit of this type which effectively meters the amount of liquid discharged and which maintains substantially constant the rate of discharge of water therethrough incident to each operation of the device to a given extent.

A further object of this invention is to provide a device of this character which provides multiple spaced valve seats engageable by a valve element to insure effective normal sealing of the valve element.

A further object is to provide a device of this character wherein a flexible valve seat forming member is engaged by a valve element having a spherical surface and is subjct to deflection to provide continuous annular sealing engagement with a valve element, including engagement at irregularities in the surface of the valve element.

A further object is to provide a water distributor having an actuator projecting therefrom at a water

2

discharge opening and operable to unseat a valve in response to lateral tilting in any direction and to upward bodily movement.

Other objects will be apparent from the following specification.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view illustrating a watering system having multiple water distribution parts of the character embodied in this invention.

FIG. 2 is an axial sectional view of one embodiment of a distributor in sealed position.

FIG. 3 is an axial sectional view of another embodiment of the invention in its sealed position.

FIG. 4 is an axial sectional view of the embodiment of the invention illustrated in FIG. 2, shown in a water discharging position.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to the drawings which illustrate preferred embodiments of the invention, the numeral 10 designates a water supply conduit connected with pressure regulating means 2 having connection with a water supply through a line 3 The conduit 1 is positioned to extend through a series of cages, not shown, in which fowl and small animals may be housed. The conduit 1 may be supported at selected elevation and in substantially, horizontal position by any suitable means, such as suspension cables 4 connected to clamps 5, each encircling the conduit 1 at a selected position. Each clamp has a depending tubular discharge 6 communicating with a discharge opening at the lower part of the conduit 1. Clamps 5 may be provided with valves which may be of the normally closed type, but which are opened upon connection of a water distributor thereto. Thus, the clamp may include a valve element 7 normally seating on a valve seat 8, but displaced from the valve seat, as shown in FIG. 3, in the assembled position of the parts. The clamp may be of the type illustrated in my co-pending application Ser. No. 034,243, filed Apr. 30, 1979 for Watering Cup For Poultry and Animals.

If desired, an electrically conductive cable 9 may be suitably mounted in spaced relation above the conduit 1, as by supports 10 projecting above the clamp 5. The cable may be energized by a suitable electrical component 10 connected by a line 11 leading to an electric outlet. The downward tubular discharge 6 of the clamp may include a hook portion at its lower end to accommodate and position a water discharge unit, such as the water discharge unit shown in FIGS. 2, 3, and 4 which fits within the depending tubular discharge 6.

My novel water distributing unit or discharge adapted to be mounted at each clamp 5 is preferably of the character illustrated in FIGS. 2, 3, and 4. Each unit includes an upper tubular member 20 having an upper annular flange portion 21 which has a snug sliding fit within the bore of the clamp discharge tube 6. Tube member 20 has an upper end wall extending thereacross within which are formed a plurality of apertures 22 and from which projects upwardly at its center a valve unseating pin 23 which is adapted to engage the valve 7 of the clamp outlet as illustrated in FIG. 3 when the discharge unit is operatively connected to a clamp 5. The bore of the tubular member 20 is enlarged at its lower end to provide a reduced thickness tube wall portion 24 which is preferably characterized by shallow longitudinal internally projecting ribs 25.

4,491,088

3

The discharge unit includes a lower tubular member 30 having a snug sliding fit upon the upper tubular member 20 below the upper flange 21 and which fits in the tubular portion 6 of a clamp. Member 30 has a bore which is of stepped configuration to provide an inner annular shoulder 31 adapted to engage the lower end of the tube member 20, a second internal shoulder 32 spaced slightly below the shoulder 31, and a third or lower shoulder 33. The lower portion of the tubular member 30 preferably has a frusto conical bore 34 which is of larger diameter at its lower open end than at its upper end at the shoulder 33.

The clamp 5 with its tubular discharge 6 and the tubular members 20 and 30 are preferably formed of plastic material so as to accommodate the formation thereon of interlocking means to hold the parts 6, 20 and 30 together in operative position when assembled. Thus, the tubular discharge member 6 may have molded integrally therewith at its lower end a laterally projecting hook member 40 terminating in an upwardly projecting flange 41, which hook 40–41 is of limited circumferential dimension. The lower tubular member 30 may have molded integrally therewith at a selected position therein a lateral projection 42 of limited circumferential extend from which projects upwardly the shank 43 of a hook having a downturned flange 44. The hook 43–44 is spaced from the outer surface of the tube 30 a distance to accommodate passage of the clamp tube 6 around the assembled tubes 20, 30 when the hook 40–41 is disaligned from the hook 43–44, to effect the telescoping connection of the parts to the position shown in FIG. 3. When the telescoping connection of the parts is completed, the lower tubular member 30 can be rotated on tube part 6 to cause the hook 43–44 thereof to engage and interlock with the hook 40–41 of the tube 6.

The lower bore 34 of the tube 30 is preferably lined by a metal tapered tubular part 50 having its small diameter end uppermost. From the upper end of liner 50 projects outwardly substantially flat annular flange 51 which bears upon and is supported at the shoulder 33 of tube 30.

A cup shaped member 52, preferably formed of resilient material, such as rubber, is mounted within the bore of the member 30 with its bottom seating against the metal flange 51. The bottom of member 52 has a central aperture of ubstantially the same size as the diameter of the bore at the reduced upper end of the metal liner tube 50 and registers with liner tube 50. The resilient cup shaped member 52 has an enlarged annular upper flange 53 which seats upon the intermediate annular shoulder 32 of the tubular member 30. The upper edge of flange 53 is preferably engaged by the lower end of the tubular member 20 in the assembled relation of the parts. At its upper end the cup shaped member 52 is provided with a thin annular concentric upwardly projecting flange 54 whose outer diameter is less than the diameter of the upper flange 53 thereof and less than the inner diameter of the lower portion 24 of the tubular member 20. The inner diameter of the flange 54 is greater than the inner diameter of the cup member. This arrangement provides two annular valve seats The upper valve seat 55 is formed by the upper lip or margin of the flange 54 of part 52. The lower valve seat 56 is provided by the shoulder at the upper inner edge of the wall of the cup 65 member 52.

In the constructions illustrated in FIGS. 2 and 4, a valve member 60 in the nature of a metal ball is received within the lower enlarged bore of the portion 24 of the tubular member 20. The diameter of the ball or sphere 60 is slightly greater than the diameter of the upper valve seat 55. The spherical valve 60 may be urged downwardly by a coil spring 61 within the bore of tube 20 whose upper end bears against the apertured upper end wall of the member 20 and whose lower end bears upon the valve member 60. The pressure exerted by the spring will preferably be just sufficient to insure continuous sealing circumferential contact of the valve element 60 with the cup shaped rubber member 52 at both of the valve seats 55 and 56. The annular flange 54 of the cup shaped member 52 will be thin to accommodate flexing and stretching thereof for continuous circumferential sealing engagement of the ball 60 at the upper valve seat 55 when continuous circumferential contact of the ball valve 60 at the lower valve seat 56 occurs. At the same time the pressure exerted by the spring 61 is preferably small so that the force required to unseat the valve member 60 may be maintained at a minimum.

Within the metal liner 50 at the lower portion of the bore of the member 30 is positioned an elongated pin 65 preferably formed of metal and of a diameter slightly less than the smallest diameter of the bore of the liner tube 50 and smaller than the aperture in the bottom wall of the rubber cup shaped member 52. Pin 65 is provided with an enlarged head 66 at its upper end which head preferably includes a recessed upper central surface portion 67. The head 66 bears upon the upper surface of the bottom wall of the cup shaped member 52 and is of such size and shape that its upper surface is adjacent to but slightly spaced from the lowermost portion of the valve sphere 60, as seen in FIG. 2, in the normal position of the parts. The pin head 66 is of such dimension, however, that upon lateral pivoting of the pin, as illustrated in FIG. 4, the head 66 will slightly unseat the valve 60 from the valve seats 55 and 56 to accommodate the flow of liquid therepast metered according to the angle of lateral pivot of the pin.

An effective seal of the discharge assembly within the clamp tube 6 is provided by proportioning of the lengths of the parts 20 and 30 to provide an annular groove between the upper end of the tubular member 30 and the lower portion of the flange 21 of the member 20 which can receive an O-ring or other annular seal 68 insuring against leakage of liquid through the clamp tube 6 and around the parts 20 and 30.

A modified embodiment of the invention is shown in FIG. 3 wherein a valve member 70, of part-spherical configuration bearing upon the valve seats 55 and 56 as previously described, is provided with an elongated upwardly projecting valve stem 71. The valve stem 71 has a clearance sliding fit within a tubular guide member 72 positioned above and supported by a mounting tube 73 having a snug fit within the bore of the tube 20. A coil spring 74 presses downwardly on the valve stem 71 to urge the valve 70 into engagement with the valve seats. The lower end 75 of the mounting tube 73 includes an outwardly flaring lower end portion to anchor the guide and maintain spacing of the guide from the valve member for flow of water therearound.

When the watering system is assembled with a discharge device connected at each clamp 5 and the water supply at line 3 connected to a water supply source, the discharge outlet at each discharge device is effectively sealed by the valve 60 or 70 thereof. Liquid flow into each discharge device is assured by virtue of the opening of valve elements 7 by the members 23 incident to

5

assembly of the discharge devices to tubes 6 of the clamps 5 Leakage past a valve 60 or 70 is effectively prevented by: (a) the engagement of the ball valve 60 or 70 with part 54 to cause outward deflection of the part 54 which forms the upper valve seat 55 until (b) the ball 60 or 70 is in effective engagement with the lower valve seat 56. The spring pressure applied by the coil spring 61 is sufficient to insure the continuous peripheral seal of the ball valve at the valve seats 55 and 56. Similarly in the FIG. 3 embodiment, sufficient pressure is exerted by the spring 74 upon the stem 73 of valve 70 to cause the part-spherical valve head 70 to seat effectively at the upper and lower valve seats 55 and 56. Leakage of the parts at the interfit of the discharge assembly in the clamp tube 6 is effectively prevented by the O-ring seal 68

With respect to the FIG. 3 embodiment, it will also be noted that the clearance fit of the valve stem 71 in the guide tube 73 is sufficient to permit flow around the stem and into the chamber in which the valve head 70 is received.

The seals at the valve seats 55 and 56 and at the O-ring 68 effectively insure that no leakage will occur at a discharge device which would endanger the poultry or animals in the compartment in which the discharge device is located. Such leakage, if it did occur, would wet the litter in the enclosure and might wet the fowl and thus endanger the health of the fowl or animal. This is particularly important in connection with watering systems for cages or compartments receiving small chickens.

The effectiveness of the seal against leakage provided by the double valve seat arrangement 55, 56 and by the flexibility of the part 54, and the spring pressure exerted against the valve element does not materially detract from the sensitivity of the device in operation to discharge water as required by the fowl or animal occupying the cage or compartment within which the water discharge device is located. In this connection the pin 65 is of a length to project below the lower end of the housing part 30 and it is sufficiently loose within the housing to accommodate movement at its lower end in any direction laterally and to accommodate upward movement thereof. Lateral movement of the lower end of the pin 65 in any direction results in a fulcrum action of the head 66 of the pin upon the base of the cup member 52 and elevation of the portion of the head 66 of the pin opposite the fulcrum sufficient to raise to a slight extent the portion of the valve element 60 or 70 away from portions of the valve seats 55 and 56 and thus to permit the flow of a small quantity of liquid therepast and through the outlet opening 34 around the pin 65. Small chicks and other small fowl and small animals quickly learn to shift the pin 65 laterally in this manner when they desire drinking water. As the fowl and animals grow, they also learn that endwise upward movement of a pin 65 will displace the valve and accommodate a limited flow of water for drinking purposes.

The formation of the housing parts 20 and 30 from a plastic material avoids problems of rust thereof. The pin 65, valve elements 60 and 70, springs, and guides 73 may be formed of non-rusting metal, such as stainless steel. Thus clogging of the device due to the formation of rust is effectively precluded. These characteristics of the device avoid the requirement for frequent replacement of watering devices which has been experienced commonly in prior constructions.

6

While the use of coil springs such as 61 and 74 may be preferred, such springs are not essential in all cases, particularly where the valving element, such as 60 or 70, is of sufficient weight to normally insure an effective double seal thereof at the dual annular valve seats 55,56.

The construction illustrated in FIG. 3, which limits the flow of water to the valve 70 to the extent of the clearance of the valve stem 71 within the tubular guide 72, serves as a means for metering the rate of flow. A clearance at this point in the order of a difference of 0.007 inches in the outer diameter of the valve stem and the inner diameter of the valve guide 72 is sufficient for normal usage of the system with poultry cages. In this regard is has been found that a difference or clearance of 0.001 inches in a liquid flow passage of this construction can increase the rate of flow in the order of 25 percent. Effective metering of the rate of flow is important to insure against excessive discharge of water. At the same time the manner of actuation of the device also can serve as a control of the rate of flow, that is, only a partial lateral tilting of the pin 65 will permit less flow than maximum permissible tilting thereof is illustrated in FIG. 4. Likewise, the rate of flow can be varied by the extent to which a direct upward movement of the pin 65 occurs.

An important consideration of the device is that the factors of water pressure, spring pressure, and the weight of the valve element tend to provide an effective continuous seal 80 to the valve seats 55 and 56 and may also provide a continuous circumferential seal between the pin head 66 the bottom wall of the cup shaped member 52 against which head 66 seats, particularly in cases where the thickness of the head 66 is such that it substantially spans the clearance space between the bottom of the valve element and the bottom of the cup as illustrated in FIGS. 2 and 3.

The quick disconnect provided by the inter-engaging hooks 41, 44 effectively holds the device in assembled position. It also accommodates release and removal of the distributing unit from the water line upon rotation of the member 30 relative to the clamp tube 6. This is important because it provides ready adaptability and versatility in different types of installations, as to accommodate interchange of discharge devices of different constructions, such as constructions which include a drinking cup as illustrated in my co-pending application Ser. No. 034,243, filed Apr. 30, 1979, when a distributor of the type shown is removed.

While the preferred embodiment of the invention has been illustrated and described, it will be understood that changes in the construction may be made within the scope of the appended claims without departing from the spirit of the invention.

What I claim is:

1. A valve for watering fowl and animals, comprising a housing having an inlet and an outlet, an annular member in said housing defining three concentric valve seats in spaced substantially parallel planes, a valve element having a surface portion normally seating against two of said valve seats, and an actuating pin extending through said outlet with clearance and projecting from said housing, said pin having an enlarged head normally seating on the third said valve seat, said valve element and said head normally engaging said respective valve seats of said annular member whereby said ball and head provide three seals, said head being of a size and being positioned adjacent said valve element whereby slight movement of the projecting part of said actuating

4,491,088

pin shifts said head from seated position on said third valve seat and shifts said valve element relative to said valve seats to initiate liquid flow from said inlet to said outlet.

2. A valve for watering fowl and animals, comprising a housing having an inlet and an outlet, said housing including telescopically interfitting parts defining an annular seal-receiving chamber, a sealing ring within said annular chamber, said telescopically interfitting parts having complementary external hooks adapted to interlock when said housing parts are in selected relative rotative telescoped position and to disengage in other relative rotative positions, a member in said housing defining a plurality of valve seats, a valve element normally in sealing engagement with at least one valve seat of said valve seat member, and an actuating pin extending with clearance through said outlet and projecting therefrom, said pin having a head positioned in said housing and abutting and normally engaging another valve seat of said valve element and positioned adjacent said valve element whereby movement of said actuator relative to said valve seat shifts said valve element to accommodate liquid flow from said inlet to said outlet past said valve element and the head of said pin.

* * * * *

850

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO. : B1 4,491,088

DATED : March 31, 1987

INVENTOR(S) : Eldon Hostetler

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In Section [56], please insert --

OTHER PUBLICATIONS

Ziggity Systems, Inc. E-Z Sip Drinker Advertisement--

**Signed and Sealed this**

**Seventeenth Day of November, 1987**

*Attest:*

*Attesting Officer*

DONALD J. QUIGG

*Commissioner of Patents and Trademarks*

# REEXAMINATION CERTIFICATE (660th)

## United States Patent [19]

### Hostetler

[11] **B1 4,491,088**

[45] Certificate Issued * **Mar. 31, 1987**

[54] **WATERING SYSTEM FOR FOWL AND SMALL ANIMALS**

[75] Inventor: Eldon Hostetler, Middlebury, Ind.

[73] Assignee: Ziggity Systems, Inc., Middlebury, Ind.

**Reexamination Request:**
No. 90/000,760, Apr. 16, 1985

**Reexamination Certificate for:**
| | |
|---|---|
| Patent No.: | **4,491,088** |
| Issued: | **Jan. 1, 1985** |
| Appl. No.: | **520,099** |
| Filed: | **Apr. 10, 1981** |

[ * ] Notice: The portion of the term of this patent subsequent to Aug. 18, 1998 has been disclaimed.

### Related U.S. Application Data

[63] Continuation of Ser. No. 113,607, Jan. 21, 1980, Pat. No. 4,284,036.

[51] Int. Cl.$^4$ .............................................. A01K 7/06
[52] U.S. Cl. .................................................. 119/72.5
[58] Field of Search ........................... 119/71, 72.5, 75

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 923,611 | 6/1909 | Werd . |
| 1,168,933 | 1/1916 | Burkley et al. . |
| 1,249,090 | 12/1917 | Hoff . |
| 1,331,720 | 2/1920 | Paterson . |
| 1,345,496 | 7/1920 | Keeler . |
| 1,916,513 | 7/1933 | Jones . |
| 2,044,629 | 6/1936 | Parker . |
| 2,252,924 | 8/1941 | Hale . |
| 2,307,220 | 1/1943 | Hewitt . |
| 2,575,906 | 11/1951 | Bullard . |
| 2,591,514 | 4/1952 | Courtot . |
| 2,664,255 | 1/1948 | Johnson . |
| 2,676,782 | 4/1954 | Bostock et al. . |
| 2,678,630 | 5/1954 | Frederiksen . |
| 2,851,007 | 9/1958 | Kagan . |
| 2,884,944 | 5/1959 | Giles . |
| 3,010,435 | 11/1961 | Abrams . |
| 3,077,896 | 2/1963 | Weingard . |
| 3,217,746 | 11/1965 | Voisine . |
| 3,431,891 | 3/1969 | Boegli et al. . |
| 3,483,847 | 12/1969 | Kneubuehl . |
| 3,513,811 | 5/1970 | Graham . |
| 3,529,575 | 9/1970 | Schalk . |
| 3,550,560 | 12/1970 | Edstrom . |
| 3,602,197 | 8/1971 | Fioretto . |
| 3,620,653 | 11/1971 | Gaylord . |
| 3,664,305 | 5/1972 | Hart et al. . |
| 3,669,077 | 6/1972 | Spierenburg . |
| 3,698,431 | 10/1972 | Thompson . |
| 3,716,030 | 2/1973 | Godshalk . |
| 3,750,628 | 8/1973 | Schumacher . |
| 3,756,199 | 9/1973 | Clark . |
| 3,887,165 | 6/1975 | Thompson . |
| 4,185,590 | 1/1980 | Hostetler . |
| 4,221,188 | 9/1980 | Hostetler . |
| 4,244,398 | 1/1981 | Tengan . |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 213203 | 3/1940 | Fed. Rep. of Germany . |
| 213395 | 3/1940 | Fed. Rep. of Germany . |
| 213396 | 3/1940 | Fed. Rep. of Germany . |
| 720130 | 4/1942 | Fed. Rep. of Germany . |
| 738513 | 8/1943 | Fed. Rep. of Germany . |
| 902329 | 1/1954 | Fed. Rep. of Germany . |
| 2320012 | 11/1973 | Fed. Rep. of Germany . |
| 877679 | 12/1941 | France . |
| 877680 | 12/1941 | France . |
| 2005311 | 12/1969 | France . |
| 225113 | 4/1943 | Switzerland . |

*Primary Examiner*—Paul J. Hirsch
*Attorney, Agent, or Firm*—Barnes & Thornburg

[57] **ABSTRACT**

A valved discharge member for use with the water supply system for use with cages of fowl and small animals, wherein a valve element in the member engages two spaced valve seats and is unseated by movement laterally and upwardly of a pin extending through a discharge opening and projecting below the housing.

852

B1 4,491,088

# REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 307

## THE PATENT IS HEREBY AMENDED AS INDICATED BELOW.

Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.

ONLY THOSE PARAGRAPHS OF THE SPECIFICATION AFFECTED BY AMENDMENT ARE PRINTED HEREIN.

Column 1, lines 17–44:

Prior constructions of valve units of watering systems of this general type intended for providing fresh water have entailed or utilized constructions in which a housing of vertical character, usually provided with a valve, is clamped or secured to a horizontal supply conduit at an opening through which water from the conduit may be discharged. The constructions of the valves of prior devices have utilized plastic bodies and metal parts, such as valve members, which parts have commonly been formed by usual machining methods but have been subject to the formation of ribs or projections thereon which, in repeated use for a period of time have caused wear of the plastic body, as by a sawing action. Progressive wear progressively increases the rate of flow liquid which is discharged incident to any given operation of the valve member, and the flow rate can become excessive and cause discharge of water in an amount in excess of the amount which the fowl or animal, and particularly a small chicken, can ingest. Also, the discharge of an excess amount of water incident to a given opening actuation of the valve can cause wetting of the fowl or animal within the cage [and wetting of the fowl or animal within the cage] and wetting of the litter within the cage with the result that the health of the occupant is endangered. This and other characteristics of prior devices have detracted from successful use and have required either [frequency] frequent replacement of the watering device or removal thereof.

Column 2, lines 21–52:

Referring to the drawings which illustrate preferred embodiments of the invention, the numeral [10] 1 designates a water supply conduit connected with pressure regulating means 2 having connection with a water supply through a line 3. The conduit 1 is positioned to extend through a series of cages, not shown, in which fowl and small animals may be housed. The conduit 1 may be supported at selected elevation and in substantially [,] horizontal position by any suitable means, such as suspension cables 4 connected to clamps 5, each encircling the conduit 1 at a selected position. Each clamp has a depending tubular discharge 6 communicating with a discharge opening at the lower part of the conduit 1. Clamps 5 may be provided with valves which may be of the normally closed type, but which are opened upon connection of a water distributor thereto. Thus, the clamp may include a valve element 7 normally seating on a valve seat 8, but displaced from the valve seat, as shown in FIG. 3, in the assembled position of the parts. The clamp may be of the type illustrated in

my co-pending application Ser. No. 034,243, filed Apr. 30, 1979 for Watering Cup For Poultry and Animals.

If desired, an electrically conductive cable 9 may be suitably mounted in spaced relation above the conduit 1, as by supports 10 projecting above the [clamp] clamps 5. The cable may be energized by a suitable electrical component 10 connected by a line 11 leading to an electric outlet. The downward tubular discharge 6 of the clamp may include a hook portion at its lower end to accommodate and position a water discharge unit, such as the water discharge unit shown in FIGS. 2, 3, and 4 which fits within the depending tubular discharge 6.

Column 3, lines 43–66:

A cup shaped member 52, preferably formed of resilient material, such as rubber, is mounted within the bore of the member 30 with its bottom seating against the metal flange 51. The bottom of member 52 has a central aperture of [ubstantially] substantially the same size as the diameter of the bore at the reduced upper end of the metal liner tube 50 and registers with liner tube 50. The resilient cup shaped member 52 has an enlarged annular upper flange 53 which seats upon the intermediate annular shoulder 32 of the tubular member 30. The upper edge of flange 53 is preferably engaged by the lower end of the tubular member 20 in the assembled relation of the parts. At its upper end the cup shaped member 52 is provided with a thin annular concentric upwardly projecting flange 54 whose outer diameter is less than the diameter of the upper flange 53 thereof and less than the inner diameter of the lower portion 24 of the tubular member 20. The inner diameter of the flange 54 is greater than the inner diameter of the cup member. This arrangement provides two annular valve seats. The upper valve seat 55 is formed by the upper lip or margin of the flange 54 of part 52. The lower valve seat 56 is provided by the shoulder at the upper inner edge of the wall of the cup member 52.

Column 5, lines 33–59:

The effectiveness of the seal against leakage provided by the double valve seat arrangement 55, 56 and by the flexibility of the part 54, and the spring pressure exerted against the valve element does not materially detract from the sensitivity of the device in operation to discharge water as required by the fowl or animal occupying the cage or compartment within which the water discharge device is located. In this connection the pin 65 is of a length to project below the lower end of the housing part 30 and it is sufficiently loose within the housing to accommodate movement at its lower end in any direction laterally and to accommodate upward movement thereof. Lateral movement of the lower end of the pin 65 in any direction results in a fulcrum action of the head 66 of the pin upon the base of the cup member 52 and elevation of the portion of the head 66 of the pin opposite the fulcrum sufficient to raise to a slight extent the portion of [the] a valve element 60 or 70 away from portions of the valve seats 55 and 56 and thus to permit the flow of a small quantity of liquid therepast and through the outlet opening 34 around the pin 65. Small chicks and other small fowl and small animals quickly learn to shift the pin 65 laterally in this manner when they desire drinking water. As the fowl and animals grow, they also learn that endwise upward move-

ment of a pin 65 will displace the valve and accommodate a limited flow of water for drinking purposes.

Column 6, lines 26–36:

An important consideration of the device is that the factors of water pressure, spring pressure, and the weight of the valve element tend to provide an effective continuous seal [80] to the valve seats 55 and 56 and may also provide a continuous circumferential seal between the pin head 66 and the bottom wall of the cup shaped member 52 against which head 66 seats, particularly in cases where the thickness of the head 66 is such that it substantially spans the clearance space between the bottom of the valve element and the bottom of the cup as illustrated in FIGS. 2 and 3.

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claims 1 and 2 are cancelled.

New claims 3–5 are added and determined to be patentable.

3. The valve according to claim 5 wherein said telescopically interfitting parts have only a single set of complementary external hooks, said hooks being of limited circumferential dimension.

4. A valve for watering fowl and small animals, comprising:
 a housing having an inlet and an outlet,
 an annular member in said housing defining three concentric valve seats in spaced, substantially parallel planes,
 a ball valve element having a surface portion normally seating against a first and second of said valve seats,
 an actuating pin extending through said outlet with clearance and projecting from said housing,
 said pin having an enlarged head normally seating on the third of said valve seats,
 said ball valve element and said enlarged head normally engaging said respective valve seats of said annular member whereby said ball valve element and said enlarged head provide three seals,
 said enlarged head being of a size and including a recessed portion having at least a portion of its peripheral edge adjacent and confronting said ball valve element and cooperatively associated therewith during actuation of said ball valve element such that any lateral movement in any direction by the projecting part of said actuating pin causes said enlarged head to shift from its seated position on said third valve seat and causes off-centered leveraged interaction between said ball valve element and said peripheral edge; and
 said off-centered leveraged interaction causing said ball valve element to shift relative to said valve seats to initiate liquid flow from said inlet through said outlet by lifting said ball valve element off of at least part of said first and second valve seats.

5. A valve for watering fowl and animals, comprising:
 a housing having an inlet and an outlet,
 said housing including telescopically interfitting parts defining an annular seal receiving chamber,
 a sealing ring within said annular chamber
 said telescopically interfitting parts having complementary external hooks adapted to interlock when said housing parts are in selected relative rotative telescoped position and to disengage in other relative rotative positions,
 a separate member in said housing defining at least three valve seats,
 a ball valve element normally in sealing engagement with at least a first and second of said valve seats,
 an actuating pin extending with clearance through said outlet and projecting therefrom,
 said actuating pin having a head positioned in said housing and abutting and normally engaging a third of said valve seats,
 said head including a recessed portion having a peripheral edge portion adjacent and confronting said ball valve element and cooperatively associated therewith during actuation of said ball valve element such that any lateral movement in any direction by said actuator pin relative to said third valve seat causes off-centered leveraged interaction between said ball valve element and said peripheral edge portion, and
 said off-centered leveraged interaction causing said ball valve element to accommodate liquid flow from said inlet to said outlet past said ball valve element and said head of said actuating pin by lifting said ball valve element off of at least a portion of said first and second valve seats.

* * * * *

854

# United States Patent [19]

## Hostetler

[11] **Patent Number:** 4,637,345

[45] **Date of Patent:** Jan. 20, 1987

[54] **WATERING SYSTEM FOR FOWL AND SMALL ANIMALS**

[75] Inventor: **Eldon Hostetler**, Middlebury, Ind.

[73] Assignee: **Ziggity Systems, Inc.**, South Middlebury, Ind.

[21] Appl. No.: **644,612**

[22] Filed: **Aug. 27, 1984**

### Related U.S. Application Data

[63] Continuation of Ser. No. 520,099, Apr. 10, 1981, which is a continuation of Ser. No. 113,607, Jan. 21, 1980, Pat. No. 4,284,036.

[51] Int. Cl.⁴ ............................................. A01K 7/06
[52] U.S. Cl. ..................................... 119/72.5; 119/75
[58] Field of Search ................................ 119/72.5, 75; 137/630.22; 251/333

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,249,090 | 12/1917 | Hoff | 251/333 |
| 1,336,026 | 4/1920 | Dempsey | 137/901 |
| 1,454,284 | 5/1923 | Holmes | 119/72.5 |
| 1,916,513 | 7/1933 | Jones . | |
| 1,928,103 | 9/1933 | Hill . | |
| 3,263,652 | 8/1966 | Nakajima et al. . | |
| 3,416,499 | 12/1968 | Wilmot . | |
| 3,550,560 | 12/1970 | Edstrom | 119/72.5 |
| 3,563,264 | 2/1971 | Boegli . | |
| 3,566,844 | 3/1971 | Occhiodori . | |
| 3,602,197 | 8/1971 | Fioretto . | |
| 3,669,077 | 6/1972 | Spierenburg . | |
| 3,756,199 | 9/1973 | Clark, IV . | |
| 3,838,664 | 4/1973 | Atchley . | |
| 4,047,503 | 9/1977 | Wilmot . | |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 720130 | 4/1942 | Fed. Rep. of Germany . |
| 738513 | 8/1943 | Fed. Rep. of Germany . |
| 902329 | 7/1949 | Fed. Rep. of Germany . |
| 877680 | 12/1941 | France . |
| 877679 | 12/1941 | France . |

#### OTHER PUBLICATIONS

Ziggity Systems, Inc., The New E-Z Sip Drinker System from Ziggity, 1977, 1-2.
E-Z Sip Advertisement.

*Primary Examiner*—Paul J. Hirsch
*Attorney, Agent, or Firm*—Barnes & Thornburg

[57] **ABSTRACT**

A valved discharge member for use with the water supply system for use with cages of fowl and small animals, wherein a valve element in the member engages two spaced valve seats and is unseated by movement laterally and upwardly of a pin extending through a discharge opening and projecting below the housing.

**24 Claims, 4 Drawing Figures**

FIG. I

Fig.2 Fig.3

Fig.4

4,637,345

# WATERING SYSTEM FOR FOWL AND SMALL ANIMALS

This is a continuation of co-pending application Ser. No. 520,099 filed on 4/10/81 which is a continuation of Ser. No. 113,607, filed 1/21/80, now U.S. Pat. No. 4,284,036.

## SUMMARY OF THE INVENTION

This invention relates to a watering system for fowl and small animals and particularly to the watering system for use in connection with and accessible at the various cages or compartments in which fowl and small animals are reared, and/or cages in which hens and other fowl are retained so that eggs produced by them may be retained and collected.

Prior constructions of valve units of watering systems of this general type intended for providing fresh water have entailed or utilized constructions in which a housing of vertical tubular character, usually provided with a valve, is clamped or secured to a horizontal supply conduit at an opening through which water from the conduit may be discharged. The constructions of the valves of prior devices have utilized plastic bodies and metal parts, such as valve members, which parts have commonly been formed by usual machining methods but have been subject to the formation of ribs or projections thereon which, in repeated use for a period of time have caused wear of the plastic body, as by a sawing action. Progressive wear progressively increases the rate of flow of liquid which is discharged incident to any given operation of the valve member, and the flow rate can be become excessive and cause discharge of water in an amount in excess of the amount which the fowl or animal, and particularly a small chicken, can ingest. Also, the discharge of an excess amount of water incident to a given opening actuation of the valve can cause wetting of the fowl or animal within the cage and wetting of the litter within the cage with the result that the health of the occupant is endangered. This and other characteristics of prior devices have detracted from successful use and have required either frequent replacement of the watering device or removal thereof.

The present device is designed and constructed to eliminate the aforementioned and other deficiencies of prior devices and has for its principal object the successful elimination of the aforementioned and other limitations and disadvantages.

A further object is to provide a water discharge unit of this type which effectively meters the amount of liquid discharged and which maintains substantially constant the rate of discharge of water therethrough incident to each operation of the device to a given extent.

A further object of this invention is to provide a device of this character which provides multiple spaced valve seats engageable by a valve element to insure effective normal sealing of the valve element.

A further object is to provide a device of this character wherein a flexible valve seat forming member is engaged by a valve element having a spherical surface and is subject to deflection to provide continuous annular sealing engagement with a valve element, including engagement at irregularities in the surface of the valve element.

A further object is to provide a water distributor having an actuator projecting therefrom at a water discharge opening and operable to unseat a valve in response to lateral tilting in any direction and to upward bodily movement.

Other objects will be apparent from the following specification.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view illustrating a watering system having multiple water distribution parts of the character embodied in this invention.

FIG. 2 is an axial sectional view of one embodiment of a distributor in sealed position.

FIG. 3 is an axial sectional view of another embodiment of the invention in its sealed position.

FIG. 4 is an axial sectional view of the embodiment of the invention illustrated in FIG. 2, shown in a water discharging position.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to the drawings which illustrate preferred embodiments of the invention, the numeral 1 designates a water supply conduit connected with pressure regulating means 2 having connection with a water supply through a line 3. The conduit 1 is positioned to extend through a series of cages, not shown, in which fowl and small animals may be housed. The conduit 1 may be supported at selected elevation and in substantially horizontal position by any suitable means, such as suspension cables 4 connected to clamps 5, each encircling the conduit 1 at a selected position. Each clamp has a depending tubular discharge 6 communicating with a discharge opening at the lower part of the conduit 1. Clamps 5 may be provided with valves which may be of the normally closed type, but which are opened upon connection of a water distributor thereto. Thus, the clamp may include a valve element 7 normally seating on a valve seat 8, but displaced from the valve seat, as shown in FIG. 3, in the assembled position of the parts. The clamp may be of the type illustrated in my co-pending application Ser. No. 034,243, filed Apr. 30, 1979 now U.S. Pat. No. 4,221,188 for Watering Cup For Poultry and Animals.

If desired, an electrically conductive cable 9 may be suitably mounted in spaced relation above the conduit 1, as by supports 10(a) projecting above the clamps 5. The cable may be energized by a suitable electrical component 10 connected by a line 11 leading to an electric outlet. The downward tubular discharge 6 of the clamp may include a hook portion at its lower end to accommodate and position a water dishcarge unit, such as the water discharge unit shown in FIGS. 2, 3, and 4 which fits within the depending tubular discharge 6.

My novel water distributing unit or discharge adapted to be mounted at each clamp 5 is preferably of the character illustrated in FIGS. 2, 3, and 4. Each unit includes an upper tubular member 20 having an upper annular flange portion 21 which has a snug sliding fit within the bore of the clamp discharge tube 6. Tube member 20 has an upper end wall extending thereacross within which are formed a plurality of apertures 22 and from which projects upwardly at its center a valve unseating pin 23 which is adapted to engage the valve 7 of the clamp outlet as illustrated in FIG. 3 when the discharge unit is operatively connected to a clamp 5. The bore of the tubular member 20 is enlarged at its lower end to provide a reduced thickness tube wall

3

portion 24 which is preferably characterized by shallow longitudinal internally projecting ribs 25.

The discharge unit includes a lower tubular member 30 having a snug sliding fit upon the upper tubular member 20 below the upper flange 21 and which fits in the tubular portion 6 of a clamp. Member 30 has a bore which is of stepped configuration to provide an inner annular shoulder 31 adapted to engage the lower end of the tube member 20, a second internal shoulder 32 spaced slightly below the shoulder 31, and a third or lower shoulder 33. The lower portion of the tubular member 30 preferably has a frusto conical bore 34 which is of larger diameter at its lower open end than at its upper end at the shoulder 33.

The clamp 5 with its tubular discharge 6 and the tubular members 20 and 30 are preferably formed of plastic material so as to accommodate the formation thereon of interlocking means to hold the parts 6, 20, and 30 together in operative position when assembled. Thus, the tubular discharge member 6 may have molded integrally therewith at its lower end a laterally projecting hook member 40 terminating in an upwardly projecting flange 41, which hook 40–41 is of limited circumferential dimension. The lower tubular member 30 may have molded integrally therewith at a selected position thereon a lateral projection 42 of limited circumferential extent from which projects upwardly the shank 43 of a hook having a downturned flange 44. The hook 43–44 is spaced from the outer surface of the tube 30 a distance to accommodate passage of the clamp tube 6 around the assembled tubes 20, 30 when the hook 40–41 is disaligned from the hook 43–44, to effect the telescoping connection of the parts to the position shown in FIG. 3. When the telescoping connection of the parts is completed, the lower tubular member 30 can be rotated on tube part 6 to cause the hook 43–44 thereof to engage and interlock with the hook 40–41 of the tube 6.

The lower bore 34 of the tube 30 is preferably lined by a metal tapered tubular part 50 having its small diameter end uppermost. From the upper end of liner 50 projects outwardly substantially flat annular flange 51 which bears upon and is supported at the shoulder 33 of tube 30.

A cup shaped member 52, preferably formed of resilient material, such as rubber, is mounted within the bore of the member 30 with its bottom seating against the metal flange 51. The bottom of member 52 has a central aperture of substantially the same size as the diameter of the bore at the reduced upper end of the metal liner tube 50 and registers with liner tube 50. The resilient cup shaped member 52 has an enlarged annular upper flange 53 which seats upon the intermediate annular shoulder 32 of the tubular member 30. The upper edge of flange 53 is preferably engaged by the lower end of the tubular member 20 in the assembled relation of the parts. At its upper end the cup shaped member 52 is provided with a thin annular concentric upwardly projecting flange 54 whose outer diameter is less than the diameter of the upper flange 53 thereof and less than the inner diameter of the lower portion 24 of the tubular member 20. The inner diameter of the flange 54 is greater than the inner diameter of the cup member. This arrangement provides two annular valve seats. The upper valve seat 55 is formed by the upper lip or margin of the flange 54 of part 52. The lower valve seat 56 is provided by the shoulder at the upper inner edge of the wall of the cup member 52.

4

In the constructions illustrated in FIGS. 2 and 4, a valve member 60 in the nature of a metal ball is received within the lower enlarged bore of the portion 24 of the tubular member 20. The diameter of the ball or sphere 60 is slightly greater than the diameter of the upper valve seat 55. The spherical valve 60 may be urged downwardly by a coil spring 61 within the bore of tube 20 whose upper end bears against the apertured upper end wall of the member 20 and whose lower end bears upon the valve member 60. The pressure exerted by the spring will preferably be just sufficient to insure continuous sealing circumferential contact of the valve element 60 with the cup shaped rubber member 52 at both of the valve seats 55 and 56. The annular flange 54 of the cup shaped member 52 will be thin to accommodate flexing and stretching thereof for continuous circumferential sealing engagement of the ball 60 at the upper valve seat 55 when continuous circumferential contact of the ball valve 60 at the lower valve seat 56 occurs. At the same time the pressure exerted by the spring 61 is preferably small so that the force required to unseat the valve member 60 may be maintained at a minimum.

Within the metal liner 50 at the lower portion of the bore of the member 30 is positioned an elongated pin 65 preferably formed of metal and of a diameter slightly less than the smallest diameter of the bore of the liner tube 50 and smaller than the aperture in the bottom wall of the rubber cup shaped member 52. Pin 65 is provided with an enlarged head 66 at its upper end which head preferably includes a recessed upper central surface portion 67. The head 66 bears upon the upper surface of the bottom wall of the cup shaped member 52 and is of such size and shape that its upper surface is adjacent to but slightly spaced from the lowermost portion of the valve sphere 60, as seen in FIG. 2, in the normal position of the parts. The pin head 66 is of such dimension, however, that upon lateral pivoting of the pin, as illustrated in FIG. 4, the head 66 will slightly unseat the valve 60 from the valve seats 55 and 56 to accommodate the flow of liquid therepast metered according to the angle of lateral pivot of the pin.

An effective seal of the discharge assembly within the clamp tube 6 is provided by proportioning of the lengths of the parts 20 and 30 to provide an annular groove between the upper end of the tubular member 30 and the lower portion of the flange 21 of the member 20 which can receive an O-ring or other annular seal 68 insuring against leakage of liquid through the clamp tube 6 and around the parts 20 and 30.

A modified embodiment of the invention is shown in FIG. 3 wherein a valve member 70, of part-spherical configuration bearing upon the valve seats 55 and 56 as previously described, is provided with an elongated upwardly projecting valve stem 71. The valve stem 71 has a clearance sliding fit within a tubular guide member 72 positioned above and supported by a mounting tube 73 having a snug fit within the bore of the tube 20. A coil spring 74 presses downwardly on the valve stem 71 to urge the valve 70 into engagment with the valve seats. The lower end 75 of the mounting tube 73 includes an outwardly flaring lower end portion to anchor the guide and maintain spacing of the guide from the valve member for flow of water therearound.

When the watering system is assembled with a discharge device connected at each clamp 5 and the water supply at line 3 connected to a water supply source, the discharge outlet at each discharge device is effectively sealed by the valve 60 or 70 thereof. Liquid flow into

4,637,345

each discharge device is assured by virtue of the opening of valve elements 7 by the members 23 incident to assembly of the discharge devices to tubes 6 of the clamps 5. Leakage past a valve 60 or 70 is effectively prevented by: (a) the engagement of the ball valve 60 or 70 with part 54 to cause outward deflection of the part 54 which forms the upper valve seat 55 until (b) the ball 60 or 70 is in effective engagement with the lower valve seat 56. The spring pressure applied by the coil spring 61 is sufficient to insure the continuous peripheral seal of the ball valve at the valve seats 55 and 56. Similarly in the FIG. 3 embodiment, sufficient pressure is exerted by the spring 74 upon the stem 73 of valve 70 to cause the part-spherical valve head 70 to seat effectively at the upper and lower valve seats 55 and 56. Leakage of the parts at the interfit of the discharge assembly in the clamp tube 6 is effectively prevented by the O-ring seal 68.

With respect to the FIG. 3 embodiment, it will also be noted that the clearance fit of the valve stem 71 in the guide tube 73 is sufficient to permit flow around the stem and into the chamber in which the valve head 70 is received.

The seals at the valve seats 55 and 56 and at the O-ring 68 effectively insure that no leakage will occur at a discharge device which would endanger the poultry or animals in the compartment in which the discharge device is located. Such leakage, if it did occur, would wet the litter in the enclosure and might wet the fowl and thus endanger the health of the fowl or animal. This is particularly important in connection with watering systems for cages or compartments receiving small chickens.

The effectiveness of the seal against leakage provided by the double valve seat arrangement 55, 56 and by the flexibility of the part 54, and the spring pressure exerted against the valve element does not materially detract from the sensitivity of the device in operation to discharge water as required by the fowl or animal occupying the cage or compartment within which the water discharge device is located. In this connection the pin 65 is of a length to project below the lower end of the housing part 30 and it is sufficiently loose within the housing to accommodate movement at its lower end in any direction laterally and to accommodate upward movement thereof. Lateral movement of the lower end of the pin 65 in any direction results in a fulcrum action of the head 66 of the pin upon the base of the cup member 52 and elevation of the portion of the head 66 of the pin opposite the fulcrum sufficient to raise to a slight extent a portion of the valve element 60 or 70 away from portions of the valve seats 55 and 56 and thus to permit the flow of a small quantity of liquid therepast and through the outlet opening 34 around the pin 65. Small chicks and other small fowl and small animals quickly learn to shift the pin 65 laterally in this manner when they desire drinking water. As the fowl and animals grow, they also learn that endwise upward movement of a pin 65 will displace the valve and accommodate a limited flow of water for drinking purposes.

The formation of the housing parts 20 and 30 from a plastic material avoids problems of rust thereof. The pin 65, valve elements 60 and 70, springs, and guides 73 may be formed of non-rusting metal, such as stainless steel. Thus clogging of the device due to the formation of rust is effectively precluded. These characteristics of the device avoid the requirement for frequent replacement of watering devices which has been experienced commonly in prior constructions.

While the use of coil springs such as 61 and 74 may be preferred, such springs are not essential in all cases, particularly where the valving element, such as 60 or 70, is of sufficient weight to normally insure an effective double seal thereof at the dual annular valve seats 55,56.

The construction illustrated in FIG. 3, which limits the flow of water to the valve 70 to the extent of the clearance of the valve stem 71 within the tubular guide 72, serves as a means for metering the rate of flow. A clearance at this point in the order of a difference of 0.007 inches in the outer diameter of the valve stem and the inner diameter of the valve guide 72 is sufficient for normal usage of the system with poultry cages. In this regard it has been found that a difference or clearance of 0.001 inches in a liquid flow passage of this construction can increase the rate of flow in the order of 25 percent. Effective metering of the rate of flow is important to insure against excessive discharge of water. At the same time the manner of actuation of the device also can serve as a control of the rate of flow, that is, only a partial lateral tilting of the pin 65 will permit less flow than maximum permissible tilting thereof is illustrated in FIG. 4. Likewise, the rate of flow can be varied by the extent to which a direct upward movement of the pin 65 occurs.

An important consideration of the device is that the factors of water pressure, spring pressure, and the weight of the valve element tend to provide an effective continuous seal to the valve seats 55 and 56 and may also provide a continuous circumferential seal between the pin head 66 and the bottom wall of the cup shaped member 52 against which head 66 seats, particularly in cases where the thickness of the head 66 is such that it substantially spans the clearance space between the bottom of the valve element and the bottom of the cup as illustrated in FIGS. 2 and 3.

The quick disconnect provided by the inter-engaging hooks 41, 44 effectively holds the device in assembled position. It also accommodates release and removal of the distributing unit from the water line upon rotation of the member 30 relative to the clamp tube 6. This is important because it provides ready adaptability and versatility in different types of installations, as to accommodate interchange of discharge devices of different constructions, such as constructions which include a drinking cup as illustrated in my co-pending application Ser. No. 034,243, filed Apr. 30, 1979, now U.S. Pat. No. 4,221,188 when a distributor of the type shown is removed.

While the preferred embodiment of the invention has been illustrated and described, it will be understood that changes in the construction may be made within the scope of the appended claims without departing from the spirit of the invention.

What I claim is:

1. In a watering device for fowl and small animals, a valve housing adapted to be connected to a water supply line and having an inlet, an outlet and a valve chamber having a valve seat and a second seat therein, a valve member normally bearing on said valve seat, a valve actuator having clearance in and projecting from said outlet, said actuator having a head within said valve chamber and bearing on said second seat, said actuator head normally being positioned adjacent and confronting said valve member and having a concave surface with a leveraging edge confronting said valve

member and positioned and interacting therewith such that said leveraging edge first engages said valve member off center so as to shift said valve member off from said valve seat by leveraged actuation upon tilting movement of said actuator head relative to said second seat caused by slight actuator movement and thereby permit fluid flow from said supply line through said outlet, and said valve member having a convex surface confronting and engageable by said concave surface of said actuator head.

2. The watering device of claim 1, wherein said valve member is a ball and said concave actuator surface substantially corresponds to the curvature of said ball.

3. A watering device for fowl and small animals, including a valve housing adapted to be connected to a fluid supply line, said valve housing having an inlet, an outlet, a valve chamber connected between said inlet and said outlet, said valve chamber having therein a valve seat and a valve member engageable with said valve seat to restrict fluid flow between said inlet and said outlet, and a valve actuator means having a portion thereof with clearance within and projecting from said outlet, said valve actuator means including an actuator head, adjacent to and confronting said valve member, and having a recessed portion in its surface confronting said valve member, said recessed portion including a leveraging edge about its circumference, and said valve member having a cooperative projecting portion confronting and at least partially received within said recessed portion such that said valve actuator means interacts with said confronting surface of said valve member through said leveraging edge which first engages said valve member off center to provide leveraged actuation to shift said valve member off of engagement with said valve seat to permit fluid flow between said inlet and said outlet in response to slight tilting movement of said actuator means with respect to said valve member.

4. The watering device according to claim 3 wherein said recessed portion is a concave surface.

5. The watering device according to claim 4 wherein said valve member includes a ball valve having a portion thereof receivable within said concave surface.

6. A watering device for fowl and small animals comprising:
a housing having a valve chamber therein with a fluid inlet to said valve chamber and a fluid outlet from said valve chamber;
said valve chamber including therein first and second seat members spaced apart and at different levels in said valve chamber;
a ball valve means disposed within said valve chamber for bearing on said first seat member to seal against fluid flow through said valve chamber;
a valve actuator means disposed partially within said valve chamber for actuating said ball valve means to permit said fluid flow;
said valve actuator means including an actuator head bearing on said second seat member and a pin portion extending through said outlet with clearance and projecting beyond said outlet;
said actuator head including an upper surface with a recessed portion adjacent and confronting said ball valve means;
said recessed portion including an edge region cooperatively associated with said ball valve means such that, upon lateral movement of said valve actuator means in any direction relative to said housing, said edge region provides initial actuation

engagement with said ball valve means at a location on said ball valve means spaced apart from that portion of said ball valve means closest to the level of said second seat member; and
said initial actuation engagement causing said ball valve means to shift relative to said first seat member by leveraged actuation to permit said fluid flow.

7. The watering device according to claim 6 wherein said lateral movement of said valve actuator relative to said housing causes said actuator head to shift relative to said second seat member so as to move said edge region toward said ball valve means.

8. The watering device according to claim 7 wherein said recessed portion includes a concave surface and said edge region is disposed about the periphery of said concave surface.

9. The watering device according to claim 8 wherein said second seat member includes a flattened surface and said actuator head includes a lower, flattened surface bearing on said flattened surface of said second seat member.

10. The watering device according to claim 9 wherein said outlet forms a substantially frusto-conical bore having its largest diameter at the end furthest from said second seat member and wherein said pin portion of said valve actuator means is substantially cylindrical.

11. The watering device according to claim 10 wherein said actuator head bears on said second seat member so as to also seal against fluid flow through said valve chamber when said valve actuator means is not subject to lateral or upward endwise movement with respect to said housing.

12. The watering device according to claim 10 wherein said frusto-conical bore is lined with a wear resistant metallic material.

13. The watering device according to claim 9 wherein said valve means is disposed so as to be sufficiently responsive to provide said leveraged actuation from the lateral movement provided to said pin portion by small chicks.

14. The watering device according to claim 9 wherein said valve chamber is formed from upper and lower telescopically interfitting parts having complementary external hooks thereon which are adapted to be releasably rotationally interlocked when said parts are in selected telescoped positions.

15. The watering device according to claim 14 wherein said first and second seat members are integrally formed within a single sealing element, said sealing element being mounted within said lower telescopically interfitting part and engaging a lower portion of said upper telescopically interfitting part to prevent upward movement of said sealing element.

16. The watering device according to claim 15 wherein said sealing element includes a third seat member engageable by said ball valve means substantially simultaneously with said first seat means so as to also seal against fluid flow through said valve chamber.

17. The watering device according to claim 14 wherein said valve chamber includes an interior surface with portions dimensioned with respect to the diameter of said ball valve means so as to provide a guide for vertical motion of said ball valve means.

18. The watering device according to claim 15 wherein said concave surface has a radius of curvature less than the radius of said ball valve means such that at least a portion of said concave surface is spaced apart

4,637,345

from said ball valve element when said ball valve means is not actuated to permit said fluid flow.

19. A watering device for fowl and small animals comprising:

a housing including a valve chamber therein and an inlet and an outlet connected to said valve chamber;

upper and lower seat members disposed within said valve chamber;

a ball valve means disposed within said valve chamber for bearing on said upper seat member to seal against fluid flow through said valve chamber;

a valve actuator means having a head portion and a pin portion;

said pin portion extending through said outlet with clearance and projecting beyond said outlet;

said head portion having a lower surface bearing on said lower seat member and an upper surface with recessed region thereon;

said recessed region being disposed adjacent and confronting said ball valve means;

said recessed region including an edge region cooperatively associated with said ball valve means such that, upon lateral movement of said pin portion in any direction relative to said housing, said edge region provides initial actuation engagement with said ball valve means; and

said initial actuation engagement being provided at a location spaced apart from the lowermost portion of said ball valve means such that said lateral movement causes said ball valve means to shift relative to said upper seat member by leveraged actuation to permit said fluid flow through said valve chamber.

20. The watering device according to claim 19 wherein said lowermost portion of said ball valve means corresponds to that portion of said ball valve means which is closest to the plane of said lower seat member.

21. The watering device according to claim 20 wherein said recessed region includes a concave surface and wherein said edge region is disposed at the periphery of said concave surface.

22. The watering device according to claim 21 wherein said ball valve means, said upper seat member and said valve actuating means are formed such that repeated leveraged actuation of said ball valve means results in rotation of said ball valve means with respect to said upper seat member.

A poultry watering device, comprising:

an axially extending housing having a fluid inlet at one end of said housing, a fluid outlet at another end of said housing, and a valve chamber connected therebetween;

first and second seat members disposed in said valve chamber, said seat members being axially spaced apart with said second seat member being located between said first seat member and said outlet;

ball valve means disposed in said valve chamber for bearing on said first seat member to seal against fluid flow through said valve chamber from said inlet to said outlet;

valve actuator means bearing on said second seat member for at least partially displacing said ball valve means from said first seat member to permit said fluid flow;

said valve actuator means including a head portion disposed within said valve chamber and a pin portion extending with clearance through said outlet and projecting therebeyond;

said head portion including a first surface adjacent and confronting said ball valve means and a flattened second surface bearing on said second seat member;

said first surface including a substantially concave recessed portion with a peripheral edge about said recessed portion;

said valve actuator means being cooperatively associated with said ball valve means such that upon tilting movement of said pin portion with respect to said housing said ball valve means is at least partially displaced from said first seat member by leveraged actuation; and

said leveraged actuation resulting from fulcrum lifting of said flattened second surface from said second seat member causing initial actuation displacement of said ball valve means through engagement of said peripheral edge with said ball valve means at a location on said ball valve means which is spaced apart from that portion of said ball valve means extending furthest toward the end of said housing having said outlet.

24. The poultry watering device according to claim 23 wherein said second seat member includes a flattened surface adjacent to said flattened second surface of said head portion for supporting said head portion in sealing engagement to prevent said fluid flow when said pin portion is not contacted by poultry.

* * * * * *

## ON MOTION FOR RECONSIDERATION

Defendants move this court pursuant to Rule 59 of the Federal Rules of Civil Procedure for reconsideration of the judgment, for amendment of the judgment, for a partial new trial as to the issues of infringement and damages, and to open that judgment to take additional testimony as to those issues, and to amend the findings of fact and conclusions of law pursuant to Rule 52(b) of the Federal Rules of Civil Procedure, and to direct the entry of a new judgment. Oral argument was held on Friday, November 2, 1990. For the reasons set forth below, I shall deny defendants' motion.

This is a complex patent infringement action. A non-jury trial was held from February 13, 1990 until February 23, 1990. On September 27, 1990, after the expenditure of considerable judicial resources, this court issued its findings of fact and conclusions of law in a 209 page opinion. On October 10, 1990, judgment was entered in favor of plaintiff and against defendants in the amount of $3,835,090.46, plus costs.

The primary issue at trial was whether defendant Val's nipple drinker, which incorporated a trigger pin with a visible recess in its head, infringed Ziggity's patents. Prior to trial, Ziggity had conceded that Val's nipple drinker would not infringe its patents if Val incorporated a trigger pin with a flat head. Nonetheless, defendants refused to alter the design of their trigger pin.

During the trial, defendants contended that their trigger pin with a slight recess did not infringe Ziggity's patents. Although defendants admitted at trial that they could manufacture trigger pins with visually flat heads, they claimed that to do so would be prohibitively expensive.

In its findings of fact and conclusions of law, this court concluded that Val's nipple drinker incorporating a trigger pin with a slight recess on its head infringed Ziggity's patents. This court found that, had defendants not infringed plaintiff's patents, Ziggity would have made 70% of Val's sales. This court also found that Val's drinker would not have performed as well as it did if Val had not infringed plaintiff's patents. In addition, this court found that poor performance of the Val drinker would have resulted in its removal as an authorized or approved supplier on the integrator supplier lists.

Now through defendants' motion, this court is informed that, within one week after completion of the trial, Val had retooled its production facility in order to manufacture trigger pins with visually flat heads and that, as of March 1, 1990 and continuing through to the present, Val has been selling nipple drinkers with visually flat-headed trigger pins. Defendants maintain that, in the seven months since the design change was made, sales have increased over two hundred and fifty percent and that Val has remained on the integrator lists of approved suppliers. In addition, defendants contend that this increase in sales shows that flat-headed pins are perfectly acceptable to the market and further shows that Ziggity did not pick up 70% of Val's sales. In light of this new evidence, defendants request this court to grant them a partial new trial, to reopen testimony, to reconsider its findings of fact and conclusions of law, and to amend its judgment. Defendants contend that the new evidence renders the judgment entered on October 10, 1990 a miscarriage of justice.

In order to grant a new trial pursuant to Rule 59 based upon newly discovered evidence, the movant must demonstrate, among other things, that the newly discovered evidence was (1) in existence at the time of the trial, (2) not discoverable through a diligent search prior to trial, and (3) material to the issues before the court. *See Chemical Delinting Co. v. Jackson*, 193 F.2d 123, 126–27 (5th Cir.1951); 11 Wright & Miller's Federal Practice and Procedure § 2808. *See also Brown v. Pennsylvania Railroad Co.*, 282 F.2d 522, 526–27 (3d Cir.1960). The evidence which defendants want this court to consider is the evidence of the market acceptance of Val's nipple drinker with a flat-headed trigger pin, as demonstrated by Val's sales of nipple drinkers with flat-headed trigger

pins which began on March 1, 1990 and have continued until the present. Clearly, however, that evidence is evidence that did *not* exist at the time of trial. Indeed, defendants admitted at oral argument that evidence of the market acceptance of a Val drinker with a flat-headed trigger pin was not in existence at the time of the trial.

In addition, to warrant a new trial, the evidence must not have been known to the movant at the time of trial, but also the movant must have been excusably ignorant of the facts. *Chemical,* 193 F.2d at 126; *Brown,* 282 F.2d at 526–27. In other words, the evidence must be such that it was not discoverable by diligent search. *Chemical,* 193 F.2d at 127. Given the immediate conversion, upon completion of the trial, of Val's production facility in order to manufacture a flat-headed trigger pin, this court can only wonder why defendants did not in due diligence simply create and sell a flat-headed drinker prior to trial. Prior to trial, defendants obdurately refused to alter their product and insisted upon trial of this action despite the great expense forced upon the parties and the time and energy required by this court. Ironically, immediately after trial, defendants altered their trigger pin to come up with a trigger pin with a flat head, even though defendants had just spent apparently over $500,000 defending this action, presumably in an effort to preserve their right to manufacture a trigger pin with a slight recess. This court cannot find that defendants were reasonably diligent in their attempt to discover the evidence, which they now present, prior to trial. In ruling on a motion for a new trial, the court in *Jay Edwards, Inc. v. New England Toyota Distributor, Inc.,* 708 F.2d 814 (1st Cir.1983), stated:

> A motion for new trial on the ground of newly discovered evidence will generally be granted only where the movant was excusably ignorant of the facts despite exercising due diligence to uncover them. We cannot be impressed by the diligence of a party that fails to uncover evidence during four years of discovery that it

manages to retrieve four weeks after losing the lawsuit.

*Id.* at 825.

Finally, the facts and evidence now presented by the defendants are simply *not* material to the issues decided by this court. This court's judgment addressed only damages as a result of infringement occurring between June 1987 and December 31, 1989, not as a result of defendants' sales after January 1, 1990. As to the reasonable royalty component of damages, the "fictitious negotiations" under the *Georgia Pacific* analysis are to be made with respect to facts in existence immediately prior to commencement of the infringement, i.e. prior to June of 1987. *Hanson v. Alpine Valley Ski Area, Inc.,* 718 F.2d 1075, 1079 (Fed.Cir.1983); *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1154 (6th Cir.1978). With respect to the lost profits component of damages, this court has already pointed out to defendants that in order to qualify as an "acceptable substitute," a product must be on the market at the time of the infringement, i.e. between June 1987 and December 1989. *See* Findings of Fact, Discussion, Conclusions of Law, and Order at 166; *see also Central Soya Co. v. Geo. A. Hormel & Co.,* 723 F.2d 1573, 1579 (Fed.Cir.1983). Since defendants' new flat-headed trigger pin did not exist during the relevant time periods for either aspect of the damages, evidence as to the subsequent sales of Val drinkers with flat-headed trigger pins is simply irrelevant to the issues decided by this court.

Defendants make no effort to distinguish their situation from the facts presented to the court in *Panduit Corp.* and in response to which the court stated:

> The post-hoc circumstance that Stahlin, when finally forced to obey the court's injunction, was successful in "switching" customers to a noninfringing product, does not destroy the advantage-recognition attributable to the patent over the prior 15 years. Those preferred advantages were recognized by Stahlin itself, by other infringers, by customers, by the district court, and by this court. That

Stahlin's customers, no longer *able* to buy the patented product from Stahlin, were willing to buy something else from Stahlin, does not establish that there was on the market during the period of infringement a product which customers in general were, in the master's words, "willing to buy in place of the infringing product." Moreover, Stahlin's "switching" occurred years *after* the date on which the determination of available substitutes must focus, i.e., the date of first infringement.

575 F.2d at 1162.

Previous patent infringers have argued, as defendants now do, that market acceptance of a non-infringing product—after infringement ceases—should be considered evidence of market acceptability before infringement ceased because the so-called substitute was an available alternative product that the infringer could have made during the period of infringement. These arguments have failed. Addressing this issue directly, the court in *T.D. Williamson, Inc. v. Laymon*, 723 F.Supp. 587 (N.D.Okla.1989) stated:

> The *Panduit* test appears to require actual use of the substitute product and not merely its "availability"....
>
> Further review of the case law does not convince the Court that a product's mere "availability" qualifies it as an "acceptable substitute."

*Id.* at 596. *See also Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 824–25 (Fed.Cir. 1989) (rejecting evidence at trial as to an available alternative design because that design was not on the market).

Defendants do not cite any authorities suggesting that their position on materiality is warranted by existing law or that the weight of existing law should be overruled. In sum, the allegedly newly discovered evidence is *not* material to the judgment rendered by this court.

Therefore, because the evidence upon which defendants base this motion is clearly *not* newly discovered evidence and because the factual issues of which defendants now complain were fully briefed and extensively argued by both parties at trial,

it would *not* be a manifest injustice to permit the judgment to stand.

Pursuant to Rules 52 and 59 of the Federal Rules of Civil Procedure, defendants ask this court for a partial new trial and for reconsideration and amendment of the judgment in light of a new product developed *after* the close of trial which they believe to be non-infringing. Defendants stated at trial that they could have manufactured a flat-headed trigger pin, but for reasons of product quality and expense chose not to do so. Now, having discovered that their own marketing conclusions were apparently flawed and that using a flat-headed trigger pin has actually increased their sales, defendants ask this court, in essence, to excuse their past infringement. "If it were grounds for a new trial that facts occurring subsequent to the trial have shown inaccurate prophecy, litigation would never come to an end." *Nordin Construction Co. v. City of Nome*, 489 P.2d 455, 473 (Alaska 1971).